# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued July 12, 2019          Decided October 11, 2019

No. 19-5142

DONALD J. TRUMP, ET AL.,
APPELLANTS

v.

MAZARS USA, LLP AND COMMITTEE ON OVERSIGHT AND
REFORM OF THE U.S. HOUSE OF REPRESENTATIVES,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-01136)

*William S. Consovoy* argued the cause for appellants. With him on the briefs were *Cameron T. Norris* and *Stefan C. Passantino*.

*Duane Morley Cox*, *pro se*, filed the brief for *amicus curiae* Duane Morley Cox in support of appellants.

*Douglas N. Letter*, General Counsel, U.S. House of Representatives, argued the cause for appellee Committee on Oversight and Reform of the U.S. House of Representatives. With him on the briefs were *Todd B. Tatelman*, Deputy General Counsel, *Megan Barbero* and *Josephine Morse*, Associate

General Counsel, and *Brooks M. Hanner*, Assistant General Counsel.

*Elizabeth B. Wydra*, *Brianne J. Gorod*, and *Ashwin P. Phatak* were on the brief for *amicus curiae* Constitutional Accountability Center in support of intervenor-defendant-appellee Committee on Oversight and Reform of the U.S. House of Representatives.

*Hashim M. Mooppan*, Deputy Assistant Attorney General, U.S. Department of Justice, and *Mark R. Freeman*, *Scott R. McIntosh*, and *Gerard Sinzdak*, Attorneys, were on the brief as *amicus curiae* The United States.

Before: TATEL, MILLETT and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Dissenting opinion filed by *Circuit Judge* RAO.

TATEL, *Circuit Judge*: On April 15, 2019, the House Committee on Oversight and Reform issued a subpoena to the accounting firm Mazars USA, LLP for records related to work performed for President Trump and several of his business entities both before and after he took office. According to the Committee, the documents will inform its investigation into whether Congress should amend or supplement current ethics-in-government laws. For his part, the President contends that the Committee's investigation into his financial records serves no legitimate legislative purpose, and he has sued to prevent Mazars from complying with the subpoena. The district court granted summary judgment in favor of the Committee, and we affirm. Contrary to the President's arguments, the Committee possesses authority under both the House Rules and the Constitution to issue the subpoena, and Mazars must comply.

## 3

**I.**

Shortly after the 116th Congress convened on January 3, 2019, the new U.S. House of Representatives debated and adopted a set of rules to govern its proceedings. *See* H.R. Res. 6, 116th Cong. (2019). Like previous Congresses, the 116th established an oversight committee, the Committee on Oversight and Reform, which it charged with "review[ing] and study[ing] on a continuing basis the operation of Government activities at all levels" and which it permitted to "conduct investigations" "at any time . . . of any matter," "without regard to" other standing committees' jurisdictions. Rules of the House of Representatives, 116th Cong., Rule X, cls. 3(i), 4(c)(2) (2019) ("House Rules"); *see also id.*, cl. 1(n) (establishing the Committee on Oversight and Reform). To "carry[] out . . . [these] functions and duties," the Oversight Committee may "require, by subpoena or otherwise . . . the production of such . . . documents as it considers necessary." House Rule XI, cl. 2(m).

This case concerns one such subpoena. Issued on April 15 by the chairman of the House Committee on Oversight and Reform, Representative Elijah Cummings, to President Trump's accounting firm, the subpoena requests financial documents concerning the President and his companies covering years both before and during his presidency.

In order to explain the impetus behind the subpoena, we must go back to the Ethics in Government Act of 1978. Enacted in the wake of the Watergate scandal, that statute requires many aspiring and current government officials, including presidential candidates and sitting Presidents, to file financial disclosure reports at various times during their candidacies and incumbencies. *See* 5 U.S.C. app. 4 § 101(a), (c), (d), (f) (requiring "a candidate . . . for nomination or election to the office of President" and "the President" to "file a report

containing the information described" in section 102 of the Act). In their initial reports, presidential candidates and new Presidents must provide information concerning their income, assets, liabilities, and employers. *See id.* § 102(b) (requiring "[e]ach report filed pursuant to subsections (a), (b), and (c) of section 101" to contain such information). Once in office, sitting Presidents must file annual reports disclosing that same information plus details about any covered gifts, real estate and securities transactions, and blind trusts. *See id.* § 102(a) (requiring "[e]ach report filed pursuant to section 101(d) and (e)" to contain such information). Presidential candidates submit their reports to the Federal Election Commission, *see id.* § 103(e), while incumbent Presidents file with the Office of Government Ethics, an "executive agency" tasked with "interpreting rules and regulations . . . governing . . . the filing of financial statements," *id.* §§ 103(b), 401(a), 402(b)(3), 402(b)(6).

Last year, the Office of Government Ethics announced that it had identified an error in one of the several reports that President Trump had filed since he became a presidential candidate in 2015. Specifically, by letter dated May 16, 2018, the Acting Director of the Office of Government Ethics advised the Deputy Attorney General that, "based on the information provided" in President Trump's 2018 financial disclosure report (covering calendar year 2017), he had determined that the President's 2017 financial disclosure (covering calendar year 2016) omitted "a reportable liability under the Ethics in Government Act," namely, "a payment made by Mr. Michael Cohen," President Trump's former personal lawyer, "to a third party." Letter from David J. Apol, Acting Director, Office of Government Ethics, to Rod J. Rosenstein, Deputy Attorney General, Department of Justice 1 (May 16, 2018) ("Apol Letter"). Because President Trump's 2018 filing disclosed that in 2017 the President had reimbursed Cohen for the 2016

payment, the Acting Director concluded that "the payment made by Mr. Cohen [was] required to be reported as a liability" before it was reimbursed. *Id.* at 1; *see also* OGE Form 278e, 2017 Annual Report for Donald J. Trump, Part 8 n.3 (May 15, 2018), https://oge.app.box.com/v/Trump2018Annual278 (disclosing that "Mr. Trump fully reimbursed Mr. Cohen in 2017").

Several months later, then-Ranking Member Cummings wrote to White House Counsel seeking documents related to President Trump's payments to Cohen. *See* Letter from Elijah E. Cummings, Ranking Member, House Committee on Oversight and Reform, to Donald F. McGahn II, Counsel to the President, The White House, and George A. Sorial, Executive Vice President of the Trump Organization 4–5 (Sept. 12, 2018). That letter remained unanswered as of January 2019, when Representative Cummings, who in the intervening months had become Chairman Cummings, reiterated his request in a second letter. *See* Letter from Elijah E. Cummings, Chairman, House Committee on Oversight and Reform, to Pat Cipollone, Counsel to the President, The White House 1–2 (Jan. 8, 2019). Chairman Cummings also wrote to the new Director of the Office of Government Ethics, asking him, too, for "documents related to President Donald Trump's reporting of debts and payments to his personal attorney, Michael Cohen." Letter from Elijah E. Cummings, Chairman, House Committee on Oversight and Reform, to Emory A. Rounds III, Director, Office of Government Ethics 1 (Jan. 22, 2019).

In February, White House Counsel responded that the President would consider permitting the Committee to review, on a limited basis, a subset of the requested documents, but Chairman Cummings rejected this proposal as inadequate. *See* Letter from Elijah E. Cummings, Chairman, House Committee on Oversight and Reform, to Pat Cipollone, Counsel to the

President, The White House 1 (Feb. 15, 2019) ("Cummings Feb. 15 Letter") (stating that the President's offer to "consider providing Committee staff with the ability to review limited portions of two of the six categories of documents *in camera*" would "not obviate the need . . . to fully comply" (internal quotation marks omitted)). Citing the Oversight Committee's status as "the authorizing Committee for the Office of Government Ethics," the President's statutory obligation to "file . . . public financial disclosure report[s]," and Congress's "plenary authority to legislate and conduct oversight regarding compliance with ethics laws and regulations," Chairman Cummings urged the White House "to provide documents relevant to the Committee's investigation of these matters." *Id.* at 7–8. "These documents will help the Committee determine," he explained, "why the President failed to report . . . payments and whether reforms are necessary to address deficiencies with current laws, rules, and regulations." *Id.* at 9.

Two weeks later, Michael Cohen appeared at a hearing before the Oversight Committee. *See Hearing with Michael Cohen, Former Attorney to President Donald Trump: Hearing Before the House Committee on Oversight and Reform*, 116th Cong. (Feb. 27, 2019). He testified that he believed, based on his experience working for President Trump, that the President had "inflated his total assets when it served his purposes" in some situations and had "deflated his assets" in others. *Id.* at 13 (testimony of Michael D. Cohen). Several Committee Members questioned Cohen's credibility; he had, after all, recently pleaded guilty to various crimes, including lying to Congress. *See, e.g.*, *id.* at 7 (statement of Ranking Member Jim Jordan) ("This might be the first time someone convicted of lying to Congress has appeared again so quickly in front of Congress."); *id.* at 57 (statement of Rep. Michael Cloud) (asking Cohen to "state what you've been convicted of"). Seeking to support his testimony, Cohen produced to the

Committee several accounting documents, all of which predated Mr. Trump's presidency. Two of these documents—2011 and 2012 "Statements of Financial Condition" for Donald J. Trump—were prepared by Mazars. *See* "Donald J. Trump Statement of Financial Condition" dated June 30, 2011; "Donald J. Trump Statement of Financial Condition" dated June 30, 2012.

Chairman Cummings next wrote to Mazars. In a March 2019 letter, he explained that the statements of financial condition prepared by the firm and supplied by Cohen had "raise[d] questions about the President's representations of his financial affairs," "particularly [his] debts," "on these forms and on other disclosures." Letter from Elijah E. Cummings, Chairman, House Committee on Oversight and Reform, to Victor Wahba, Chairman and Chief Executive Officer, Mazars USA, LLP 1 (Mar. 20, 2019) ("Cummings Mar. 20 Letter"). Chairman Cummings highlighted several "specific concerns," including: (1) that "[t]he 2012 Statement of Financial Condition prepared by [Mazars]" intentionally omitted over $50 million in assets and $75 million in liabilities that "then-Candidate Trump" later disclosed on his "first publicly filed financial disclosure made . . . in 2015," (2) that read together, the 2012 statement of financial condition and 2015 financial disclosure indicated that Deutsche Bank had reduced the interest rate it was charging on a $125 million loan to then-Candidate Trump, potentially saving him "about $625,000" each year, and (3) that "both the 2011 and 2012 financial statements" noted that, before becoming a presidential candidate, Mr. Trump "ha[d] pledged" almost $20 million to a "former partner in the Trump World Tower at United Nations Plaza," who, "[a]ccording to contemporaneous reports," was possibly "the Korean conglomerate Daewoo" or a "German financial institution." *Id.* at 2–3. "To assist [its] review of these issues," the Committee requested several categories of

documents relating to President Trump's accounts going back to January 2009. *Id.* at 4.

Mazars responded that it could not provide the requested documents voluntarily. *See* Letter from Jerry D. Bernstein, Partner, Blank Rome LLP, to Elijah E. Cummings, Chairman, House Committee on Oversight and Reform 1 (Mar. 27, 2019). So, on April 12, Chairman Cummings sent a memorandum to his fellow committee members explaining his intention to issue, pursuant to the Committee's authority under House Rule X to "investigate 'any matter at any time,'" a subpoena to Mazars. Memorandum from Chairman Elijah E. Cummings to Members of the Committee on Oversight and Reform 3 (Apr. 12, 2019) ("Cummings Memo"). The Chairman identified four subject matters that, in his view, "[t]he Committee has full authority to investigate": (1) "whether the President may have engaged in illegal conduct before and during his tenure in office," (2) "whether [the President] has undisclosed conflicts of interest that may impair his ability to make impartial policy decisions," (3) "whether [the President] is complying with the Emoluments Clauses of the Constitution," and (4) "whether [the President] has accurately reported his finances to the Office of Government Ethics and other federal entities." *Id.* at 4. "The Committee's interest in these matters," he stated, "informs its review of multiple laws and legislative proposals under [its] jurisdiction." *Id.*

The subpoena issued three days later. It requested, "[w]ith respect to Donald J. Trump" and several of his affiliated businesses—including the Trump Organization, the Trump Corporation, and the Trump Old Post Office LLC—"[a]ll statements of financial condition, annual statements, periodic financial reports, and independent auditors' reports prepared, compiled, reviewed, or audited by Mazars . . . or its predecessor." Subpoena to Mazars USA, LLP, Apr. 15, 2019

("Subpoena"). Furthermore, with respect to Mazars's "preparation, compilation, review, or auditing" of those documents, the subpoena requested all related "engagement agreements or contracts" "[w]ithout regard to time"; "[a]ll underlying, supporting, or source documents and records . . . or any summaries of such documents"; and all related "memoranda, notes, and communications," including "communications related to potential concerns that . . . information . . . provided by Donald J. Trump or . . . the Trump Organization[] [was] incomplete, inaccurate, or otherwise unsatisfactory." *Id.* Narrowed somewhat from the Chairman's initial request to Mazars, the subpoena sought documents from "calendar years 2011 through 2018" "[u]nless otherwise noted." *Id.* The subpoena instructed Mazars to comply by April 29.

Before that date arrived, however, President Trump and several of his business entities (collectively, the "Trump Plaintiffs") filed this lawsuit seeking a declaratory judgment invalidating the subpoena and a permanent injunction prohibiting its enforcement. *See* Complaint at 13, *Trump v. Committee on Oversight & Reform of U.S. House of Representatives*, 380 F. Supp. 3d 76 (D.D.C. 2019) (No. 19-cv-01136) ("Complaint"). The Trump Plaintiffs also moved for a preliminary injunction, and while that motion was pending, the Committee agreed to defer Mazars's deadline to comply with the subpoena.

The district court worked quickly to provide the parties with an answer. Following the Supreme Court's direction to "give[] the most expeditious treatment" to suits seeking to enjoin congressional subpoenas, *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 511 n.17 (1975), the court "consolidate[d] [its] hearing on the preliminary injunction" with a resolution of the merits by "treat[ing] the parties' briefing"—which raised

no disputes of material fact—"as cross-motions for summary judgment," *Trump*, 380 F. Supp. 3d at 88, 90; *see also* Fed. R. Civ. P. 65(a)(2) (permitting the court, "[b]efore or after beginning the hearing on a motion for a preliminary injunction," to "advance the trial on the merits and consolidate it with the hearing"). Then, after explaining that its "analysis must be highly deferential to the legislative branch," *Trump*, 380 F. Supp. 3d at 91, the court concluded that each of the four investigative topics set forth in Chairman Cummings's April 12 memorandum represents "a subject 'on which legislation could be had,'" *id.* at 94 (quoting *McGrain v. Daugherty*, 273 U.S. 135, 177 (1927)). The court thus granted summary judgment in favor of the Oversight Committee. *See id.* at 105.

The Trump Plaintiffs now appeal, challenging the district court's grant of summary judgment to the Committee (though not its decision to treat the briefs as cross-motions for summary judgment). By agreement of the parties, Mazars need not comply with the subpoena during the pendency of this expedited appeal. *See* Oral Arg. Tr. 129. After oral argument, and at the court's invitation, the Department of Justice filed an amicus brief, and the Trump Plaintiffs and Committee responded. Our review is de novo. *See Teva Pharmaceuticals USA, Inc. v. Food & Drug Administration*, 441 F.3d 1, 3 (D.C. Cir. 2006) (reviewing de novo "the district court's legal determination" made after "consolidat[ing] [a] motion for a preliminary injunction with a final decision on the merits").

**II.**

This is hardly the first subpoena Congress has issued—legislative subpoenas are older than our country itself—and the parties draw upon the historical record to support their claims. Accordingly, before digging into the details of this case, we think it necessary to place the challenged subpoena in historical context.

The story of legislative subpoenas extends all the way back to the "emergence of [the English] Parliament," when that body, as part of its campaign to "challenge the absolute power of the monarch," asserted "plenary authority" to hold offending parties in contempt. *Watkins v. United States*, 354 U.S. 178, 188 (1957). Beginning in the late seventeenth century, Parliament armed "a host of committees" with the "powers to send for persons and papers" in aid of their "investigat[ions] . . . [into] the operations of government"—from "the conduct of the war in Ireland" to "[t]he unwarranted proclamation of martial law . . . by a commissioner of the East India Company" to "the State of the Gaols of [the] Kingdom." James M. Landis, *Constitutional Limitations on the Congressional Power of Investigation*, 40 Harv. L. Rev. 153, 162–63 (1926). Across the Atlantic, too, "[t]he privileges and powers of the [House of] Commons were naturally assumed to be an incident of the representative assemblies of the Thirteen Colonies." *Id.* at 165.

After the Revolutionary War and the Constitutional Convention, the U.S. Congress wasted little time in asserting its power to use compulsory process to investigate matters of national—and potentially legislative—importance. The House of Representatives opened the first such investigation in 1792, when it passed a resolution appointing a committee "to inquire into the causes of the failure of the late expedition under Major General St. Clair," whose troops had recently suffered an

embarrassing defeat in the Northwest Territory, and "empowered" that committee "to call for such persons, papers, and records, as may be necessary to assist [its] inquiries." 3 Annals of Congress 493 (1792); *see also* George C. Chalou, *General St. Clair's Defeat, 1792–93*, *in* 1 *Congress Investigates: A Critical and Documentary History* 1, 2 (Roger A. Bruns et al. eds., rev. ed. 2011). More investigatory committees, similarly empowered to issue subpoenas, followed. For example, in 1814, the House directed an inquiry "into the causes of the success of the enemy"—that is, the British—"in his late enterprises" in burning the Capitol, 28 Annals of Congress 310 (1814), and, in 1859, the Senate established a select committee to "inquire into the facts attending" John Brown's raid on Harpers Ferry and to "report whether . . . and what legislation may . . . be necessary . . . for the future preservation of the peace," Cong. Globe, 36th Cong., 1st Sess. 141 (1859).

But not until 1880 did "the first case reach[] [the Supreme] Court to challenge the use of compulsory process as a legislative device." *Watkins*, 354 U.S. at 193. In that case, *Kilbourn v. Thompson*, 103 U.S. 168 (1881), the Court held that the House had exceeded its investigatory authority by opening an inquiry into the bankruptcy proceedings of a firm into which the United States had invested money. The Court explained that Congress's sole route to a remedy in that bankruptcy proceeding, like that of all other dissatisfied creditors, was "by a resort to a court of justice." *Id.* at 193. Accordingly, because under those circumstances the House's investigation "could result in no valid legislation," *id.* at 195, the Court concluded that the House had impermissibly "assumed a power which could only be properly exercised by another branch of the government," *id.* at 192.

13

If *Kilbourn* created any doubt about Congress's power to conduct legislative investigations, the Supreme Court dispelled that cloud in a pair of cases arising out of alleged corruption in the administration of President Warren G. Harding. In the first, *McGrain v. Daugherty*, the Court considered a subpoena issued to the brother of then-Attorney General Harry Daugherty for bank records relevant to the Senate's investigation into the Department of Justice. Concluding that the subpoena was valid, the Court explained that Congress's "power of inquiry . . . is an essential and appropriate auxiliary to the legislative function," as "[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." 273 U.S. at 174–75. It mattered not that the Senate's authorizing resolution lacked an "avow[al] that legislative action was had in view" because, said the Court, "the subject to be investigated was . . . [p]lainly [a] subject . . . on which legislation could be had" and such legislation "would be materially aided by the information which the investigation was calculated to elicit." *Id.* at 176–77 (internal quotation marks omitted). That was enough. Although "[a]n express avowal" of the Senate's legislative objective "would have been better," the Court admonished that "the presumption should be indulged that [legislation] was the real object." *Id.* at 178.

Two years later, in *Sinclair v. United States*, 279 U.S. 263 (1929), the Court echoed many of the same refrains. In this second case, Harry Sinclair, the president of an oil company, appealed his conviction for refusing to answer a Senate committee's questions regarding his company's allegedly fraudulent lease on federal oil reserves at Teapot Dome in Wyoming. The Court, acknowledging individuals' "right to be exempt from all unauthorized, arbitrary or unreasonable inquiries and disclosures in respect of their personal and private affairs," *id.* at 292, nonetheless explained that because "[i]t was

a matter of concern to the United States," "the transaction purporting to lease to [Sinclair's company] the lands within the reserve cannot be said to be merely or principally . . . personal," *id.* at 294. The Court also dismissed the suggestion that the Senate was impermissibly conducting a criminal investigation. "It may be conceded that Congress is without authority to compel disclosures for the purpose of aiding the prosecution of pending suits," explained the Court, "but the authority of that body, directly or through its committees, to require pertinent disclosures in aid of its own constitutional power is not abridged because the information sought to be elicited may also be of use in such suits." *Id.* at 295.

The Court returned to the question of Congress's investigative authority during the Cold War, as "investigations into the threat of subversion of the United States Government" began to raise "novel questions [about] the appropriate limits of congressional inquiry" "into the lives and affairs of private citizens." *Watkins*, 354 U.S. at 195. At first, the Court avoided these thorny First Amendment issues by resolving cases on other grounds. In *United States v. Rumely*, the Court overturned a defendant's contempt-of-Congress conviction for refusing to answer a congressional committee's request for "the names of those who made bulk purchases" of "books of a particular political tendentiousness." 345 U.S. 41, 42 (1953). Rather than reach the "[g]rave" First Amendment question posed by such an inquiry, the Court interpreted the House's authorizing resolution, which instructed the committee to study "lobbying activities," as failing to permit an investigation into the sale of books. *Id.* at 45, 48. And a few years later, in *Watkins v. United States*, the Court overturned another contempt conviction, this time holding that the defendant, a labor organizer who had refused "to testify about persons who may in the past have been Communist Party members," 354 U.S. at 185, had received insufficient notice of "the 'question under inquiry'" at his

congressional hearing, *id.* at 214 (quoting 2 U.S.C. § 192). In that case, the Court took the opportunity to emphasize that although "there is no congressional power to expose for the sake of exposure," courts should avoid "testing the motives of committee members for this purpose." *Id.* at 200. Rather, the crucial inquiry is whether a "legislative purpose is being served." *Id.*

The Court soon reached the First Amendment issue it had been avoiding. In *Barenblatt v. United States*, the Court considered the case of a teacher convicted of criminal contempt for refusing, when testifying before a Subcommittee of the House Committee on Un-American Activities, to answer questions about his "past or present membership in the Communist Party." 360 U.S. 109, 126 (1959). Unlike the *Watkins* defendant, the *Barenblatt* defendant had been "sufficiently apprised of the topic under inquiry" by "other sources of . . . information," such as the Subcommittee "Chairman's statement as to why he had been called" to testify and the questions posed by the Subcommittee to previous witnesses. *Id.* at 124–25 (internal quotation marks omitted). Proceeding, then, to the "precise constitutional issue"— namely, "whether the Subcommittee's inquiry . . . transgressed the provisions of the First Amendment"—the Court explained that although "Congress may not constitutionally require an individual to disclose his . . . private affairs except in relation to" "a valid legislative purpose," such a purpose was present in that case. *Id.* at 127. Congress's "wide power to legislate in the field of Communist activity . . . and to conduct appropriate investigations in aid thereof[] is hardly debatable," said the Court, and "[s]o long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Id.* at 127, 132. Thus, given "the governmental interests . . . at stake," the Court concluded that "the First

Amendment [had] not been offended" and affirmed the defendant's conviction. *Id.* at 134.

Presidents, too, have often been the subjects of Congress's legislative investigations, though fewer of these have required judicial intervention. Historical examples stretch far back in time and broadly across subject matters. In 1832, for example, the House vested a select committee with subpoena power "to inquire whether an attempt was made by the late Secretary of War . . . [to] fraudulently [award] . . . a contract for supplying rations" to Native Americans and to "further . . . inquire whether the President . . . had any knowledge of such attempted fraud, and whether he disapproved or approved of the same." H.R. Rep. No. 22-502, at 1 (1832) (internal quotation marks omitted). Shortly after World War II, Congress's Pearl Harbor Committee published a joint report exonerating the President of "charges" that he had "tricked, provoked, incited, cajoled, or coerced Japan into attacking this Nation." S. Doc. No. 79-244, at xiii, 251 (1946). In 1987, the House established a committee to investigate the Iran-Contra Affair, including "the role of the President." H.R. Rep. No. 100-433, at 21 (1987). During that investigation, President Reagan declined to assert executive privilege, going so far as to furnish "relevant excerpts of his personal diaries" to Congress. Morton Rosenberg, Congressional Research Service, RL 30319, *Presidential Claims of Executive Privilege: History, Law, Practice and Recent Developments* 14 (Aug. 21, 2008) (internal quotation marks omitted). And in the 1990s, first the House and Senate Banking Committees and then a Senate special committee investigated President and Mrs. Clinton's involvement in the Whitewater land deal and related matters. *See* Douglas L. Kriner & Eric Schickler, *Investigating the President* 56–62 (2016) (describing the "three-year congressional investigation of Whitewater"); *see also* S. Res. 120, 104th Cong. (1995) (establishing the Senate Special Committee to Investigate

Whitewater Development Corporation and Related Matters). Thanks to a last-minute compromise between the White House and the Senate, the courts were kept out of a dispute over whether the special committee could subpoena meeting notes taken by President Clinton's former lawyer. *See* Louis Fisher, Congressional Research Service, RL 31836, *Congressional Investigations: Subpoenas and Contempt Power* 16–18 (Apr. 2, 2003).

Of all the historical examples, perhaps the most high-profile congressional investigation into a President—and the only one we have found that produced an appellate-level judicial opinion—was Congress's investigation into President Nixon. The Senate created the Senate Select Committee on Presidential Campaign Activities, better known as the Senate Watergate Committee, to investigate "illegal, improper, or unethical activities engaged in by *any* persons" involved in a campaign "conducted by . . . *any* person seeking nomination or election . . . for the office of the President of the United States" during the "Presidential election of 1972." S. Res. 60, 119 Cong. Rec. 3255, 93rd Cong. § 1(a) (1973) (emphasis added). In *Senate Select Committee on Presidential Campaign Activities v. Nixon*, our court was asked to decide whether President Nixon had "a legal duty to comply with" a subpoena issued by the Senate Watergate Committee for "taped recordings of five conversations . . . discussing alleged criminal acts." 498 F.2d 725, 726–27 (D.C. Cir. 1974) (en banc). President Nixon, apparently taking no issue with the general power of congressional committees to subpoena sitting Presidents, instead asserted executive privilege over the individual tapes requested, arguing that they "[could] []not be made public consistent with the confidentiality essential to the functioning of the Office of the President." *Id.* at 727 (internal quotation marks omitted). In the end, we agreed with the President: although the "presumptive[] privilege[]" protecting

"presidential conversations" could "be overcome . . . by an appropriate showing of public need," *id.* at 730 (internal quotation marks omitted), we explained, the Committee had failed to make such a showing "in the peculiar circumstances of [that] case," *id.* at 733. But even though the Senate Watergate Committee ultimately lost, *Senate Select Committee* strongly implies that Presidents enjoy no blanket immunity from congressional subpoenas. After all, if such immunity exists, it would have been wholly unnecessary for the court to explore the subpoena's particulars and to weigh "the public interest [in] favor[] [of] confidentiality" against a "showing of need by another institution of government"—that is, Congress. *Id.* at 730.

All told, from Congress's centuries-long experience issuing legislative subpoenas, and the courts' (somewhat less frequent) experience reviewing them, a few principles emerge—principles that control our resolution of this case.

As an initial matter, "whether [a] committee [is] authorized [to] exact the information" it has subpoenaed "must first be settled before . . . consider[ing] whether Congress had the [constitutional] power to confer upon the committee the authority which it claim[s]." *Rumely*, 345 U.S. at 42–43. In other words, it matters not whether the Constitution would give Congress authority to issue a subpoena if Congress has given the issuing committee no such authority.

That said, once a committee has been delegated "[t]he power of the Congress to conduct investigations," that constitutional authority "is broad." *Watkins*, 354 U.S. at 187; *accord Eastland*, 421 U.S. at 504 n.15 ("[T]he power to investigate is necessarily broad."); *Barenblatt*, 360 U.S. at 111 (describing Congress's investigative power as "broad"); *Quinn v. United States*, 349 U.S. 155, 160 (1955) (same);

*McGrain*, 273 U.S. at 173–74 (same). "It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes," "[i]t includes surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them," and "[i]t comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste." *Watkins*, 354 U.S. at 187. In short, "[a] legislative inquiry may be as broad, as searching, and as exhaustive as is necessary to make effective the constitutional powers of Congress." *Townsend v. United States*, 95 F.2d 352, 361 (D.C. Cir. 1938). Expansive as it is, however, Congress's subpoena power is subject to several key constraints.

First, because "the power of Congress . . . to investigate" is "co-extensive with [its] power to legislate," *Quinn*, 349 U.S. at 160, Congress may in exercising its investigative power neither usurp the other branches' constitutionally designated functions nor violate individuals' constitutionally protected rights. Congress may not conduct itself as "a law enforcement or trial agency," as "[t]hese are functions of the executive and judicial departments." *Watkins*, 354 U.S. at 187. And Congress lacks any "general power to expose where the predominant result can only be an invasion of the private rights of individuals." *Id.* at 200.

Next, precisely because "[t]he scope of [Congress's] power of inquiry . . . is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution," *Barenblatt*, 360 U.S. at 111, Congress may investigate only those topics on which it could legislate, *see Quinn*, 349 U.S. at 161 (stating that Congress's "power to investigate" does not "extend to an area in which Congress is forbidden to legislate"). If no constitutional statute may be

enacted on a subject matter, then that subject is off-limits to congressional investigators.

And finally, congressional committees may subpoena only information "calculated to" "materially aid[]" their investigations. *McGrain*, 273 U.S. at 177. Even a valid legislative purpose cannot justify a subpoena demanding irrelevant material.

With these principles in mind, we proceed to the particulars of this case. The Trump Plaintiffs dispute both the Committee's authority from the House to issue the subpoena and the House's authority under the Constitution to confer the same. For reasons that shall become clear later, we address these questions in reverse order.

## III.

At the outset, we emphasize that to resolve this case we need not decide whether the Constitution permits Congress, in the conduct of a legislative—that is, non-impeachment—investigation, to issue subpoenas to a sitting President. That issue is not presented here because, quite simply, the Oversight Committee has *not* subpoenaed President Trump. Rather, the Committee has issued its subpoena to Mazars, an accounting firm with whom President Trump has voluntarily shared records from his time as a private citizen, as a candidate, and as President. Neither the Trump Plaintiffs nor the Department of Justice argues that the Constitution denies Congress authority to subpoena non-governmental custodians of the President's financial information. *Cf.* Oral Arg. Tr. 50 (stating that assuming a committee has authority from the House to issue a subpoena, the relevant inquiry is whether "the subpoena ha[s] a legitimate legislative purpose"); *id.* at 68 (denying that the President is "absolutely immune from any oversight whatsoever"); Department Br. 7–8. Nor do the Trump Plaintiffs

assert any property rights in, or executive or other recognized evidentiary privilege over, the subpoenaed information. *See* Complaint (failing to assert any claim of privilege or property right in the subpoenaed materials); Oral Arg. Tr. 15 (confirming that the President asserts no claim of executive privilege or immunity); *see also Couch v. United States*, 409 U.S. 322, 335 (1973) (recognizing that "no confidential accountant-client privilege exists under federal law, and no state-created privilege has been recognized in federal cases"); *Peerenboom v. Marvel Entertainment, LLC*, 148 A.D.3d 531, 532 (N.Y. App. Div. 1st Dep't 2017) (holding that "[t]here is no accountant-client privilege in [New York]"). Instead, the Trump Plaintiffs ask us to do what courts have done ever since *Kilbourn*: to determine "[w]hether the Committee's subpoena . . . is 'related to, and in furtherance of, a legitimate task of the Congress.'" Appellants' Br. 5 (quoting *Watkins*, 354 U.S. at 187); *see also* Department Br. 10 (quoting same).

Taking up that question, we consider whether the Oversight Committee is pursuing a legislative, as opposed to a law-enforcement, objective; whether the Committee is investigating a subject on which constitutional legislation "could be had," *McGrain*, 273 U.S. at 177; and whether the challenged subpoena seeks information sufficiently relevant to the Committee's legislative inquiry.

**A.**

While "[t]he power of the Congress to conduct investigations is inherent in the legislative process," *Watkins*, 354 U.S. at 187, that authority "must not be confused with any of the powers of law enforcement," which "are assigned under our Constitution to the Executive and the Judiciary," *Quinn*, 349 U.S. at 161. The Trump Plaintiffs contend that the Committee has crossed this constitutional line, veering from permissible legislative investigation into impermissible law

enforcement. In assessing whether Congress has strayed outside its legislative lane, we face two analytical hurdles.

First, the case law is quite stingy in describing what impermissible congressional law enforcement might look like in practice. The Supreme Court has framed its primary instruction on this point in the negative: the fact that an investigation might expose criminal conduct does not transform a legislative inquiry into a law-enforcement endeavor. As the Court explained in *Sinclair*, Congress's "authority . . . to require pertinent disclosures in aid of its own constitutional power is not abridged" merely "because the information sought to be elicited may also be of use" in criminal prosecutions. 279 U.S. at 295. "Nor [is] it a valid objection," said the Court in *McGrain*, that an investigation "might possibly disclose crime or wrongdoing." 273 U.S. at 179–80. Indeed, thanks to the Court's clarity on this matter, all parties here agree that "a permissible legislative investigation does not become impermissible merely because it might expose law violations." Appellants' Br. 33 (internal quotation marks omitted); *see also* Appellee's Br. 44 ("The fact that the . . . underlying conduct might also be unlawful . . . does not invalidate the inquiry.").

Second, the Supreme Court has made plain that "in determining the legitimacy of a congressional act," courts may "not look to the motives alleged to have prompted it." *Eastland*, 421 U.S. at 508; *see also Watkins*, 354 U.S. at 200 (stating that "a solution to our problem is not to be found in testing the motives of committee members for [legislative] purpose"); *Barenblatt*, 360 U.S. at 132 ("So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power."). This is true both because "it is not for [the courts] to speculate as to the motivations that may have

prompted the decision of individual [committee] members," *Wilkinson v. United States*, 365 U.S. 399, 412 (1961), and because, in any event, those "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served," *Watkins*, 354 U.S. at 200. On this point, too, the parties agree. *See* Appellants' Reply Br. 11 ("To determine whether a subpoena is pursuing [the] impermissible goal" of law enforcement, "courts . . . cannot delve into legislators' hidden motives . . . ."); Appellee's Br. 43 ("[C]ourts cannot examine Congress's motives to determine the validity of a subpoena.").

Thus stranded between Charybdis and Scylla, we must determine whether Congress's "legislative purpose is being served," *Watkins*, 354 U.S. at 200, without taking into account either whether the investigation *will reveal*, or whether the investigators are *motivated to reveal*, criminal conduct. According to the Committee, the way out of this dilemma is simple: just "'presume Congress is acting in furtherance of its constitutional responsibility to legislate and . . . defer to congressional judgments about what Congress needs to carry out that purpose.'" Appellee's Br. 46 (quoting *Trump*, 380 F. Supp. 3d at 82). In most cases, such a presumption would be entirely appropriate. As the Court instructed in *Tenney v. Brandhove*, "[t]o find that a committee's investigation has exceeded the bounds of legislative power it must be *obvious* that there was a usurpation of functions exclusively vested in the Judiciary or the Executive," 341 U.S. 367, 378 (1951) (emphasis added); or, as it said in *McGrain*, even absent an "express avowal" by Congress that the purpose of an "investigation was to aid it in legislating," "the presumption should be indulged that this was the real object," 273 U.S. at 178.

The trouble, however, is that this deferential presumption finds its roots in the principle that "every reasonable indulgence of legality must be accorded to the actions of a coordinate branch of our Government," *Watkins*, 354 U.S. at 204, and here, we arguably confront not one but two "coordinate branch[es] of our Government"—Congress and the President. We say "arguably" because it is far from obvious that President Trump, proceeding in his individual capacity, carries the mantle of the Office of the President in this case. The challenged subpoena seeks financial records totally unrelated to any of the President's official actions; indeed, for six of the eight years covered by the subpoena, President Trump was merely Mr. Trump or Candidate Trump. *Cf. Clinton v. Jones*, 520 U.S. 681, 697 (1997) ("[W]e have never suggested that the President . . . has an immunity that extends beyond the scope of any action taken in an official capacity."). That said, the fact remains that the constitutional authority assigned to the Office of the President can be exercised only by the flesh-and-blood human occupying that office, so as a practical matter, a restriction on the person might constrain the branch of government. *Cf. In re Lindsey*, 158 F.3d 1263, 1286 (D.C. Cir. 1998) ("Because the Presidency is tied so tightly to the persona of its occupant[,] . . . official matters . . . often have personal implications for a President" and vice versa.) (Tatel, J., concurring in part and dissenting in part). In short, although the challenged subpoena, which seeks financial documents related to President Trump in his pre-presidential, private capacities, presents no direct inter-branch dispute, separation-of-powers concerns still linger in the air. *Cf. United States v. Nixon*, 418 U.S. 683, 702 (1974) (explaining that where a pretrial "subpoena is directed to a President of the United States, appellate review, in deference to a coordinate branch of Government, should be particularly meticulous").

Assuming for the moment that we owe Congress no deference, we must figure out how to assess whether the subpoena serves "a valid legislative purpose," *Barenblatt*, 360 U.S. at 127, without resorting to the "presumption" "that [legislation] was the real object" of Congress's investigation, *McGrain*, 273 U.S. at 178. The Trump Plaintiffs, arguing that "'purpose' and 'motive'" are different, suggest that we may rely upon "available evidence"—that is, "what [the Committee] is doing and what it has stated publicly"—to "discern for [ourselves] what the Committee's *actual* purpose is." Appellants' Br. 29–30. Following that course, we conclude that the public record reveals legitimate legislative pursuits, not an impermissible law-enforcement purpose, behind the Committee's subpoena. As a result, we need not decide precisely what deference we owe Congress, as we would reach the same conclusion absent any deference at all.

We start with Chairman Cummings's April 12 memorandum, in which he laid out the "need for [the] subpoena" issued to Mazars. Cummings Memo 1. As the document most closely tied in time and subject matter to the subpoena, that memorandum offers a natural starting point for our analysis. *Cf. Shelton v. United States*, 404 F.2d 1292, 1297 (D.C. Cir. 1968) (identifying "the opening statement of the Chairman at [committee] hearings" and the "statements of the members of the committee" as "'sources [that might] indicate the existence of a legislative purpose'" (quoting *Wilkinson*, 365 U.S. at 410)). The Trump Plaintiffs and the Committee appear to agree, as does the dissent. *See* Appellee's Br. 30–31 (relying on Chairman Cummings's memorandum to supply a list of the subjects of the Committee's investigations); Appellants' Reply Br. 20–21 (dismissing as "retroactive rationalizations" potential legislative purposes that did not "appear[] in the Chairman's memorandum" (alterations and internal quotation

marks omitted)); Dissenting Op. at 2 (tracing the "reasons" for the subpoena to Chairman Cummings's Memo).

Chairman Cummings's memorandum identifies four questions that the subpoena will help answer: "whether the President may have engaged in illegal conduct before and during his tenure in office," "whether [the President] has undisclosed conflicts of interest that may impair his ability to make impartial policy decisions," "whether [the President] is complying with the Emoluments Clauses of the Constitution," and "whether [the President] has accurately reported his finances to the Office of Government Ethics and other federal entities." Cummings Memo 4. But even more important than this list, the Chairman's very next sentence explains that "[t]he Committee's interest in these matters informs [the Committee's] review of multiple laws and legislative proposals under [its] jurisdiction." *Id.* Such an "express avowal of the [Committee's] object" offers strong evidence of the Committee's legislative purpose. *McGrain*, 273 U.S. at 178.

The April memorandum does not stand alone. Just two months earlier, Chairman Cummings articulated the same remedial legislative objective in his letter to White House Counsel. In that letter, he explained that obtaining the requested financial documents would "help the Committee determine why the President failed to report . . . payments and whether reforms are necessary to address deficiencies with current laws, rules, and regulations." Cummings Feb. 15 Letter 9. "Since the earliest days of our republic," the Chairman emphasized, "Congress has investigated how existing laws are being implemented and whether changes to the laws are necessary." *Id.* And "[f]or decades," he concluded, "this has included laws relating to financial disclosures required of the President." *Id.*

What's more, although the House is under no obligation to enact legislation after every investigation, the fact that the House has pending several pieces of legislation related to the Committee's inquiry offers highly probative evidence of the Committee's legislative purpose. *See In re Chapman*, 166 U.S. 661, 670 (1897) ("[I]t is certainly not necessary" to identify future legislation "in advance."); *see also Eastland*, 421 U.S. at 509 ("The very nature of the investigative function—like any research—is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises."). The House has already passed one such bill, H.R. 1, which requires Presidents to list on their financial disclosures the liabilities and assets of any "corporation, company, firm, partnership, or other business enterprise in which" they or their immediate family have "a significant financial interest." H.R. 1, 116th Cong. § 8012 (2019). Another bill currently pending, H.R. 706, would require both sitting Presidents and presidential candidates to "submit to the Federal Election Commission a copy of the individual's income tax returns" for the preceding nine or ten years, respectively. H.R. 706, 116th Cong. § 222 (2019). And still another, H.R. 745, would amend the Ethics in Government Act to make the Director of the Office of Government Ethics removable only for cause. *See* H.R. 745, 116th Cong. § 3 (2019) (making the Director "subject to removal only for inefficiency, neglect of duty, or malfeasance in office").

Despite these indicia of legislative purpose, the Trump Plaintiffs contend that "[t]he subpoena's *actual* purpose is law enforcement." Appellants' Reply Br. 9 (emphasis added). They make four principal arguments.

First, the Trump Plaintiffs question whether the Committee's avowals of legislative purpose are genuine. Quoting our court's opinion in *Shelton v. United States*, they argue that "Congress cannot cure [a] constitutional violation

through 'the mere assertion of a need to consider remedial legislation.'" Appellants' Br. 34 (quoting *Shelton*, 404 F.2d at 1297). But the Trump Plaintiffs stop at a key conjunction. "[T]he mere assertion of a need to consider 'remedial legislation' may not alone justify an investigation," we explained in *Shelton*. 404 F.2d at 1297. "[*B*]*ut*," we continued, "when the purpose asserted is supported by references to specific problems which in the past have been or which in the future could be the subjects of appropriate legislation, then we cannot say that a committee of the Congress exceeds its broad power." *Id.* (emphasis added).

That is just this case. We do not confront an insubstantial, makeweight assertion of remedial purpose. To the contrary, Chairman Cummings's April 12 memorandum to his colleagues lists four investigative topics; his March 20 letter to Mazars details several "specific concerns raised by the [firm's] financial statements," Cummings Mar. 20 Letter 2; and his February 15 letter to White House Counsel states his intent to assess whether "changes to the laws . . . relating to financial disclosures required of the President" "are necessary," Cummings Feb. 15 Letter 9. These "references to specific problems," *Shelton*, 404 F.2d at 1297, together with actual legislation now pending, *see supra* at 26–27, are more than sufficient to demonstrate the Committee's interest in investigating possible remedial legislation.

Second, the Trump Plaintiffs contend that, far from "avow[ing]" a legislative intent, *McGrain*, 273 U.S. at 178, Chairman Cummings's memorandum and statements by other Representatives have "affirmatively and definitely avowed an unlawful law-enforcement purpose," Appellants' Reply Br. 13 (internal quotation marks omitted); *see also* Dissenting Op. at 43. In particular, the Trump Plaintiffs take issue with the first investigative rationale offered in Chairman Cummings's

memorandum: "to investigate whether the President may have engaged in illegal conduct before and during his tenure in office." Cummings Memo 4. But even if such an investigation would not by itself serve a legitimate legislative purpose, we can easily reject the suggestion that this rationale spoils the Committee's otherwise valid legislative inquiry. Simply put, an interest in past illegality can be wholly consistent with an intent to enact remedial legislation.

Take *Hutcheson v. United States*, in which the Court considered the activities of a Senate committee tasked with "investigat[ing] . . . the extent to which criminal . . . practices or activities" were occurring "in the field of labor-management relations" and "determin[ing] whether any changes [were] required in the laws . . . to protect . . . against . . . such practices or activities." 369 U.S. 599, 600–01 (1962) (quoting S. Res. 74, 85th Cong. (1957)). The president of the United Brotherhood of Carpenters and Joiners of America, called before the committee to testify regarding whether he had used "union funds . . . to 'fix' a 1957 criminal investigation . . . by a state grand jury," *id.* at 603, refused to answer such questions and was convicted of criminal contempt, *see id.* at 605. Even though "[t]he Committee's concern . . . was to discover whether . . . [union] funds . . . had been used . . . to bribe a state prosecutor," and even though "[i]f these suspicions were founded, they might . . . have warranted a separate state prosecution for obstruction of justice," the Supreme Court nonetheless affirmed the contempt conviction. *Id.* at 617–18. What mattered to the Court was that the committee's investigation into the details of the defendant's illegal conduct "would have supported remedial federal legislation for the future." *Id.* at 617. "[S]urely," the Court concluded, "a congressional committee . . . engaged in a legitimate legislative investigation need not grind to a halt whenever . . . crime or

wrongdoing is disclosed." *Id.* at 618 (internal citations omitted).

*Sinclair* teaches a similar lesson. Shortly before the Senate summoned the oil tycoon Sinclair to testify, it had passed a joint resolution "recit[ing] that [his company's] leases . . . were executed under circumstances indicating fraud and corruption" and "direct[ing] the President . . . to prosecute such . . . proceedings, civil and criminal, as were warranted by the facts." 279 U.S. at 289. When Sinclair appeared for the hearing, the Senate committee considered but rejected a motion that would have prohibited "inquir[ies] . . . relat[ing] to pending controversies before any of the Federal courts in which Mr. Sinclair [was] a defendant." *Id.* at 290. "If we do not examine Mr. Sinclair about those matters," one committee member lamented, "there is not anything else to examine him about." *Id.* Despite all this, the Court held that "[t]he record [did] not sustain [Sinclair's] contention that the investigation was avowedly not in aid of legislation." *Id.* at 295. The failed motion and the member's statement were "not enough to show that the committee intended to depart from the purpose to ascertain whether additional legislation might be advisable," explained the Court, because "[i]t [was] plain that investigation of the matters involved in" pending or future "suits . . . might directly aid in respect of legislative action." *Id.*

So too here. Like the committees in *Hutcheson* and *Sinclair*, the Oversight Committee has expressed an interest in determining whether and how illegal conduct has occurred. But also like the committees in *Hutcheson* and *Sinclair*—indeed, even more so—the Oversight Committee has repeatedly professed that it seeks to investigate remedial legislation. In fact, the House has even put its legislation where its mouth is: it has passed one bill pertaining to the information sought in the subpoenas and is considering several others. *See supra* at

26–27. The Committee's interest in alleged misconduct, therefore, is in direct furtherance of its legislative purpose.

Third, the Trump Plaintiffs argue that the subpoena's "laser-focus[] on the businesses and finances of one person" evinces "a particularity that is the hallmark of executive and judicial power." Appellants' Br. 35. But again, Supreme Court precedent forecloses this contention. In *McGrain*, for example, the Senate authorized a select committee "to investigate . . . the alleged failure of Harry M. Daugherty, Attorney General of the United States, to prosecute properly violators of" anti-trust laws and "further directed [the committee] to inquire into, investigate and report . . . the activities of the said Harry M. Daugherty, Attorney General, and any of his assistants . . . which would in any manner tend to impair their efficiency or influence as representatives of the government of the United States." 273 U.S. at 151–52 (internal quotation marks omitted). Untroubled by the resolution's "direct reference to the then Attorney General by name," the Court held that "the resolution and proceedings" of the investigatory committee "g[a]ve no warrant for thinking the Senate was attempting or intending to try the Attorney General . . . before its committee for any crime or wrongdoing." *Id.* at 179.

The lesson of *McGrain* is that an investigation may properly focus on one individual if that individual's conduct offers a valid point of departure for remedial legislation. Again, such is the case here. It is not at all suspicious that the Committee would focus an investigation into presidential financial disclosures on the accuracy and sufficiency of the sitting President's filings. That the Committee began its inquiry at a logical starting point betrays no hidden law-enforcement purpose.

Finally, the Trump Plaintiffs detect something untoward in

the Committee's interest in the President's finances. "If this subpoena is valid," they argue, "then Congress is free to investigate every detail of a President's personal life, with endless subpoenas to his accountants, bankers, lawyers, doctors, family, friends, and anyone else with information that a committee finds interesting." Appellants' Reply Br. 24.

But unlike a subpoena to, say, a doctor or an attorney, the congressional request at issue in this case implicates no material subject to a recognized legal privilege or an asserted property interest. *See supra* at 20. Moreover, as the Court explained in *Sinclair*, although Congress may not make "unauthorized, arbitrary or unreasonable inquiries" into individuals' "personal and private affairs," Congress most assuredly does possess authority "to require pertinent disclosures in aid of its . . . constitutional power" when those affairs become a "matter of [public] concern" amenable to a legislative solution. 279 U.S. at 292, 294–95; *see also Barenblatt*, 360 U.S. at 127 (explaining that "Congress may . . . constitutionally require an individual to disclose his political relationships or other private affairs" if "in relation to" "a valid legislative purpose"). The same rationale applies here. Whether current financial disclosure laws are successfully eliciting the right information from the sitting President, occupant of the highest elected office in the land, is undoubtedly "a matter of concern to the United States." *Sinclair*, 279 U.S. at 294; *cf. Washington Post Co. v. U.S. Department of Health & Human Services*, 690 F.2d 252, 265 (D.C. Cir. 1982) ("[T]he [Ethics in Government] Act shows Congress' general belief that public disclosure of conflicts of interest is desirable despite its cost in loss of personal privacy.").

In its amicus brief, the Justice Department argues that the subpoena is invalid for still another reason, namely that the

House (or at least the Committee) failed to offer a "clear, *specific* statement . . . of the legislative purpose that it believes justifies its subpoena." Department Br. 12 (emphasis added). In the Department's view, general indicia of legislative purpose are not enough; the House must identify "with sufficient particularity the subject matter of potential legislation." *Id.* at 14. In support, the Department cites *Watkins*, where, it argues, "the Supreme Court demanded just such a clear statement of purpose." *Id*. at 13. But the *Watkins* Court demanded no such thing. That case concerned not the legitimacy of an investigative subpoena, but rather an appeal of a criminal conviction for contempt of Congress under 2 U.S.C. § 192, which makes it a misdemeanor to refuse to answer any question posed by a member of Congress "pertinent to the question under inquiry." *Watkins*, 354 U.S. at 207 (quoting 2 U.S.C. § 192). Because the committee's "authorizing resolution, the remarks of the chairman or members of the committee, [and] even the nature of the proceedings themselves," *id.* at 209, failed to articulate "the 'question under inquiry,'" *id.* at 214, the Court reversed the conviction, holding that an individual risking criminal contempt must "have knowledge of the subject to which the interrogation is deemed pertinent . . . with the same degree of explicitness and clarity that the Due Process Clause requires in the expression of any element of a criminal offense." *Id*. at 208–09. The fact that the *Watkins* Court probed the committee's statements in an attempt to remedy "the vice of vagueness"—present for criminal contempt of Congress, "as in all other crimes," *id*. at 209—provides no support for the Department's contention that Congress must identify its legislative purpose "with sufficient particularity" in order to justify an investigative subpoena. *See Barenblatt,* 360 U.S. at 123 (explaining that in *Watkins,* the Court "rest[ed] [its] decision on [the] ground" that "a conviction for contempt under 2 U.S.C. § 192 cannot stand unless the questions asked are pertinent to the subject matter of the investigation").

Far from finding support in *Watkins*, the Department's argument conflicts with binding Supreme Court precedent. Over a century ago, the Court made clear in *In re Chapman* that it is "certainly not necessary that the resolutions should declare in advance what the [Congress] meditate[s] doing when the investigation [i]s concluded." 166 U.S. at 670. The Court has twice reiterated this holding, stating in *McGrain* that "it was not essential that the Senate declare in advance what it meditated doing," 273 U.S. at 172, and then in *Eastland*— issued nearly two decades after *Watkins*—that "to be a valid legislative inquiry there need be no predictable end result," 421 U.S. at 509. After all, the purpose of an investigation, as the Court explained in *McGrain*, is to gather "information respecting the conditions which the legislation is intended to affect or change," 273 U.S. at 174–75; it is, as the Court added in *Eastland*, "research" that informs future Congressional action, 421 U.S. at 509. Congress's decision whether, and if so how, to legislate in a particular area will necessarily depend on what information it discovers in the course of an investigation, and its preferred path forward may shift as members educate themselves on the relevant facts and circumstances. Requiring Congress to state "with sufficient particularity" the legislation it is considering *before* it issues an investigative subpoena would turn the legislative process on its head.

Moreover, it is not at all clear what such a statement would accomplish. The Department suggests that a clear statement rule is "mandate[d]" by the "particular separation-of-powers issues that arise when Congress attempts to compel the President to produce information." Department Br. 9. Setting aside the fact that this subpoena, which is addressed to Mazars, "compel[s] the President to produce" nothing, we still see no justification in the Department's brief for why specificity is required in this scenario as opposed to any other. To be sure,

"[t]he President occupies a unique position in the constitutional scheme." *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982). But that unique position has little bearing on our ability to determine whether Congress has strayed from the realm of legitimate legislation into improper law enforcement—an inquiry that, as we have just demonstrated, we can meaningfully conduct without the specific articulation the Department seeks. Nor does the Department explain how specificity would meaningfully protect the President beyond simply burdening Congress's exercise of its own Article I power.

The Department's argument also ignores how much Congress has already revealed about its legislative objectives. In his February 15 letter and April 12 memorandum, Chairman Cummings explained that the Committee was reviewing "multiple laws and legislative proposals under [its] jurisdiction," Cummings Memo 4, including whether "changes . . . are necessary" to "laws relating to financial disclosures required of the President," Cummings Feb. 15 Letter 9. The House has already passed H.R. 1, which would require Presidents to disclose businesses in which they or their immediate families have significant interests, and is considering legislation which would require Presidential candidates and Presidents to submit their income tax returns to the Federal Election Commission and make the Director of the Office of Government Ethics removable only for cause. *See supra* at 26–27. To be sure, as the Department points out, the House passed H.R. 1 without the information the subpoena seeks. But House passage is far from the end of the legislative process. Information revealed by the subpoena could inform the Senate as it considers the bill, as well as any subsequent conference committee or the House itself, should it reconsider the bill post-conference.

Based on all the foregoing, we conclude that in issuing the challenged subpoena, the Committee was engaged in a "legitimate legislative investigation," *Hutcheson*, 369 U.S. at 618, rather than an impermissible law-enforcement inquiry. We next assess whether that legislative investigation concerned a subject "on which legislation could be had." *McGrain*, 273 U.S. at 177.

**B.**

Because "Congress may only investigate into those areas in which it may potentially legislate or appropriate," *Barenblatt*, 360 U.S. at 111, a congressional committee may issue only those subpoenas that are "intended to gather information about a subject on which legislation may be had," *Eastland*, 421 U.S. at 508; *see also McGrain*, 273 U.S. at 177 (stating that "the subject" of investigation "was one on which legislation could be had"). The Trump Plaintiffs argue that the challenged subpoena fails this test because, in their view, "[t]he subpoena could not result in valid legislation regarding the President." Appellants' Reply Br. 17.

In addressing this argument, we emphasize that the relevant inquiry is whether legislation "*may* be had," *Eastland*, 421 U.S. at 508 (emphasis added), not whether constitutional legislation *will* be had. Accordingly, we first define the universe of possible legislation that the subpoena provides "information about," *id.*, and then consider whether Congress could constitutionally enact any of those potential statutes.

We must, however, tread carefully. As the Committee points out, our limited judicial role gives us no authority to reach out and "[s]trik[e] down a statute before it is even enacted." Appellee's Br. 41; *see also Nashville, Chattanooga & St. Louis Railway v. Wallace*, 288 U.S. 249, 262 (1933) (explaining that courts may not make "abstract

determination[s] . . . of the validity of a statute" or issue "decision[s] advising what the law would be on an uncertain or hypothetical state of facts"). That said, as the Trump Plaintiffs observe, *see* Appellants' Br. 21 ("[b]ecause valid legislation could not 'be had' if it would be unconstitutional, the court ha[s] to decide whether this subpoena is designed to advance unconstitutional legislation"), the only way to determine whether the Committee's investigation informs "a subject on which legislation may be had" is to ask, abstract as the inquiry may be, whether "legislation *may* be had" on that "subject," *Eastland*, 421 U.S. at 508 (emphasis added). Although we must avoid passing on the constitutionality of hypothetical statutes, we must also fulfill our responsibility to decide the case in front of us, even if the road to resolution passes through an issue of constitutional law. *See Cohens v. Virginia*, 19 U.S. 264, 404 (1821) ("The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the [C]onstitution. . . . [W]e must decide [a case] if it be brought before us."). Accordingly, in order to resolve *this* case, we need to identify a statutory litmus test. The Committee and the Trump Plaintiffs each offer one, but neither quite fits our needs.

The Committee urges us to consider whether any law "concerning government ethics and conflicts of interest affecting Executive Branch officials" could pass constitutional muster. Appellee's Br. 30. But this test is too broad. The challenged subpoena—or, more specifically, the portion of the subpoena that seeks a sitting President's financial information—would produce no relevant "information about," *id.*, laws that apply to ordinary Executive Branch employees. Because "[t]he President occupies a unique position in the constitutional scheme," *Fitzgerald*, 457 U.S. at 749, Congress's constitutional authority to regulate the President's conduct is significantly more circumscribed than its power to regulate that of other federal employees, *see supra* at 35–36.

Just as a congressional committee could not subpoena the President's high school transcripts in service of an investigation into K-12 education, nor subpoena his medical records as part of an investigation into public health, it may not subpoena his financial information except to facilitate an investigation into *presidential* finances. Thus, to determine whether the records of pre-Candidate, Candidate, and President Trump provide "information about a subject on which legislation may be had," *Eastland*, 421 U.S. at 508, we must train our attention on laws that apply to Presidents (and presidential hopefuls).

In that vein, the Trump Plaintiffs urge us to focus on the constitutionality of laws that "impose conflict-of-interest restrictions on the President." Appellants' Br. 37. As the Trump Plaintiffs point out, such restrictions raise difficult constitutional questions. Statutes mandating divestment from financial interests or recusal from conflicted matters might impermissibly "disempower [Presidents] from performing some of the functions prescribed [by] the Constitution or . . . establish a qualification for . . . serving as President . . . beyond those contained in the Constitution." Memorandum from Laurence H. Silberman, Deputy Attorney General, to Richard T. Burress, Office of the President, Re: Conflict of Interest Problems Arising out of the President's Nomination of Nelson A. Rockefeller to be Vice President Under the Twenty-Fifth Amendment to the Constitution 5 (Aug. 28, 1974) ("Silberman Memo"). But we need not grapple with those constitutional issues because the Mazars subpoena seeks information related to a class of statutes that impose far fewer burdens than laws requiring Presidents to change their behavior based on their financial holdings. This less burdensome species of law would require the President to do nothing more than *disclose* financial information. Such statutes might amend the Ethics in Government Act, for example, to require Presidents and

presidential candidates to file reports more frequently, to include information covering a longer period of time, or to provide new kinds of information such as past financial dealings with foreign businesses or current liabilities of closely held companies. We take this category of statutes as the appropriate object of our litmus test in this case.

The Trump Plaintiffs argue that the Constitution prohibits even these. Relying on Chief Justice Burger's concurrence in *Nixon v. Fitzgerald*, they contend that financial disclosure laws unconstitutionally "'impinge[] on and hence interfere[] with the independence that is imperative to the functioning of the office of a President.'" Appellants' Br. 44 (quoting *Fitzgerald*, 457 U.S. at 761 (Burger, C.J., concurring)).

But that is not the rule—at least not quite. As the Court explained in *Nixon v. Administrator of General Services* (*Nixon II*), the mere act of "regulat[ing] . . . Presidential materials," "without more," does not "constitute[] . . . a violation of the principle of separation of powers." 433 U.S. 425, 441 (1977). Instead, rejecting "the argument that the Constitution contemplates a complete division of authority between the three branches," the Court reaffirmed its reliance on "the more pragmatic, flexible approach of Madison in the Federalist[] Papers." *Id.* at 442–43. "In . . . dividing and allocating the sovereign power among three coequal branches," the Court explained, "the Framers of the Constitution" did not intend "the separate powers . . . to operate with absolute independence." *Id.* at 443 (internal quotation marks and emphasis omitted). The Court therefore announced the following test: "in determining whether [a statute] disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Id.* Applying this rule, we have no basis for concluding that complying with financial

disclosure laws would in any way "prevent[] the [President] from accomplishing [his] constitutionally assigned functions." *Id.*

The most persuasive evidence on this score comes from the Constitution itself. The very same document that "vest[s]" "[t]he executive Power . . . in [the] President," U.S. Const. art. II, § 1, cl. 1, and directs him to "take Care that the Laws be faithfully executed," *id.* art. II, § 3, also imposes two separate requirements pertaining to the President's private finances. The first, the so-called Domestic Emoluments Clause, prohibits the President from receiving "any . . . Emolument" from the federal or state governments other than a fixed "Compensation" "for his Services." *Id.* art. II, § 1, cl. 7. And the second, the so-called Foreign Emoluments Clause, prohibits any federal official "holding any Office of Profit or Trust"—the President included—from "accept[ing] . . . any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State" without "the Consent of the Congress." U.S. Const. art. I, § 9, cl. 8; *see also* Applicability of the Emoluments Clause & the Foreign Gifts & Decorations Act to the President's Receipt of the Nobel Peace Prize, O.L.C. slip op. at 4, 2009 WL 6365082, at *4 (Dec. 7, 2009) ("The President surely 'hold[s] an[] Office of Profit or Trust' . . . ." (alterations in original) (quoting U.S. Const. art. I, § 9, cl. 8)). If the President may accept no domestic emoluments and must seek Congress's permission before accepting any foreign emoluments, then surely a statute facilitating the disclosure of such payments lies within constitutional limits.

The United States Code, too, provides ample precedent for laws that regulate Presidents' finances and records. *Cf. Nixon II*, 433 U.S. at 445 (noting the "abundant statutory precedent for the regulation and mandatory disclosure of documents in

the possession of the Executive Branch"). The Foreign Gifts and Decorations Act requires all federal employees, including the President, to "file a statement" regarding any gift they receive "of more than minimal value." 5 U.S.C. § 7342(c). The STOCK Act prohibits all "executive branch employees," including the President, from "us[ing] nonpublic information derived from such person's position . . . as a means for making a private profit." Pub. L. No. 112-105, §§ 2, 9, 126 Stat. 291, 291, 297. And the Presidential Records Act—whose constitutionality the Trump Plaintiffs readily concede—establishes a whole statutory scheme for "categoriz[ing]," "fil[ing]," "dispos[ing]" of, and "manag[ing]" "Presidential records." 44 U.S.C. § 2203; *see* Appellants' Br. 40 ("The Presidential Records Act . . . did not cause a disruption of executive functions significant enough to trigger separation of powers analysis" (internal quotation marks omitted)). History discloses no evidence that these statutes have disrupted presidential functions.

The history of past Presidents' financial disclosures offers a particularly useful guide. As explained above, *see supra* at 3–4, the Ethics in Government Act requires Presidents to file periodic reports detailing, among other things, "[t]he source, type, and [approximate] amount or value of income . . . from any [non-federal] source," "[t]he identity and [approximate] value of . . . total liabilities owed," and "the date . . . and [approximate] value of any purchase, sale or exchange [of real property and securities] during the preceding calendar year." 5 U.S.C. app. 4 § 102(a). Every President to have served since the Ethics in Government Act became law in 1978—Presidents Carter, Reagan, H.W. Bush, Clinton, W. Bush, Obama, and now Trump—has complied with these disclosure requirements. *See, e.g.*, Philip Taubman, *Carter Drops 'Blind Trust' Secrecy and Divulges Finances for 1978-9*, N.Y. Times, May 31, 1979, at A1; Edward T. Pound, *Reagan's Worth Put at $4 Million*,

N.Y. Times, Feb. 23, 1981, at A1; Associated Press, *President's Trust Grows in Value*, N.Y. Times, May 15, 1992, at A17; Stephen Labaton, *Most of Clintons' Wealth Held by Mrs. Clinton, Disclosure Form Shows*, N.Y. Times, May 18, 1994, at A20; Richard W. Stevenson, *Bushes' Assets Put at $8.8 Million in Filing*, N.Y. Times, May 16, 2003, at A22; U.S. Office of Government Ethics, *Presidential and Vice Presidential Financial Disclosure Reports*, https://extapps2.oge.gov/201/Presiden.nsf/President%20and%20Vice%20President%20Index (financial disclosure reports of Presidents Obama and Trump); *see also* Appellants' Br. 44 (acknowledging that "President [Trump] has voluntarily complied with those statutory requirements"). In fact, Presidents Carter, Reagan, H.W. Bush, Clinton, W. Bush, and Obama exceeded statutory disclosure requirements by releasing their personal federal income tax returns to the public. *See Presidential Tax Returns*, TaxNotes, taxnotes.com/presidential-tax-returns (collecting presidential tax records).

Of course, as the Trump Plaintiffs point out, "compliance is not the measure of constitutionality." Appellants' Br. 44. But when asked to decide whether an act of Congress "disrupts the proper balance between the coordinate branches," *Nixon II*, 433 U.S. at 443, a court would be foolish to ignore those branches' prior pattern of conflict—or, as here, cooperation. *See id.* at 441 (finding it significant that "[n]either President Ford nor President Carter support[ed] [former-President Nixon's] claim" that the challenged statute's "regulation of the disposition of Presidential materials . . . constitutes, without more, a violation of the principle of separation of powers"); *cf. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2091 (2015) ("In separation-of-powers cases this Court has often 'put significant weight upon historical practice.'" (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014))). Though not dispositive,

the fact that every President during the last four decades has filed financial disclosures offers persuasive evidence that such disclosures neither "prevent[]" nor "disrupt[]," *Nixon II*, 433 U.S. at 443, the President's efforts to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.

To be sure, it is possible that some hypothetical statute could go too far. One could certainly imagine disclosure mandates so onerous that they begin to "prevent[] the Executive Branch from accomplishing its constitutionally assigned functions." *Nixon II*, 433 U.S. at 443; *see, e.g.*, Oral Arg. Tr. 17 (positing "a statute [requiring] the President . . . to submit 100,000 pages of financial disclosures and [to] meet with Congress once a month to discuss them"). But to accept the Trump Plaintiffs' suggestion that Congress may impose *no* disclosure requirements whatsoever on the President, *see* Oral Arg. Tr. 51–52 (stating it is "very difficult to think of" a constitutional law Congress "could pass" with respect to the President)—or, put another way, that the challenged subpoena could result in *no* valid legislation—would be to return to an "archaic view of the separation of powers" that "requir[es] three airtight departments of government," *Nixon II*, 433 U.S. at 443 (internal quotation marks omitted). That is not the law.

Instead, "our constitutional system imposes upon the Branches a degree of overlapping responsibility, a duty of interdependence as well as independence[,] the absence of which 'would preclude the establishment of a Nation capable of governing itself effectively.'" *Mistretta v. United States*, 488 U.S. 361, 381 (1989) (quoting *Buckley v. Valeo*, 424 U.S. 1, 121 (1976)). As the Supreme Court has observed, "separation of powers does not mean that the branches 'ought to have no *partial agency* in, or no *controul* over, the acts of each other.'" *Clinton*, 520 U.S. at 702–03 (quoting The Federalist No. 47, at 325–326 (J. Cooke ed.1961) (emphasis in original)); *see also*

*Nixon II*, 433 U.S. at 442-43 & n.5 (affirming "the more pragmatic, flexible approach of Madison in the Federalist Papers and later of Mr. Justice Story" to the separation of powers); *Nixon*, 418 U.S. at 703 ("In designing the structure of our Government and dividing and allocating the sovereign power among three coequal branches, the Framers of the Constitution sought to provide a comprehensive system, but the separate powers were not intended to operate with absolute independence."). As the *Nixon* cases teach, the "proper inquiry focuses on the extent to which [another branch's actions] prevent[] the Executive branch from accomplishing its constitutionally assigned functions." *Nixon II*, 433 U.S. at 443 (citing *Nixon*, 418 U.S. at 711-712). Congress can require the President to make reasonable financial disclosures without upsetting this balance.

The Trump Plaintiffs challenge the constitutionality of legislation that "may be had" on another basis. *Eastland*, 421 U.S. at 508. Drawing on the principle announced in *Powell v. McCormack*, 395 U.S. 486 (1969), and *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995), that "[n]either Congress nor the states can add to the constitutional qualifications for holding federal elective office," *Walker v. United States*, 800 F.3d 720, 723–24 (6th Cir. 2015), they argue that imposing conflict-of-interest laws on the President would impermissibly "change or expand the qualifications for serving as President," Appellants' Br. 38 (citing *Powell* and *Thornton*). But once again, we need not reach this issue. Regardless of whether Congress may require Presidents to "eliminat[e] [their] financial conflicts" through divestment or recusal, the Trump Plaintiffs offer no reason to suspect that a statute requiring nothing more than *disclosure* of such conflicts might also "'establish a qualification for . . . serving as President.'" Appellants' Br. 38 (quoting Silberman Memo 5). Financial disclosure laws would not, as in *Powell*, prevent a "duly

elected" official from assuming office, 395 U.S. at 550, nor, as in *U.S. Term Limits*, add a term limit to "the exclusive qualifications set forth in the text of the Constitution," 514 U.S. at 827; *cf.* Appellants' Br. 39 (conceding that "[t]he Presidential Records Act does not add or alter the qualifications for office"). In the end, laws requiring disclosure exclude precisely zero individuals from running for or serving as President; regardless of their financial holdings, all constitutionally eligible candidates may apply.

In sum, we detect no inherent constitutional flaw in laws requiring Presidents to publicly disclose certain financial information. And that is enough. Without treading onto any other potentially fertile grounds from which constitutional legislation could flower, we conclude that given the constitutionally permissible options open to Congress in the field of financial disclosure, the challenged subpoena seeks "information about a subject on which legislation may be had." *Eastland*, 421 U.S. at 508.

To the dissent, however, this makes no difference. Although acknowledging that the Committee is pursuing a "valid legislative inquiry," the dissent insists that the Mazars subpoena is nonetheless invalid because it "seeks to investigate individual suspicions of criminality against the President," an inquiry that "may be pursued only through impeachment." Dissenting Op. at 44. In support, the dissent claims to rely on the "text and structure of the Constitution, its original meaning and longstanding practice." *Id*. at 3.

Of course, the Constitution always serves as our starting point, and particularly in separation-of-powers disputes, we "put significant weight upon historical practice." *Zivotofsky*, 135 S. Ct. at 2091 (internal quotations omitted). Indeed, this is a path the Supreme Court and this court have already

trod. Nearly a century of precedent has laid out an established test that resolves this inter-branch dispute in a way that, unlike the dissent, respects the co-equal status and roles of *both* the legislative and executive branches. Settled Supreme Court precedent teaches that—at least where, as here, no party argues that compliance with the subpoena would impair the President's execution of the Article II power—the Constitution protects both branches' prerogatives by determining whether the subpoena serves "a valid legislative purpose." *Barenblatt*, 360 U.S. at 127. Both the Trump Plaintiffs and the Department of Justice agree that this is the relevant inquiry. *See* Appellants' Br. 16 ("When Congress issues subpoenas in aid of valid legislation, it needs a legitimate legislative purpose"); Department Br. 10. ("The court must first determine whether the subpoena serves a 'valid legislative purpose.'").

To be sure, a Congress pursuing a legitimate legislative objective may, as the many examples recounted in the dissent demonstrate, choose to move from legislative investigation to impeachment. But the dissent cites nothing in the Constitution or case law—and there is nothing—that compels Congress to abandon its legislative role at the first scent of potential illegality and confine itself exclusively to the impeachment process. Nor does anything in the dissent's lengthy recitation of historical examples dictate that result. All involved investigations targeted at individual conduct; none involved a Congressional effort to investigate the need to amend existing laws or enact remedial legislation. Instead, those examples merely demonstrate that Congress has, at various points throughout our history, debated and decided when it wishes to shift from legislating to impeaching. Where legislation may be had—and especially here, where bills are pending and no intrusion on the President's execution of his official duties is alleged—the Constitution assigns that decision to Congress.

Unable to prevail under the test the Supreme Court has enforced for more than a century, the dissent moves the goalposts. The dissent proposes a brand-new test for the President (and other "impeachable officials," Dissenting Op. at 44) that would enfeeble the legislative branch. According to the dissent, once some Members—or perhaps just one Member—raise "suspicions of criminality" by an impeachable official, Congress must "end[]" all legislative investigation and either do nothing at all or "move[] that part of the investigation into impeachment." Dissenting Op. at 19.

In other words, Congress must either initiate the grave and weighty process of impeachment or forgo any investigation in support of potential legislation. Under the dissent's novel test, "even a valid legislative purpose" cannot "justify" the investigation. *Id.* at 19. The dissent identifies nothing in the text, structure, or original meaning of Article I or Article II of the Constitution to support such a sweeping rule of legislative paralysis. As the Trump Plaintiffs and the Department of Justice agree, the Supreme Court has said just the opposite: "a congressional committee which is engaged in a legitimate legislative investigation need not grind to a halt whenever . . . crime or wrongdoing is disclosed." *Hutcheson*, 369 U.S. at 618.

The dissent tries to house its theory in the Supreme Court's decision in *McGrain.* Quoting the Court's observation that an investigation would be invalid "if the Senate was 'attempting or intending to *try* the Attorney General at its bar or before its committee for crime or wrongdoing,'" the dissent insists that "[i]t was essential to the Court's decision that the investigation did not target the unlawful behavior of the Attorney General," Dissenting Op. at 49 (quoting *McGrain*, 273 U.S. at 179–80) (emphasis added). But as the sentence quoted by the dissent reveals, the Court said nothing about "targeting" specific conduct. Instead, the Court made clear that the investigation

was not invalid because the authorizing "resolution, like the charges which prompted its adoption . . . [made] reference to [the Attorney General] by name," nor was it "a valid objection to the investigation that it might possibly disclose crime or wrongdoing on his part." *McGrain*, 273 U.S. at 179–80. Indeed, the district court in *McGrain* had adopted the dissent's view, invalidating the subpoena because the authorizing resolution alleged "specific instances of . . . neglect" and the Senate was "proposing . . . to determine the guilt of the Attorney General of the shortcomings and wrongdoings set forth in th[ose] resolutions." *Id*. at 177. The Senate was, as the district court saw it, "exercising the judicial function," a power "impliedly negatived by th[e] Constitution, in its provision conferring the sole power of impeachment on the House of Representatives." *Ex parte Daugherty*, 299 F. 620, 639 (S.D. Ohio 1924). The Supreme Court labeled this reasoning "wrong," explaining "that the object of the investigation . . . was to obtain information for legislative purposes." *McGrain*, 273 U.S. at 177.

The dissent points to *McGrain*'s language that "[i]t [wa]s not as if an inadmissible or unlawful object were affirmatively and definitely avowed," arguing that, here, the subpoena is invalid because "[t]he Committee has 'affirmatively and definitely avowed' its suspicions of criminality against the President.'" Dissenting Op. at 50–51 (quoting *McGrain*, 273 U.S. at 180). The dissent misreads that sentence. According to the Court, the Senate resolution in *McGrain* sought "information necessary as a basis for such legislative *and other action as the Senate may deem necessary and proper*." 273 U.S. at 179 (emphasis added). But there was "no other action," the Court explained, "which would be within the power of the Senate." *Id*. It was the Senate's "indefinite and untenable suggestion" of non-legislative action—not an avowal of suspicions of individual wrongdoing—that the Court held did

not "invalidate[] the entire proceeding." *Id. McGrain* thus squarely forecloses the dissent's theory.

It is unsurprising that no case law supports the dissent. Under its view, Congress's power to investigate, when it comes to the President and all other impeachable officials, would no longer be "co-extensive with [its] power to legislate." *Quinn*, 349 U.S. at 160. The dissent would reorder the very structure of the Constitution. Throughout history, the Constitution has left to Congress the judgment whether to commence the impeachment process. But the dissent's approach would not even allow Congress to make the quintessentially legislative judgment that some concerns about potential misconduct or illegality are better addressed through oversight and legislation than impeachment. Worse still, the dissent's novel approach would now impose upon the courts the job of ordering the cessation of the legislative function and putting Congress to the Hobson's Choice of impeachment or nothing.

To be sure, the dissent would still allow Congress to "enact legislation." Dissenting Op. at 64. But it would have to do so uninformed and with its oversight function informationally crippled. This would mean that, at times when oversight and legislation are most urgent, such as to prevent executive branch overreach or to keep officials' behavior within ethical boundaries going forward, Congress would be legislatively hamstrung unless it were to pull the impeachment trigger. And if Congress chooses not to pursue impeachment, or if impeachment is unavailable because Congress believes the alleged misconduct falls short of a high crime or misdemeanor, then there can be no investigation of—and thus no viable legislative check on—the President at all. A proposition that so strips Congress of its power to legislate would enforce only the Executive's arrogation of power, not the separation of powers.

At bottom, this subpoena is a valid exercise of the legislative oversight authority because it seeks information important to determining the *fitness of legislation* to address potential problems within the Executive Branch and the electoral system; it does not seek to determine the President's fitness for office.

## C.

Thus far we have concluded that the Committee is pursuing a legislative, non-law-enforcement purpose and that at least one kind of constitutional legislation may be had on the subject matter of the Committee's investigation. What is left to decide is whether the documents requested in *this* subpoena are relevant to *that* investigation. The Trump Plaintiffs insist that at least some are not.

As the *Watkins* Court described it, the requirement that a subpoena request only those documents that are relevant to a committee's legitimate investigation "is a jurisdictional concept of pertinency drawn from the nature of a congressional committee's source of authority." 354 U.S. at 206. Though complex sounding, the relevancy requirement functions merely as a corollary to the other restraints on congressional committees' investigative powers: if a committee could subpoena information irrelevant to its legislative purpose, then the Constitution would in practice impose no real limit on congressional investigations.

The Supreme Court has used various formulations to describe the relevancy standard that applies to congressional subpoenas. In *McGrain*, the Court held that Congress could subpoena any information that would "materially aid[]" a legitimate investigation. 273 U.S. at 177. In *Watkins*, it explained that committees may subpoena information "to be used . . . in coping with a problem that falls within [their]

legislative sphere." 354 U.S. at 206. And in *McPhaul v. United States*, the Court offered not one but two explanations, validating a subpoena because, in the Court's words, the subcommittee had requested records that "were not plainly incompetent or irrelevant to any lawful purpose . . . , but, on the contrary, were reasonably relevant to the inquiry." 364 U.S. 372, 381–82 (1960) (alterations, citations, and internal quotation marks omitted). We read all these statements, varied as they are, as conveying essentially the same straightforward proposition: Congress may subpoena only that information which is "reasonably relevant" to its legitimate investigation. *Id.*; *accord* Appellants' Br. 19 ("If the congressional subpoena is not 'reasonably relevant to the inquiry,' then it lacks a legitimate purpose." (quoting *McPhaul*, 364 U.S. at 381–82)).

With this standard in mind, we turn to the challenged subpoena. Recall that it seeks four categories of documents: for "calendar years 2011 through 2018," (1) "statements of financial condition, annual statements, periodic financial reports, and independent auditors' reports," (2) "underlying, supporting, or source documents and records," and (3) related "memoranda, notes, and communications;" and, (4) "[w]ithout regard to time," all related "engagement agreements or contracts." Subpoena. For clarity, we label these four categories Accounting Records, Source Documents, Related Communications, and Engagement Agreements, respectively. In our view, all are reasonably relevant to remedial legislation addressing at least two of the topics listed in Chairman Cummings's Memo: the President's potential "undisclosed conflicts of interest" and the President's "report[s] . . . to the Office of Government Ethics and other federal entities." Cummings Memo 4.

We begin with Accounting Records and Source Documents for calendar years 2014 through 2018. Because

then-Candidate and now-President Trump filed financial disclosure reports covering these years, financial records from this period are highly relevant to the Committee's inquiry into whether Candidate and President Trump "accurately reported his finances to . . . federal entities," *id.*, and, by extension, "whether reforms are necessary to address deficiencies with current laws, rules, and regulations," Cummings Feb. 15 Letter 9. A clear line connects the Office of Government Ethics's May 2018 determination that President Trump's financial disclosure form failed to list "a reportable liability" to Michael Cohen, Apol Letter 1; to Chairman Cummings's January 2019 requests to the White House and the Office of Government Ethics for further information on President Trump's payments to Cohen; to Cohen's February 2019 production of Mazars accounting documents revealing financial information different from and additional to Candidate and President Trump's financial disclosures; and finally to the Committee's March 2019 request and April 2019 subpoena to Mazars. From this logical progression we discern "no indication" that the subpoena "follow[ed] from indiscriminate dragnet procedures, lacking in probable cause for belief that" Mazars "possesse[s] information which might be helpful to the" Committee. *Barenblatt*, 360 U.S. at 134. Tellingly, the Trump Plaintiffs raise no relevance objection to this subset of subpoenaed documents.

We next consider the same two categories of records— Accounting Records and Source Documents—for years 2011 through 2013. According to the Trump Plaintiffs, these documents are irrelevant to the Committee's investigation because they "reach[] back many years before the President was even a candidate for public office." Appellants' Reply Br. 16–17. This is true, but beside the point. The fact that the Ethics in Government Act *currently* requires candidates and Presidents to disclose information for "the preceding calendar

year," *e.g.*, 5 U.S.C. app. 4 § 102(b)(1)(A), hardly forecloses Congress from amending the Act to require filers to go back a reasonable amount of additional time to provide a more accurate financial picture. That is especially true here because the sitting President possesses financial holdings that are arguably more complex than past Presidents held, has elected while in office to handle his finances differently than past Presidents did, and has declined to voluntarily release the sorts of tax-return information that past Presidents disclosed. *See, e.g.*, *H.R. 1: Strengthening Ethics: Hearing Before the House Committee on Oversight and Reform*, 116th Cong. 125 (Feb. 6, 2019) (statement of Walter M. Shaub, Jr.) (describing the President's decision not "to divest his conflicting financial interests" as a "radical departure" from previous Presidents).

Congress might therefore reasonably wonder whether the Ethics in Government Act needs an update, and even pre-candidacy documents from the President would shed light on that inquiry. Requiring presidential candidates and Presidents to disclose earlier years' information might, for example, reveal forgiven debts, financial partnerships, or favorable deals that Congress determines should be disclosed to the public—that is, "undisclosed conflicts of interest." Cummings Memo 4. In fact, at least one bill now pending before the House would require presidential candidates to "submit to the Federal Election Commission a copy of [their] income tax returns for the 10 most recent taxable years." H.R. 706, 116th Cong. § 222(b)(1)(A) (2019).

Of course, the Committee may discover nothing notable in Mazars's 2011 through 2013 records. But that is not the test for relevancy. As the Supreme Court has explained, "[t]he very nature of the investigative function—like any research—is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises." *Eastland*, 421 U.S. at 509; *see also*

Appellants' Br. 32 (conceding that "Congress cannot be penalized if an otherwise valid investigation turns out to be a dead end"). To be sure, information from the past may at some point become so stale as to be irrelevant to present inquiries, but the eight-year mark falls comfortably on the relevant side of the line.

We last turn to the Committee's request for Related Communications and Engagement Agreements. According to the Trump Plaintiffs, these documents "have nothing to do with the financial statements the Committee says it needs." Appellants' Reply Br. 17. But again, we think the records' relevancy is quite clear. As the Committee explains, the import of the Mazars accounting documents hinges on the conditions under which they were prepared—for example, whether Mazars accepted documents "as a given," whether Mazars prepared its reports intending third parties to rely upon them, and whether Mazars had the "power[] or responsibilit[y]" to conduct independent audits. Oral Arg. Tr. 108. Obviously not every "agreement[]" or "note[]" will provide this information. Subpoena. But absent foreknowledge of the documents' contents, congressional investigators have no way to reliably determine before issuing a subpoena which specific communications might reveal relevant information. It is enough that the categories of information sought are "reasonably relevant" to the Committee's legitimate legislative inquiry.

## IV.

Having found no constitutional defect in the Committee's subpoena to Mazars, we at last arrive at the question of authority: "whether the committee [is] authorized" by the full House "to exact the information" it seeks. *Rumely*, 345 U.S. at 42–43; *see also Exxon Corp. v. FTC*, 589 F.2d 582, 592 (D.C. Cir. 1978) ("To issue a valid subpoena, . . . a committee or

subcommittee must conform strictly to the resolution establishing its investigatory powers."). The Trump Plaintiffs urge us to interpret the House Rules narrowly to deny the Committee the authority it claims. But we have no need—and most important, no authority—to do so.

**A.**

We start with the proposition, undisputed by the Trump Plaintiffs, that under the most natural reading of the House Rules, the full chamber has authorized the Committee to issue the challenged subpoena. *See* Oral Arg. Tr. 38–39 (Trump Plaintiffs conceding that the Rules, under a "normal reading," authorize the subpoena). A brief tour through the Rules confirms as much.

To begin with, the Rules vest the Oversight Committee with standing authority to institute investigations and issue subpoenas without first "obtain[ing] such authority . . . by a separate resolution." *House Rules and Manual*, 115th Cong., § 788 note (2017); *see also* Morton Rosenberg, *When Congress Comes Calling: A Study on the Principles, Practices, and Pragmatics of Legislative Inquiry* 33–34 & 34 n.5 (2017) (explaining that although "[t]he required authorization from the full House . . . may take the form of a statute, a resolution, or a standing rule of the House," "[t]his [last] mode is the most common today" (footnotes omitted)). Clause 1(b)(1) of House Rule XI permits "[e]ach committee [to] conduct at any time such investigations and studies as it considers necessary." And Clause 2(m) of the same Rule authorizes committees—or, when the committees so choose, their chairs—"to require, by subpoena or otherwise, . . . the production of such books, records, correspondence, memoranda, papers, and documents as [they] consider[] necessary" "[f]or the purpose of carrying out any of [their] functions and duties under . . . rule X." House Rule XI, cl. 2(m)(1); *see also id.* cl. 2(m)(3)(A)(i) (permitting

committees to "delegate[] to the[ir] chair" "[t]he power to authorize and issue subpoenas"); Rules of the House Committee on Oversight and Reform, 116th Cong., Rule 12(g) (2019) (authorizing the Oversight Committee Chair to "issue subpoenas as provided in House Rule XI, clause 2(m), in the conduct of any investigation or activity or series of investigations or activities within the jurisdiction of the Committee").

Rule X, in turn, establishes the Oversight Committee's jurisdiction, which unquestionably includes financial-disclosure and other ethics-in-government laws. Rule X, clause 1(n) assigns the Committee jurisdiction over the "[f]ederal civil service . . . and the status of officers and employees of the United States," "[g]overnment management and accounting measures generally," and "[p]ublic information and records." Pursuant to this clause, the Oversight Committee has for decades exercised jurisdiction over the Ethics in Government Act and served as the authorizing committee for the Office of Government Ethics. *See, e.g.*, 165 Cong. Rec. H1209 (daily ed. Jan. 24, 2019) (referring H.R. 745, a "bill to amend the Ethics in Government Act of 1978 to provide for reform in the operations of the Office of Government Ethics, . . . to the Committee on Oversight and Reform"); Letter from Jason Chaffetz, Chairman, House Committee on Oversight and Government Reform, to Walter M. Shaub, Jr., Director, Office of Government Ethics 2 (Jan. 12, 2017) (stating that the Oversight Committee "has jurisdiction in the House of Representatives for reauthorizing the [O]ffice" of Government Ethics); *see also* H.R. Rep. No. 95-642, pt. 1 (1977) (report of the Committee on Post Office and Civil Service, predecessor to the Oversight Committee, on H.R. 6954, predecessor to the Ethics in Government Act of 1978). Furthermore, Rule X, clause 3(i) directs the Oversight Committee to "review and study on a continuing basis the operation of Government

activities at all levels, including the Executive Office of the President." And lest any confusion remain regarding the Oversight Committee's authority to oversee, Rule X, clause 4(c)(2) states that the Committee "may at any time conduct investigations of any matter without regard to [any other] clause conferring jurisdiction over the matter to another standing committee."

Having placed "any matter" within the Oversight Committee's wide purview, the Rules nowhere disclose an intent to carve out the President. It would be quite strange for the Rules to permit the Oversight Committee to "review and study," House Rule X, cl. 3(i), financial disclosure laws in all their applications save for one—their application to the President. *See* 5 U.S.C. app. 4 §§ 101(a), (f)(1), 102 (requiring the President to file financial reports). So, too, would it be strange to direct the Committee to oversee "the operation of Government activities at all levels," House Rule X, cl. 3(i), if the Rules really meant "at all levels except the President." And although we do not read the second half of clause 3(i), which specifies that "Government . . . at all levels . . . includ[es] the Executive Office of the President," to refer to the President himself, *cf. Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136, 156 (1980) (holding that in the Freedom of Information Act, the term "'Executive Office' does not include the Office of the President"), neither do we take the "including" phrase to imply that "Government activities at all levels" means something less than "all," *see Federal Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ("[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle."). Indeed, the Trump Plaintiffs urge us to draw no such negative inference. *See* Appellants' Reply Br. 6 ("Plaintiffs do not claim that [adding the] new language

['Executive Office of the President'] *narrowed* the Committee's authority.").

## B.

Acknowledging that literally read, the Rules permit the Committee to issue the challenged subpoena, *see supra* at 49, the Trump Plaintiffs insist that a literal reading is not enough. In their view, the Mazars subpoena alters the separation of powers and raises serious constitutional questions, so nothing less than an "unequivocal[] grant" by the House of "jurisdiction to subpoena the President's accountant for his private financial records" could authorize the Committee to issue it. Appellants' Reply Br. 2; *see also* Dissenting Op. at 52–58. In support, they raise three related arguments.

First, the Trump Plaintiffs contend that because "a 'clear statement rule' applies 'to statutes that significantly alter the balance between Congress and the President,'" Appellants' Br. 16 (quoting *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991)), the House could have "authorized the Committee to embark on [the instant] investigation" only through "an express statement," Appellants' Reply Br. 3 (internal quotation marks omitted); *see also* Dissenting Op. at 54–55. For this proposition, they rely primarily on two decisions, both of which held that the President is not an "agency" subject to judicial review under the Administrative Procedure Act (APA). In the first case, *Armstrong v. Bush*, our court held that "[w]hen Congress decides purposefully to enact legislation restricting or regulating presidential action, it must make its intent clear." 924 F.2d at 289. "Although the 'clear statement' rule was originally articulated to guide interpretation of statutes that significantly alter the federal-state balance," we explained, "there are similar compelling reasons to apply the rule to statutes that significantly alter the balance between Congress and the President." *Id.* And in the second case, *Franklin v.*

*Massachusetts*, the Supreme Court confirmed that "[o]ut of respect for the separation of powers and the unique constitutional position of the President," the Court "would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion" under the APA. 505 U.S. 788, 800–01 (1992).

This case is nothing like *Armstrong* and *Franklin* for a simple reason: the House Rules have no effect whatsoever on "the balance *between* Congress and the President." *Armstrong*, 924 F.2d at 289 (emphasis added). What Rules X and XI have done is delegate from the House to the Oversight Committee the authority to exercise Congress's subpoena power without first "obtain[ing] such authority . . . by a separate resolution" of the full House. *House Rules and Manual*, 115th Cong., § 788 note (2017). The Trump Plaintiffs nowhere dispute that, assuming a legitimate legislative purpose exists, the House could have either issued the challenged subpoena by a vote of the full chamber or, via express statement, authorized the Committee to issue the subpoena on its behalf. *See* Oral Arg. Tr. 5 (conceding that the House has the power to issue the subpoena itself and arguing that the question is "whether [it] gave [that authority] to [the] Committee"); *id.* at 6 (stating that it is "a question of clarity and not a question of power"); *id.* at 130–31 (stating that, although it would be "better" for the subpoena to come from "the full House," the full House could pass a rule that "says . . . the committee could do it"). The Rules, which establish a mechanism for exercising the House's subpoena power, thus deal exclusively with the allocation of authority *within* the legislative branch, leaving unaltered the House's subpoena power vis-à-vis the President. Because Congress already possesses—in fact, has previously exercised, *see supra* at 16–17—the authority to subpoena Presidents and their information, nothing in the House Rules could in any way

"alter the balance between" the two political branches of government. *Armstrong*, 924 F.2d at 289.

The Trump Plaintiffs' second argument, containing many ingredients of their first, is similarly unavailing. Observing that "[t]he parties seriously dispute whether the subpoena has a legitimate legislative purpose," Appellants' Reply Br. 3—and, consequently, whether the subpoena exceeds constitutional limits on Congress's subpoena power—the Trump Plaintiffs urge us to "resolve[] this case in a way that avoid[s] deciding" constitutional questions "by quashing the subpoena as beyond the Committee's . . . jurisdiction," Appellants' Br. 23; *see also* Department Br. 14; Dissenting Op. at 52–58. They call our attention to two cases in particular: the Supreme Court's decision in *United States v. Rumely* and ours in *Tobin v. United States*, 306 F.2d 270 (D.C. Cir. 1962). In *Rumely*, the Court "g[a]ve" the authorizing resolution at issue "a more restricted scope" because the government's favored interpretation, which would have permitted it "to inquire into all efforts of private individuals to influence public opinion through books and periodicals," raised "doubts of constitutionality in view of the prohibition of the First Amendment" and thus presented a "[g]rave constitutional question[]." *Rumely*, 345 U.S. at 46–48. And in the latter, we "constru[ed] [a] resolution[] of authority narrowly . . . in order to obviate the necessity of passing on" the "serious and difficult constitutional question[]" presented by that case, *Tobin*, 306 F.2d at 274–75—namely, whether Congress has "the power, under the compact clause of the Constitution, to 'alter, amend or repeal' its consent to an interstate compact," *id.* at 272. Concerned that "the suspicion of even potential impermanency would be damaging to the very concept of interstate compacts," *id.* at 273, we observed that the argument against recognizing such an implied power to alter or repeal "is not unpersuasive," *id.* at 274.

In contrast to *Rumely* and *Tobin*, the constitutional questions raised here are neither "[g]rave," *Rumely*, 345 U.S. at 48, nor "serious and difficult," *Tobin*, 306 F.2d at 275. We harbor no doubts that the subpoena to Mazars comports with constitutional limits, as it seeks documents reasonably relevant to a legitimate legislative inquiry into "a subject on which legislation may be had." *Eastland*, 421 U.S. at 508; *see supra* Parts III.A–C. We therefore have no cause to invoke the canon of constitutional avoidance. *See Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Department of Treasury*, 638 F.3d 794, 801 (D.C. Cir. 2011) ("A clear statute and a weak constitutional claim are not a recipe for successful invocation of the constitutional avoidance canon.").

That is not to say the issues presented here are unimportant—far from it. But the canon of constitutional avoidance "is not a license for the judiciary to rewrite language enacted by the legislature." *United States v. Albertini*, 472 U.S. 675, 680 (1985). To adopt a restrictive interpretation of the Rules when uncompelled by constitutional concerns, "while purporting to be an exercise in judicial restraint," would in fact be to "trench upon the legislative powers vested in Congress by [Article I] of the Constitution." *Id.* We have no authority to avoid questions—even important ones—simply because we might prefer not to answer them. *Cf. United States v. American Telephone & Telegraph Co.*, 567 F.2d 121, 126 (D.C. Cir. 1977) ("The simple fact of a conflict between the legislative and executive branches over a congressional subpoena does not preclude judicial resolution.").

Finally, the Trump Plaintiffs argue that even if no separation-of-powers concerns demand application of the clear statement rule, and even if no constitutional questions rise to the level of serious, it would, given the "sensitive" nature of the Committee's request, Appellants' Reply Br. 2 (internal

quotation marks omitted), still be "better," Oral Arg. Tr. 130, for the full House to grant the Committee "express authority to subpoena the President for his personal financial records," Appellants' Reply Br. 5. We, however, have no authority to impose such a requirement on the House. The Constitution gives "[e]ach House" of Congress authority to "determine the Rules of its Proceedings," U.S. Const. art. I, § 5, cl. 2, meaning that courts lack the power to invalidate a duly authorized congressional subpoena merely because it might have been "better [if] . . . the full House" had specifically authorized or issued it, Oral Arg. Tr. 130. *See Eastland*, 421 U.S. at 509 ("The wisdom of congressional approach or methodology is not open to judicial veto."). To be sure, "the courts will intervene to protect constitutional rights from infringement by Congress, including its committees and members." *Exxon Corp.*, 589 F.2d at 590. But unless and until Congress adopts a rule that offends the Constitution, the courts get no vote in how each chamber chooses to run its internal affairs. *See id.* ("[W]here constitutional rights are not violated, there is no warrant for the judiciary to interfere with the internal procedures of Congress.").

The trouble with clear statement rules, then, is that they both "involve[] an unwillingness to give full effect to [Congress's] unambiguous text" as it exists now, *Owner-Operator Independent Drivers Ass'n v. U.S. Department of Transportation*, 724 F.3d 230, 237 (D.C. Cir. 2013), and offer a not-so-subtle encouragement to Congress to alter its rules in the future. Without some constitutionally compelled reason, we may do neither. As our court recently explained, "interpreting a congressional rule 'differently than would the Congress itself,' is tantamount to '*making* the Rules—a power that the Rulemaking Clause reserves to each House alone.'" *Barker v. Conroy*, 921 F.3d 1118, 1130 (D.C. Cir. 2019) (quoting *United States v. Rostenkowski*, 59 F.3d 1291, 1306–07 (D.C. Cir.

1995)). Accordingly, absent a substantial constitutional question pertaining to the *House*'s legislative power, we have no more authority to give a cramped interpretation to a House Rule via a clear statement requirement or the constitutional avoidance canon than we do to take out our red pens and edit the Rules ourselves.

But the House may. And indeed it has. On July 24, several weeks after oral argument in this case and several months after the Oversight Committee issued the challenged subpoena to Mazars, the full House adopted a resolution that in no uncertain terms "ratifie[d] and affirm[ed]" the Oversight Committee's authority under House Rules X and XI to issue subpoenas "concerning . . . the President in his personal or official capacity [and] his immediate family, business entities, or organizations." H.R. Res. 507, 116th Cong. (2019). Resolution 507—a resolution "[a]ffirming the validity of subpoenas duly issued and investigations undertaken by . . . committee[s] of the House . . . pursuant to authorities delegated by . . . the [House] Rules," *id.*—purports neither to enlarge the Committee's jurisdiction nor to amend the House Rules. Instead, the Resolution clarifies the authority that the Committee had on the day it issued the subpoena. It is "plainly incorrect," the Resolution states, to assert that previously issued subpoenas "seeking personal, financial, banking, and tax information related to the President" "were not authorized by the full House." *Id.*

Because the Trump Plaintiffs concede, as they must, that "[t]he Resolution does not expand the Committee's jurisdiction," Appellants' July 31 Letter 1; *see also* Dissenting Op. at 55 n.18, we need not address their argument that "the 'scope' of a committee's jurisdiction must 'be ascertained as of th[e] time' of the request," *id*. (alteration in original) (quoting *Rumely*, 345 U.S. at 48). The Trump Plaintiffs may very well

be right that the authority of a congressional committee to issue subpoenas "'cannot be enlarged by subsequent action of Congress.'" *Id.* (quoting *Rumely*, 345 U.S. at 48); *but cf. Dombrowski v. Burbank*, 358 F.2d 821, 825 (D.C. Cir. 1966), *aff'd in part, rev'd in part on other grounds sub nom. Dombrowski v. Eastland*, 387 U.S. 82 (1967) (holding that for purposes of establishing immunity from suit, a subcommittee could ratify a subpoena previously issued "without prior authorization from the [s]ubcommittee"). Resolution 507, however, "enlarges" nothing. It merely confirms what the Trump Plaintiffs admit—that the plain text of the House Rules authorizes the subpoena, *see supra* at 46, and merely provides what the Trump Plaintiffs request—that the House "'spell[] out [its] intention'" by "'adopt[ing] a resolution which in express terms authorizes'" the challenged subpoena. Appellants' Reply Br. 8–9 (quoting *Tobin*, 306 F.2d at 275–76). Because the House has "clearly manifest[ed] its intention of putting such a decisional burden upon us," we have no choice but to "meet and decide" the issues presented by this case. *Tobin*, 306 F.2d at 276.

The Justice Department adds one final objection. Although conceding that the Resolution "clearly authorizes the Committee's subpoena[,]" Department Br. 16, the Department warns that because Resolution 507 also authorizes future subpoenas, there is a "serious risk" that "[C]ongressional committees may issue successive subpoenas in waves, making far-reaching demands that harry the President and distract his attention." Department Br. 6. Time will tell whether the Department's prediction is accurate. At present, however, we have no need to consider that hypothetical scenario because the only subpoena currently before us is the one directed at Mazars. And to be clear, neither the Trump Plaintiffs nor the Department has argued that compliance with *that* subpoena risks unconstitutionally burdening the President's core duties.

Nor could they. It is Mazars, a third-party, that will retrieve and organize the relevant information; the subpoena seeks non-confidential records in which the President has asserted no proprietary or evidentiary protections; and Mazars, not the President, risks contempt through non-compliance. To be sure, monitoring Mazars's compliance with the subpoena might require some presidential time and attention. But as the Supreme Court made clear in *Clinton v. Jones*, a "burden [on] the time and attention of the Chief Executive," standing alone, "is not sufficient to establish a violation of the Constitution." 520 U.S. at 703.

## V.

Though our journey has been long, we find ourselves at the end of a familiar tale. A congressional committee, as committees have done repeatedly over the past two centuries, issued an investigative subpoena, and the target of that subpoena, questioning the committee's legislative purpose, has asked a court to invalidate it. The fact that the subpoena in this case seeks information that concerns the President of the United States adds a twist, but not a surprising one: disputes between Congress and the President are a recurring plot in our national story. And that is precisely what the Framers intended. As Justice Brandeis wrote, "[t]he doctrine of the separation of powers was adopted . . . not to promote efficiency but to preclude the exercise of arbitrary power." *Myers v. United States*, 272 U.S. 52, 293 (1926) (Brandeis, J., dissenting). "The purpose," he explained, "was not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy." *Id.*

Having considered the weighty interests at stake in this case, we conclude that the subpoena issued by the Committee

to Mazars is valid and enforceable. We affirm the district court's judgment in favor of the Oversight Committee and against the Trump Plaintiffs.

*So ordered.*

RAO, *Circuit Judge*, dissenting: The majority breaks new ground when it determines Congress is investigating allegations of illegal conduct against the President, yet nonetheless upholds the subpoena as part of the *legislative power*. The Committee on Oversight and Reform has consistently maintained that it seeks to determine whether the President broke the law, but it has not invoked Congress's impeachment power to support this subpoena. When Congress seeks information about the President's wrongdoing, it does not matter whether the investigation also has a legislative purpose. Investigations of impeachable offenses simply are not, and never have been, within Congress's legislative power. Throughout our history, Congress, the President, and the courts have insisted upon maintaining the separation between the legislative and impeachment powers of the House and recognized the gravity and accountability that follow impeachment. Allowing the Committee to issue this subpoena for legislative purposes would turn Congress into a roving inquisition over a co-equal branch of government. I respectfully dissent.

I.

We are asked to determine whether the Committee's subpoena is within the legislative power, a question that raises serious separation of powers concerns about how a House committee may investigate a sitting president. The constitutional questions only hinted at by the majority become clearer when the proper framework is applied. First, the Committee's subpoena and investigation explicitly state a purpose of investigating illegal conduct of the President, including specific violations of ethics laws and the Constitution. Second, Congress's power to investigate for legislative purposes, although broad, is not unlimited and cannot circumvent the distinct power to investigate for purposes of impeachment. Allegations that an impeachable official acted unlawfully must be pursued through impeachment. Finally, the subpoena targets the President and

raises implications for the separation of powers that the majority cannot brush aside simply because the subpoena is addressed to the President's accountants, Mazars USA, LLP. These preliminary matters place this novel investigation in context and frame the analysis of the substantial constitutional questions presented in this case.

The Committee, the Trump plaintiffs, and the majority all agree that the most relevant document for assessing the Committee's reasons for issuing the subpoena is Chairman Elijah E. Cummings's April 12 Memorandum. *See* Memorandum from Chairman Elijah E. Cummings to Members of the Committee on Oversight and Reform (Apr. 12, 2019) ("Cummings Memorandum"); Appellant Br. 32–33; Maj. Op. 25; *cf. Wilkinson v. United States*, 365 U.S. 399, 410 (1961) (looking to the "Chairman's statement at the opening of the hearings" for signs of legislative purpose); *Shelton v. United States*, 404 F.2d 1292, 1297 (D.C. Cir. 1968). The Cummings Memorandum states the Committee is investigating "whether the President may have engaged in illegal conduct" and notes that this information will "inform[] its review of multiple laws and legislative proposals under our jurisdiction." Cummings Memorandum at 4. The Committee also makes an "express avowal" to investigate alleged violations of ethics laws and the Constitution by the President. *See McGrain v. Daugherty*, 273 U.S. 135, 178 (1927) (noting that "[a]n express avowal of the object" of an investigation would aid the courts in reviewing the Senate's purpose); *see also infra* Part III.A (discussing Committee's purposes in detail).

The Committee announces two distinct investigations: one to explore allegations of illegal conduct by the President; and another to review multiple laws and legislative proposals within the Committee's jurisdiction. The Committee justifies both inquiries under the legislative power, and the majority accepts this framework when it examines the legislative power

in isolation to determine whether this investigation falls within its scope. Maj. Op. 20–54. Yet the Constitution vests the House of Representatives with more than one investigative power. Most frequently, the House investigates and issues subpoenas ancillary to its legislative powers. That investigative power is "co-extensive with the power to legislate." *Quinn v. United States*, 349 U.S. 155, 160 (1955); *see also Watkins v. United States*, 354 U.S. 178, 187 (1957) ("The power of the Congress to conduct investigations is inherent in the legislative process. That power is broad.").

The House, however, has a separate power to investigate pursuant to impeachment, which has always been understood as a limited judicial power to hold certain impeachable officials accountable for wrongdoing.[1] *See Kilbourn v. Thompson*, 103 U.S. 168, 191 (1880) ("The Senate also exercises the judicial power of trying impeachments, and the House of preferring articles of impeachment."). The text and structure of the Constitution, its original meaning, and longstanding practice demonstrate that Congress's legislative and judicial powers are distinct and exercised through separate processes, for different purposes, and with entirely different protections for individuals targeted for investigation. *See infra* Part II.

---

[1] In addition to the legislative and impeachment powers, the House and the Senate have other investigative powers, not relevant here, to maintain the integrity of their proceedings and members against bribery, nuisance, and violence. *See Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 228–30 (1821); *Barry v. United States ex rel. Cunningham*, 279 U.S. 597, 613 (1929) (the Senate has "certain powers, which are not legislative, but judicial, in character. Among these is the power to judge of the elections, returns, and qualifications of its own members." (citing U.S. CONST. art. I, § 5, cl. 1)).

The Committee's investigation into alleged illegal actions of the President naturally raises the specter of impeachment. Although the Trump plaintiffs maintain that "[t]he one thing the parties agree on is that this case is not about impeachment," Appellants Br. 14, the impeachment power unmistakably sits in the background of the legal arguments.[2] The Trump plaintiffs and the Department of Justice have suggested that the impeachment power might provide a different source of authority for this subpoena, even though it was not invoked here. *See* Appellants Br. 45 (noting with regard to impeachment that "[w]hile Congress could presumably use subpoenas to advance these non-legislative powers, the Committee has not invoked them"); DOJ Br. 15 n.1 ("The House's impeachment power is an express authority whose exercise does not require a connection to valid legislation. But the Committee has asserted neither jurisdiction over, nor an objective of pursuing, impeachment."). Furthermore, one of the primary legal arguments raised by the Trump plaintiffs is that the Committee's investigation is an impermissible form of "law enforcement." Appellants Br. 33–37. While law enforcement is normally the province of the executive branch, the House has a narrowly circumscribed power to serve as the "NATIONAL INQUEST" when it acts pursuant to the impeachment power. The Federalist No. 65, at 338 (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001). The Committee is

---

[2] Notably, the district court concluded that the impeachment and removal powers of the House and the Senate somehow bolster Congress's ability to investigate the President through the legislative power. *See Trump v. Comm. on Oversight & Reform*, 380 F. Supp. 3d 76, 95 (D.D.C. 2019) ("It is simply not fathomable that a Constitution that grants Congress the power to remove a President for reasons including criminal behavior would deny Congress the power to investigate him for unlawful conduct—past or present— even without formally opening an impeachment inquiry.").

"not here relying on impeachment power." Oral Arg. at 1:34:19–22. Nevertheless, understanding the impeachment power is essential to identifying the limits of the legislative power when Congress seeks to investigate allegations of specific unlawful actions by the President.

Constitutional powers do not stand in isolation, but rather are part of a complex structure in which each power acquires specific content and meaning in relation to the others. The Supreme Court often locates the limits of one constitutional power by identifying what is at the core of another. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2096 (2015) ("Congress has substantial authority over passports . . . . [But] [t]o allow Congress to control the President's communication in the context of a formal recognition determination is to allow Congress to exercise that exclusive power itself."); *Bowsher v. Synar*, 478 U.S. 714, 722 (1986) ("The Constitution does not contemplate an active role for Congress in the supervision of officers charged with the execution of the laws it enacts."); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) ("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker."); *Myers v. United States*, 272 U.S. 52, 164 (1926) ("[A]rticle 2 excludes the exercise of legislative power by Congress to provide for appointments and removals, except only as granted therein to Congress in the matter of inferior offices."); *Kilbourn*, 103 U.S. at 192 (the House "not only exceeded the limit of its own authority, but assumed a power which could only be properly exercised by another branch of the government, because it was in its nature clearly judicial"). This method helps illuminate the scope of the legislative power to investigate. Comparing Congress's legislative power with its wholly distinct judicial power of impeachment demonstrates the essential difference between these powers when Congress seeks to investigate the wrongdoing of the President.

6

As explained below, allegations of illegal conduct against the President cannot be investigated by Congress except through impeachment. The House may impeach for "Treason, Bribery, or other high Crimes and Misdemeanors," U.S. CONST. art. II, § 4, and has substantial discretion to define and pursue charges of impeachment. *See* The Federalist No. 65, at 338 (impeachable offenses "are of a nature which may with peculiar propriety be denominated POLITICAL, as they relate chiefly to injuries done immediately to the society itself"). While it is unnecessary here to determine the scope of impeachable offenses, Congress has frequently treated violations of statutes or the Constitution as meeting this threshold.[3] Impeachment provides the exclusive method for Congress to investigate accusations of illegal conduct by impeachable officials, particularly with the aid of compulsory process.[4] Thus, the key determination is whether this

---

[3] This discussion of the impeachment power proceeds only in relation to understanding the scope of the legislative power. As the Committee has not raised the impeachment power as a basis for this subpoena, questions regarding whether such a subpoena could issue under the impeachment power are outside the scope of this opinion, as are other questions regarding the justiciability of the impeachment power or the specific scope of impeachable offenses. Recognizing the political nature of impeachable offenses, I refer to them throughout the opinion by various terms to reflect that such offenses may include wrongdoing or illegal conduct deemed by the House to be a high crime or misdemeanor.

[4] Voluntary compliance with congressional investigations is commonplace. Different concerns arise, however, when one branch invokes power over the other through compulsory process. *See, e.g.*, *Watkins*, 354 U.S. at 215 ("It is only those investigations that are conducted by use of compulsory process that give rise to a need to protect the rights of individuals against illegal encroachment. That protection can be readily achieved through procedures which prevent

investigation targets allegations Congress might treat as "high Crimes" or "Misdemeanors." To make this determination requires no search for hidden motives, but simply crediting the Committee's consistently stated purpose to investigate "illegal conduct" of the President. Cummings Memorandum at 4; *cf. Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 508 (1975) ("[I]n determining the legitimacy of a congressional act we do not look to the motives alleged to have prompted it.").

The Committee's stated interest in remedial legislation may support any number of investigations, including into the conduct of agencies and how officials administer the laws. Yet a legislative purpose cannot whitewash this subpoena, which—by the Committee's own description—targets allegations of illegal conduct by the President. The most important question is not whether Congress has put forth some legitimate legislative purpose, but rather whether Congress is investigating suspicions of criminality or allegations that the President violated a law. Such investigations may be pursued exclusively through impeachment. The House may not use the legislative power to circumvent the protections and accountability that accompany the impeachment power.

The majority recognizes this subpoena concerns the Committee's "interest in determining whether and how illegal conduct has occurred," Maj. Op. 30, but nonetheless concludes that it is a valid exercise of the legislative power. This marks a sharp break with the few judicial precedents in this area. The Supreme Court has consistently maintained that Congress cannot undertake a legislative investigation of an impeachable official if the "gravamen" of the investigation rests on "suspicions of criminality." *Kilbourn*, 103 U.S. at 193, 195. In

---

the separation of power from responsibility and which provide the constitutional requisites of fairness for witnesses.").

*Senate Select Committee on Presidential Campaign Activities v. Nixon*, our court refused to enforce a legislative subpoena to President Richard Nixon by the Senate Select Committee tasked with investigating the Watergate break-in. 498 F.2d 725 (D.C. Cir. 1974) (en banc). The tapes sought by the subpoena were too "tangential" to the Committee's asserted legislative purposes, especially because the House had commenced impeachment proceedings to ascertain the President's role in these events. *Id.* at 733.

The majority's holding also breaks with the longstanding historical practice of Congress and the Executive. Without analyzing the Constitution or responding to the consistent historical understanding presented below, the majority simply asserts that Congress must be able "to make the quintessentially legislative judgment that some concerns about potential misconduct or illegality are better addressed through . . . legislation than impeachment." Maj. Op. 49. The majority's novel holding, however, fails to explain how specific accusations of wrongdoing by impeachable officials can be pursued through legislation. The Constitution, historical practice, and our cases prohibit rolling this investigation of illegal conduct of the President into a legislative investigation. Allowing Congress to use the legislative power to circumvent the impeachment process disrupts the separation of powers. By simply invoking a need for remedial legislation, Congress may now expand its control over the other branches and avoid the accountability and responsibility inherent in the impeachment power.

Finally, the inter-branch conflict in this case does not dissipate simply because the subpoena for the President's papers is strategically directed to Mazars rather than the President. In an attempt to sidestep thorny separation of powers questions, the majority reduces the conflict to a merely personal one involving the President's accountants: "[T]o

resolve this case, we need not decide whether the Constitution permits Congress, in the conduct of a legislative—that is, non-impeachment—investigation, to issue subpoenas to a sitting President." *Id.* at 20. By the majority's account, the subpoena does not transgress any constitutionally prescribed boundaries between co-equal branches in part because "quite simply, the Oversight Committee has *not* subpoenaed President Trump." *Id.* The majority thus concludes that concerns about the relative powers of the President and Congress do not come into play. Yet this claim belies both precedent and common sense. Indeed, by the end of its opinion, the majority abandons even this reservation and simply asserts, "Congress already possesses . . . the authority to subpoena Presidents and their information." *Id.* at 59.

The official actions of the Chief Executive are essentially bound up in the Mazars subpoena. A subpoena's force extends beyond its recipient, which the majority has implicitly acknowledged by declining to question President Trump's standing to challenge the subpoena's validity. As we have previously explained: "[T]he fortuity that documents sought by a congressional subpoena are not in the hands of a party claiming injury from the subpoena should not immunize that subpoena from challenge by that party . . . . The fact that the Executive is not in a position to assert its claim of constitutional right by refusing to comply with a subpoena does not bar the challenge." *United States v. AT&T*, 567 F.2d 121, 129 (D.C. Cir. 1977) (citing *Eastland*, 421 U.S. at 513 (Marshall, J., concurring)). Moreover, we have recognized that congressional subpoenas may create a "portentous clash between the executive and legislative branches" notwithstanding the fact that the subpoena was issued against a private party. *United States v. AT&T*, 551 F.2d 384, 385 (D.C. Cir. 1976); *accord Eastland*, 421 U.S. at 498, 501 n.14 (reviewing challenge to third-party subpoena because

otherwise "compliance by the third person could frustrate any judicial inquiry").

The Committee's subpoena is directed to Mazars but targets the President's papers. The form of the subpoena cannot mask the inter-branch conflict between Congress and the President. *Cf. Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 225–26 (D.C. Cir. 2013) (refusing to allow "end runs" around "separation-of-powers concerns" by subpoenaing the Secret Service instead of the President for presidential calendars). Despite the majority's skepticism, President Trump necessarily "carries the mantle of the Office of the President in this case." Maj. Op. 24; *cf. In re Lindsey*, 158 F.3d 1263, 1286 (D.C. Cir. 1998) (Tatel, J., concurring in part and dissenting in part) ("Because the Presidency is tied so tightly to the persona of its occupant . . . the line between official and personal can be both elusive and difficult to discern.").[5]

The basic contours of the problem are straightforward— the Committee's subpoena seeks information regarding alleged unlawful actions of the President. The direct conflict between Congress and the President cannot be evaded by treating this as an ordinary legislative inquiry involving a subpoena to an accounting firm. In pursuit of remedial legislation, the Committee may investigate broadly, but this subpoena goes too

---

[5] As the Department of Justice points out, it is also possible that judicial resolution would not be necessary if the Committee had issued the subpoena to the President directly. DOJ Br. 7–8. Instead, the President and the House would negotiate in the "hurly-burly, the give and take of the political process between the legislative and the executive," likely raising a mix of legal and political arguments and appealing to the public for support. *Executive Privilege - Secrecy in Government: Hearings Before the Subcomm. on Intergovernmental Relations of the S. Comm. on Government Operations*, 94th Cong. 87 (1975) (statement of Antonin Scalia, Assistant Att'y Gen., Office of Legal Counsel).

far because the legislative power cannot target whether the President violated the law.

## II.

The question of whether the House may issue this subpoena for a legislative purpose presents a serious conflict between Congress and the President. While the question has never been squarely addressed by the Supreme Court, Congress and the executive branch have regularly confronted similar problems. Accordingly, I start at the beginning. The text and structure of the Constitution are best read to provide for impeachment as the exclusive mechanism for reaching the wrongdoing of the President and other impeachable officials. The original understanding of Congress's separate legislative and impeachment powers, as well as consistent historical practice since the Founding, confirms that congressional investigations of the alleged unlawful actions of the President cannot be pursued through the legislative power. *Cf. NLRB v. Noel Canning*, 573 U.S. 513, 524–26 (2014) ("'[L]ong settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions' regulating the relationship between Congress and the President." (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929))).

Targeting an individual officer for suspicions of criminality requires proceeding through the impeachment power, with its attendant procedural protections and accountability. The majority claims to recount a "familiar tale" of congressional subpoenas and investigations, Maj. Op. 65; however, its story covers only legislative investigations that involve no allegations of wrongdoing against an impeachable official. The majority's cursory and selective use of history glosses over important distinctions carefully maintained by all three branches between Congress's legislative and judicial powers of investigation.

12

A.

The text and structure of the Constitution set out with precision the process for Congress to investigate the unlawful actions of the President—namely, impeachment by the House followed by a trial in the Senate. The distinctions between the legislative and judicial powers of Congress are firmly rooted in the Constitution and reflect the fundamental differences between these powers in our system of government. The original meaning confirms that Congress acts in an exceptional judicial capacity when exercising impeachment powers. Investigating unlawful actions by impeachable officials is outside the legislative power because impeachment provides the exclusive mechanism for Congress to investigate such conduct.

Congress is vested with limited and enumerated legislative powers, and while the power to investigate is not in the text of the Constitution, it has long been recognized that Congress may investigate and issue subpoenas necessary and proper to the exercise of the legislative power. U.S. CONST. art. I, § 8, cl. 18. As the Court has explained, "the power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function." *McGrain*, 273 U.S. at 174. Such investigations are part of the legislative power and may extend no farther than that power permits. *See Quinn*, 349 U.S. at 161.

In the United States, however, the legislative power does not include the exercise of judicial power to determine the guilt or innocence of individuals.[6] The Constitution prohibits bills

---

[6] By contrast, at the time of the Founding, the British House of Commons possessed broad powers to "impeach" not only officials but individual citizens, who could be tried by the House of Lords in a judicial capacity for any criminal offense. 4 William Blackstone, Commentaries *259–61. As such, Parliament could not only remove

of attainder. U.S. CONST. art. I, § 9, cl. 3; art. I, § 10, cl. 1; *see also United States v. Brown*, 381 U.S. 437, 442 (1965) ("[T]he Bill of Attainder Clause was intended not as a narrow, technical . . . prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply—trial by legislature."). The Framers understood the importance of prohibiting Congress from turning its substantial powers against an individual and possessed a "sense of a sharp necessity to separate the legislative from the judicial power." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 219 (1995); *see also Calder v. Bull*, 3 U.S. (3 Dall.) 386, 389 (1798) (reviewing parliamentary abuses of bills of attainder and noting "the Federal and State Legislatures, were prohibited from passing any bill of attainder; or any ex post facto law" to prevent "acts of violence and injustice" against individuals). As Montesquieu warned, if the judicial powers were "joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control; for the judge would then be the legislator." Montesquieu, The Spirit of the Laws 157 (A. Cohler et al. eds., 1989).

Vested with the power to make the laws, Congress cannot also execute and adjudicate them. *See Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 136 (1810) ("It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society

---

an official but also assess a broad range of punishments at the discretion of "the wisdom of the peers." *Id.* at *121–22. Against the abuses of this practice, the Founders limited the scope of impeachable offenses and punishments for conviction. *See* Peter Hoffer & N.E.H. Hull, Impeachment in America, 1635-1805, at 96–98 (1984); *see also* Akhil R. Amar, America's Constitution: A Biography 199–203 (2005) (describing how the "system of federal impeachment broke decisively with English impeachment practice").

would seem to be the duty of other departments."). Exercising the legislative power, Congress may enact general, prospective rules for the whole of society. Yet Congress cannot prosecute and decide specific cases against individuals. Such powers properly belong to the executive branch and the independent judiciary—a division essential to maintaining fundamental aspects of our separation of powers and protecting the rights of individuals accused of illegal actions.

As an exception to this separation, the Constitution confers upon the House and Senate limited judicial powers over impeachable officials. The Constitution vests the House of Representatives with the "sole Power of Impeachment," U.S. CONST. art. I, § 2, cl. 5, and the Senate with the "sole Power to try all Impeachments," U.S. CONST. art. I, § 3, cl. 6. The Constitution creates a two-tier system, dividing limited judicial power between the House and the Senate to target individual cases of wrongdoing by impeachable officials. These judicial powers were understood as exceptions to the legislative power vested in Congress. *See Kilbourn*, 103 U.S. at 190–91 (noting impeachment and removal as exceptions to the separation of powers because they place judicial power in Congress); *Hayburn's Case*, 2 U.S. (2 Dall.) 408, 410 (1792) ("[N]o judicial power of any kind appears to be vested [in the legislature], but the important one relative to impeachments.").

In the context of an impeachment inquiry, the House serves as a kind of grand jury, investigating public officials for misconduct. As Hamilton noted, the "delicacy and magnitude of [this] trust" transforms the House into a "NATIONAL INQUEST." The Federalist No. 65, at 338. The Senate acts as a "court for the trial of impeachments," exercising the "awful discretion which a court of impeachments must necessarily have, to doom to honour or to infamy the most confidential and the most distinguished characters of the community." *Id*. at 339. Trial by the Senate in cases of impeachment is part of the

"judicial character of the Senate." *Id.* at 337; *see also* Jefferson's Manual of Parliamentary Practice § 619 ("The trial, though it varies in external ceremony, yet differs not in essentials from criminal prosecutions before inferior courts."). The Constitution requires senators trying an impeachment to be on "Oath or Affirmation" and for the Chief Justice to preside when the President is tried; conviction requires "two thirds of the Members present." U.S. CONST. art. I, § 3, cl. 6. The Constitution refers to "Judgment in Cases of Impeachment." U.S. CONST. art. I, § 3, cl. 7.

As an exercise of judicial power, the impeachment process targets the individual. The Constitution's text confirms this understanding: "no Person shall be convicted," and "the Party convicted" shall be liable according to the law. U.S. CONST. art. I, § 3, cls. 6–7. "The President, Vice President, and all civil Officers of the United States" are subject to impeachment. U.S. CONST. art. II, § 4. Article I makes clear that in this role, the Senate acts as a court trying impeachable offenses and renders judgment that could result in removal from office and disqualification from holding any "Office of honor, Trust, or Profit under the United States." U.S. CONST. art. I, § 3, cl. 6. The impeachable offenses enumerated in the Constitution specifically target individual wrongdoing, namely "Treason, Bribery, or other high Crimes and Misdemeanors." U.S. CONST. art. II, § 4; *see also* The Federalist No. 65, at 339 (observing the Senate was the only body with "*confidence enough in its own situation,* to preserve, unawed and uninfluenced, the necessary impartiality between an *individual* accused, and the *representatives of the people, his accusers*").

The Founders treated impeachable offenses as wholly distinct from the subjects of investigation for legislative purposes, such as maladministration. The exact phrasing of an impeachable offense was debated at the Philadelphia Convention. After the Convention settled on "Treason, or

bribery," George Mason moved to include "maladministration" as an additional ground for impeachment. 2 Records of the Federal Convention 550 (Max Farrand ed., 1937). James Madison objected, arguing that "[s]o vague a term will be equivalent to a tenure during pleasure of the Senate," and Gouverneur Morris argued that "[a]n election of every four years will prevent maladministration." *Id.* Conceding the point, Mason withdrew "maladministration" and submitted the text eventually enacted: "other high crimes & misdemeanors." *Id.* Thus, impeachment addresses a public official's wrongdoing—treason, bribery, and high crimes or misdemeanors—while problems of general maladministration are left to the political process.

In addition, impeachment by the House and trial by the Senate were understood to include constitutional rights normally afforded to the accused in a criminal trial. After examining English, colonial, and early constitutional practice, Justice Story concluded that the common law rights of criminal defendants apply in the exercise of the impeachment power. *See* 3 Joseph Story, Commentaries on the Constitution of the United States § 796 (1833) ("[I]n trials by impeachment the law differs not in essentials from criminal prosecutions before inferior courts. The same rules of evidence, the same legal notions of crimes and punishments prevail."); *see also* 3 Asher C. Hinds, Hinds' Precedents of the House of Representatives § 2486 ("Hinds") ("In the prosecution of an impeachment, such rules must be observed as are essential to justice; and, if not exactly the same as those which are practiced in ordinary courts, they must be analogous, and as nearly similar to them as forms will permit." (quoting Op. Att'y Gen. of May 9, 1796)).

The Supreme Court has long recognized the enhanced protections required by impeachment's judicial function, even if such matters are generally not justiciable. *See Nixon v.*

*United States*, 506 U.S. 224, 238 (1993) (concluding that judicial review of impeachment procedures would be inconsistent with the text and structure of the Constitution); *Marshall v. Gordon*, 243 U.S. 521, 547 (1917) (noting that when the congressional contempt power is "transformed into judicial authority" as when a "committee contemplate[es] impeachment," the authority becomes "subject to all the restrictions and limitations imposed by the Constitution"); *Kilbourn*, 103 U.S. at 190 (impeachment proceedings assume "the same manner" and employ the "same means that courts of justice can in like cases").

Moreover, impeachment and removal ensure accountability to Congress but are not designed to give Congress direct control over the executive branch. The President is the head of a co-equal and independent branch of government. The impeachment power raised concerns for Gouverneur Morris and other Framers who feared "the prospect of impeachment would make the chief executive dependent upon the legislature." Peter Hoffer & N.E.H. Hull, Impeachment in America, 1635-1805, at 100 (1984); *see also* The Federalist No. 65, at 341 (noting the risk of "persecution of an intemperate or designing majority in the House of Representatives").

Because of the weighty responsibility of investigating and trying public officers, "the Constitution structured impeachment as a system of national accountability." Akhil R. Amar, America's Constitution: A Biography 201 (2005). The Framers established a mechanism for Congress to hold even the highest officials accountable, but also required the House to take responsibility for invoking this power. *See* 3 Annals of Cong. 903 (1793) (statement of Rep. Smith) (describing the "solemnities and guards" the impeachment process offers to public officers "accused of a breach of duty"); H.R. Rep. No. 93-1305, at 182 (1974) (describing the House's "responsibility

as representatives of the people" in the Nixon impeachment process). By vesting this visible and solemn power in one institution, the Constitution forces the House to take accountability for its actions when investigating the President's misconduct. *See* Michael J. Gerhardt, The Federal Impeachment Process: A Constitutional and Historical Analysis 110 (1996) ("[M]embers of Congress seeking reelection have a political incentive to avoid any abuse of the impeachment power. . . . [T]he cumbersome nature of the impeachment process makes it difficult for a faction guided by base personal or partisan motives to impeach and remove someone from office."); Julie R. O'Sullivan, *The Interaction Between Impeachment and the Independent Counsel Statute*, 86 GEO. L.J. 2193, 2229–30 (1998) ("[E]lectoral accountability is the ultimate check by which Congress's abuse of its otherwise externally unchecked power of impeachment may be constrained.").

In light of the text, structure, and original meaning, the Constitution is best read to provide for impeachment as the exclusive mechanism for Congress to investigate the wrongdoing of the President and other impeachable officials. *See Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 610 (1838) ("The executive power is vested in a President; and as far as his powers are derived from the constitution, he is beyond the reach of any other department, except in the mode prescribed by the constitution through the impeaching power."). It would be wholly inconsistent with this exacting structure and its explicit safeguards if Congress could target unlawful actions by impeachable officials simply through its legislative power, thereby encroaching on the Executive without the processes, protections, and accountability of impeachment.

B.

Because "the interpretive questions before us concern the allocation of power between two elected branches of Government," *Noel Canning*, 573 U.S. at 524, I proceed to consider the historical practice regarding congressional investigations of the executive branch and executive officials. *Cf. Zivotofsky*, 135 S. Ct. at 2084 ("To determine whether the President possesses the exclusive power of recognition the Court examines the Constitution's text and structure, as well as precedent and history bearing on the question."). While historical practice is relevant, it does not alter the original meaning of the Constitution. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 370 (1995) (Thomas, J., concurring in the judgment) (recognizing the concern with overturning longstanding state practice, but concluding that "the historical evidence from the framing outweighs recent tradition").

With respect to Congress's investigative powers, the original meaning and historical practice align—all three branches have consistently distinguished between investigations for legislative purposes and investigations targeting wrongdoing by an impeachable official. Moreover, the historical evidence demonstrates that Congress often begins an investigation into the executive branch with general questions properly pertaining to legislation; however, if an inquiry turns to suspicions of criminality, Congress moves that part of the investigation into impeachment or ends the inquiry into the impeachable official. Thus, even a valid legislative purpose has never been thought to justify probing specific accusations of wrongdoing by impeachable officials. Exercising their independent duty to interpret the Constitution, the political branches have maintained that impeachment is the exclusive mechanism for investigating impeachable offenses. This historical practice reflects and reinforces the Constitution's text, structure, and original meaning, and is consistent with the Supreme Court's precedents.

1.

Founding Era practice confirms the Constitution's original meaning—investigations of unlawful actions by an impeachable official cannot proceed through the legislative power. For instance, in 1793 the House passed a broad resolution to investigate the administration of the Department of the Treasury. *See* 3 Annals of Cong. 835–40 (1793). Representative William Giles subsequently introduced a string of resolutions alleging wrongdoing and lawbreaking by Secretary Alexander Hamilton. *Id.* at 900 (alleging, *inter alia*, "[t]hat the Secretary of the Treasury has violated the law"). Responding to Representative Giles's resolution, Representative William Smith argued that an investigation of whether "the Secretary violated a law" could not proceed under the guise of "an investigation of theoretic principles of Government." *Id.* at 901. Instead, the Constitution "directs" that Congress must confront "great public functionaries . . . accused of a breach of duty" through the impeachment process, with its attendant "solemnities and guards." *Id.* at 903; *see also id.* at 903–04 (statement of Rep. Murray); *id.* at 947–48 (statement of Rep. Boudinot) ("[The Committee] were no longer acting in a Legislative capacity, but were now exercising the important office of the grand inquest of the Nation . . . . The honor and reputation of the officer thus charged . . . required a steady, uniform, and disinterested examination of every question from us."). Representative Giles's resolutions were decisively defeated. *See id.* at 955–63.

Similarly, in 1796 the House requested from President George Washington documents and diplomatic correspondence related to the Jay Treaty and its ratification in order to determine whether to appropriate the funds necessary to implement the Treaty. President Washington argued that because the House could not compel him to disclose the documents through an exercise of its legislative powers, it

could demand the documents only through an exercise of its impeachment power: "It does not occur that the inspection of the papers asked for can be relative to any purpose under the cognizance of the House of Representatives, except that of an impeachment; which the resolution has not expressed." *See* 5 Annals of Cong. 760–62 (1796). The House passed a resolution disapproving of President Washington's message, but eventually appropriated the funds necessary to implement the Treaty without receiving the papers it demanded from the President. *See id.* at 1291.

Moreover, during the early years of the Republic, when the House sought to target individual, official misconduct, it proceeded through the impeachment power, not the legislative power. In the high profile 1805 impeachment of Associate Justice Samuel Chase, the investigation into his misconduct proceeded unambiguously under the impeachment power. *See* 3 Hinds §§ 2342–46. The House specifically defined its role as that of a grand jury and voted to authorize an impeachment investigation by a committee vested with subpoena powers. *See id.* § 2342.[7]

One early impeachment illustrates the line between general investigation and impeachment particularly well. During an investigation of the "disposition of the funds of the district court," "the conduct of the judge of the district had been somewhat implicated." 32 Annals of Cong. 1715–16 (1818) (discussing Judge William P. Van Ness of the Southern District of New York). The Judiciary Committee thought it improper to

---

[7] Congress conducted such investigations exclusively through the impeachment power throughout the Founding Era. *See* 3 Hinds §§ 2294–2302 (impeachment of Senator William Blount, 1797); §§ 2319–23 (impeachment of Judge John Pickering, 1803); §§ 2364–67 (impeachment of Judge James Peck, 1830, highlighting the importance of protections for the accused before the Senate trial).

proceed under the existing resolution and sought specific authority from the House to transfer from a legislative investigation to an investigation of the judge's "official conduct." *Id.* After such authority was granted, the Committee conducted an impeachment inquiry and found no "ground for the constitutional interposition of the House." 3 Hinds § 2489.

Ignoring these Founding Era precedents, the majority touches briefly on investigations for legislative purposes that concerned only general maladministration. None of the majority's examples involve an allegation of individual wrongdoing or unlawful activity by an impeachable officer. Indeed, the majority's examples help to demonstrate the original understanding that such investigations proceed exclusively through the impeachment power.

The majority begins with the House's 1792 investigation into the failure of the expedition under General Arthur St. Clair in the Northwestern Territory. Maj. Op. 11. This investigation did not single out any particular officer for misconduct; instead, it was a general investigation into "the causes of the late defeat of the army under the command of Major-General St. Clair" and associated problems of logistics and supply. 3 Hinds § 1725. The investigation did not focus on General St. Clair, who was in any event not an impeachable officer because the impeachment power extends only to "civil Officers." U.S. CONST. art. II, § 4. Rather, the House sought to study the problems of execution in the expedition as a whole. Furthermore, at the Washington Administration's urging, Congress amended its resolution of inquiry to disclaim any intention of seeking private papers. *See* Thomas Jefferson, Memoranda of Consultations with the President (11 Mar. to 9 Apr. 1792); 3 Hinds § 1726 (calling for papers only "of a public nature"). Contrast this general investigation with the investigation of Secretary Hamilton: when the inquiry began to focus on whether Hamilton had violated the law, the House

insisted such inquiries could not proceed through the ongoing legislative investigation. The investigation of the St. Clair expedition never turned toward an impeachable official, and therefore remained within Congress's legislative powers. *See* 3 Annals of Cong. 490–94 (1792).

Similarly, the majority's reference to Congress's investigation of the burning of Washington in 1814 offers a useful example of the line maintained throughout the Founding Era between general investigation and impeachment. Maj. Op. 12. This legislative investigation focused on the general causes of the military disaster without targeting any individual officer. *See* Herman J. Viola, "The Burning of Washington, 1814," *in* Congress Investigates: A Critical and Documentary History 41–45 (Roger A. Bruns et al. eds., 2011). The majority's Founding Era precedents thus buttress the rule that investigations into the causes of maladministration may proceed under the legislative power; however, the legislative power cannot support an investigation into whether an impeachable official has violated the laws. Such congressional inquiry must proceed, if at all, through the impeachment process.

2.

The Founding Era practice continued into the Jacksonian Era. For example, in 1832, Representative John Quincy Adams defeated a resolution seeking to conduct a legislative investigation into charges of public misconduct against a federal land commissioner. The matter was referred to the House Judiciary Committee after Adams argued that "[t]he resolution contained a matter of charge against a public officer. Prima facie it would lead to an expectation of an impeachment. It was alike due to the character of the officer in question, and to the reputation of the House, to investigate the matter solemnly and effectually." 8 Reg. Deb. 2198–99 (1832).

In 1836, the House appointed a select committee to conduct a broad investigation of all departments of the Jackson Administration, empowering the committee to call for persons and papers. 3 Hinds § 1737. When the Committee's investigation focused on particular officials, President Andrew Jackson intervened in protest of the Committee's "illegal and unconstitutional calls for information." *Id.* The President argued that he would fully cooperate with an investigation conducted "in the accustomed mode," impeachment, but would not subject himself to "the establishment of a Spanish inquisition." Letter from President Andrew Jackson to Rep. Henry A. Wise, Chairman, H. Select Comm. (Jan. 26, 1837). Chairman Wise resisted and submitted a resolution disagreeing with the doctrine expounded by the President, providing a rare contrary understanding of the scope of the legislative power to investigate. But the Chairman's position was soundly defeated by his committee, which issued a report endorsing President Jackson's position and noting that the investigation amounted to charges "against the individual officers for 'corrupt violation' of existing laws." 3 Hinds § 1740. The Committee further concluded that "the only constitutional power under which the House of Representatives, as a coordinate branch of the Government, could constitute a committee to inquire into alleged 'corrupt violations of duty' by another coordinate branch of the Government (the Executive) is the 'power of impeachment.'" *Id*.

Indeed, Congress reaffirmed that it could not censure President Jackson outside the context of impeachment. After initially voting to censure, the Senate later expunged the censure from the record on the grounds that "President Jackson was adjudged and pronounced to be guilty of an impeachable offence, and a stigma placed upon him, as a violator of his oath of office, and of the laws and constitution which he was sworn to preserve, protect, and defend, without going through the forms of an impeachment, and without allowing him the

benefits of a trial, or the means of defence." 12 Reg. Deb. 878 (1836).[8]

Presidents James Polk, Ulysses Grant, and Grover Cleveland continued to vigorously defend the line between legislative and impeachment investigations, maintaining the latter included legal protections for the officer accused. In 1846, the House formed a select committee to investigate the possibility of impeaching Daniel Webster, the former Secretary of State (and then-Senator), with the power to send for papers. Cong. Globe, 29th Cong., 1st Sess. 945 (1846). While the Select Committee conducted its investigation, the House debated a resolution calling for the State Department to produce documents tending to incriminate Webster. *Id.* at 636. Some members argued that only the duly authorized Select Committee could make such a request. *Id.* at 636–43. Representative Adams maintained that an impeachable official "may not be reached by side-blows." *Id.* at 641. The resolution passed, but President Polk refused to turn over the requested documents because the resolution did not clearly spell out

---

[8] The majority asserts that "Presidents, too, have often been the subject of Congress's legislative investigations." Maj. Op. 15. Its one example from the Jacksonian Era, however, fails to support its conclusion. The majority refers to the select committee appointed to investigate former Representative Samuel Houston and whether he received money from the Secretary of War with the President's knowledge. *Id.* at 15–16. Far from an investigation of the President's wrongdoing, this inquiry was part of a broader investigation of Houston's assault on a member of Congress for statements made on the floor. The Committee Report never mentions the President, nor does it indicate the Committee took any steps to investigate the President. *See* 2 Hinds §§ 1616–19; 8 Reg. Deb. 2591–92 (1832) (context of inquiry); *id.* at 2595 (then-Rep. Polk proposing inquiry); *id.* at 2853 (need for resolution was to determine veracity of statement made on floor that provoked Houston's attack); *id.* at 3022–33 (resolution forming select committee).

Congress's intent to obtain the documents pursuant to its impeachment power.

President Polk emphasized, however, that he would fully cooperate with a duly authorized impeachment investigation. *See* 2 Hinds § 1561 ("[T]he power of impeachment belongs to the House of Representatives, and that with a view to the exercise of this power, that House has the right to investigate the conduct of all public officers under the government." (quoting President James K. Polk, Message to the House of Representatives, April 20, 1846)). The Select Committee "entirely concur[red] with the President of the United States" and his decision not to "communicate or make public, except with a view to an impeachment" the document sought. Cong. Globe, 29th Cong. 1st Sess. 946–48, 988 (1846); *see also* H.R. Rep. No. 29-684, at 4 (1846). The House approved the Select Committee's proposal and took no further action on the matter. *See* 2 George Ticknor Curtis, The Life of Daniel Webster 283 (1870). President Polk and the House agreed that the House may call for documents seeking evidence of a public officer's wrongdoing only pursuant to an impeachment investigation.[9]

This issue was raised again by the 1860 House Select Committee to Investigate Alleged Corruptions in Government ("Covode Committee") when it investigated "whether the President of the United States, or any other officer of the Government, has, by money, patronage, or other improper means, sought to influence the action of Congress."

---

[9] Presidents adhered to this position throughout the Nineteenth Century without pushback from Congress. *See, e.g.*, 17 Cong. Rec. 1903 (1886) (statement of President Cleveland) ("I am also led unequivocally to dispute the right of the Senate, by the aid of any documents whatever, or in any way save through the judicial process of trial on impeachment, to review or reverse the acts of the Executive in the suspension . . . of Federal officials.").

2 Hinds § 1596. President Buchanan protested the attempt to circumvent the impeachment process, noting that while the House has the "wholesome prerogative" of examining administration of the departments of the government:

> Should [the House] find reason to believe in the course of their examinations that any grave offense had been committed by the President . . . rendering it proper, in their judgment, to resort to impeachment, their course would be plain. They would then transfer the question from their legislative to their accusatory jurisdiction, and take care that . . . the accused should enjoy the benefit of cross-examining the witnesses and all the other safeguards with which the Constitution surrounds every American citizen.

President James Buchanan, Addendum to March 28 Message to Congress (June 22, 1860). The House asserted its power to investigate generally, but issued no subpoena seeking evidence of unlawful conduct by the President. *See* 2 Hinds § 1596; 3 Hinds § 1683.

Even the Civil War and Reconstruction Congresses, which strongly asserted congressional power, adhered to the distinction between investigations for legislative purposes and investigations of illegal conduct by an impeachable official. For example, the Joint Committee on the Conduct of the War harangued non-impeachable military officers and articulated broad theories of congressional power, but never issued compulsory process to the President or sought to determine if particular civil officers violated the law. *See generally* Elizabeth Joan Doyle, "The Conduct of the Civil War, 1861–65" *in* Congress Investigates at 160–89. The majority's reference to the Harpers Ferry investigation, Maj. Op. 12, similarly misses the mark because that investigation never

focused on the unlawful conduct of an impeachable official, but instead sought facts about the raid generally in order to determine whether legislation was necessary. *See* Roger A. Bruns, "John Brown's Raid on Harpers Ferry, 1859–60" *in* Congress Investigates at 127–28.

The impeachment of President Andrew Johnson demonstrates the strength of the rule against using legislative inquiries to circumvent the impeachment process. The House rebuffed early attempts to initiate an inquiry into President Johnson's wrongdoing under the auspices of an investigation into the executive branch's administration. *See* Michael Les Benedict, "The Impeachment of President Andrew Johnson, 1867–68" *in* Congress Investigates at 263–64. While a minority of representatives would have favored using the legislative power to address President Johnson's abuses, "the tedious job of taking testimony and searching through documents" did not begin until after a formal impeachment process was initiated. *Id.*; *see also* 3 Hinds §§ 2399–2400.

President Grant maintained the line against aggressive congressional requests in the midst of Reconstruction. The House requested detailed information regarding President Grant's whereabouts while performing executive functions to determine whether the President was in violation of the Act of 16 July 1790, which established the District of Columbia as the seat of government. *See* 3 Hinds § 1889. President Grant refused to comply with the request on separation of powers grounds. *See* 4 Cong. Rec. 2999–3000 (1876). As he explained, the investigation did not "belong to the province of legislation," nor did it bear on any impeachment proceeding. *Id.* He therefore felt obliged under the Constitution to refuse the request in order to prevent "encroachments upon the proper powers of the office which the people of the United States have confided to me." *Id.*; *see also* 3 Hinds § 1889 ("What the House of Representatives may require as a right in its demand upon

the Executive for information is limited to what is necessary for the proper discharge of its powers of legislation or of impeachment."). The House took no further action. *See* 3 Hinds § 1889.

In the 1879 investigation of United States Consul George Seward, the House again reaffirmed the separation between legislative and impeachment investigations. Acting under its legislative authority, the House Committee on Expenditures in the State Department attempted to hold Seward in contempt for failing to comply with a subpoena seeking certain official papers. *Id.* § 1699. Seward argued that the Committee was not authorized to conduct an impeachment inquiry and could not investigate his alleged misconduct pursuant to the legislative power. Agreeing with Seward, the House referred the matter to the Judiciary Committee. *Id.* The Judiciary Committee's report "distinguished[ed] this case from the case of an ordinary investigation for legislative purposes," and held that the Committee on Expenditures had acted beyond its legislative powers by attempting to circumvent the protections of the impeachment process:

> The Executive is as independent of either House of Congress as either House of Congress is independent of him, and they cannot call for the records of his action or the action of his officers against his consent, any more than he can call for any of the journals or records of the House or Senate.

*Id.* §§ 1700, 2514. The Judiciary Committee maintained that the House had no right to issue compulsory process against the executive branch outside the impeachment process.[10]

---

[10] The Judiciary Committee recognized that Seward could not be compelled to produce either private or public papers. His private

30

3.

Continuing into the Twentieth Century, presidents have been vigilant against congressional attempts to circumvent the impeachment process. In 1909, the Senate attempted to subpoena documents from the Attorney General regarding the Department of Justice's failure to act against U.S. Steel Corporation. President Theodore Roosevelt refused to comply, so the Senate subpoenaed the Commissioner of Corporations, an officer within the Department of Commerce and Labor, for the same documents. *See Commissioner of Corporations— Right of Senate Committee to Ask for Information*, 27 Op. Att'y Gen. 150 (1909). After ordering the Commissioner to withhold the documents, the President informed the Senate that he would turn over the documents only if the Senate was acting in its capacity as an impeachment court. *See History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress*, 6 Op. O.L.C. 751, 769 (1982) (citing Edward S. Corwin, The President: Office and Powers 429–30 (1957)). The Senate took no further action.[11]

Investigations of Secretary of the Treasury Andrew Mellon similarly demonstrate the executive branch's resistance

---

papers were protected by the right against self-incrimination and his title to his private property, which could not be collaterally stripped by Congress. As for public papers, the Committee recognized them as within the province of executive privilege. 3 Hinds §§ 1700, 2514.

[11] President Roosevelt's handling of the matter was recorded by his personal aide: "I told [Senator Clark] that the Senate should not have those papers and that [the Commissioner] turned them over to me. The only way the Senate or the committee can get those papers now is through my impeachment." Archibald Willingham Butt & Lawrence F. Abbott, The Letters of Archie Butt, Personal Aide to President Roosevelt 305–06 (1924).

to releasing documents demanded for legislative purposes in relation to an impeachable official's wrongdoing. In 1925, President Calvin Coolidge refused to hand over Mellon's tax returns to a Senate committee tasked with a legislative investigation of the Bureau of Internal Revenue, noting that "the attack which is being made on the Treasury Department goes beyond any . . . legitimate requirements." 65 Cong. Rec. 6087–88 (1924).[12] In 1929, the Senate Judiciary Committee investigated Mellon's alleged violations of financial conflicts of interest laws. The Committee determined it did not have the power to issue compulsory process because "it would be a judicial inquiry and [] not in aid of any legislative function of the Senate" and could be reached only through "duly instated criminal proceedings or impeachment proceedings originating in the House of Representatives." S. Rep. No. 71-7, at 3 (1929). In 1932, the House Judiciary Committee was authorized to conduct a formal impeachment investigation, with subpoena power, into the same allegations of Mellon's alleged lawbreaking. 3 Deschler's Precedents, Ch. 14, § 14.1 ("Deschler").[13]

---

[12] Congress did not attempt to enforce the subpoena in court but instead engaged in negotiations with the executive branch, which resulted in a compromise and Congress passing legislation regarding the disclosure of tax returns. *See* George K. Yin, *James Couzens, Andrew Mellon, the 'Greatest Tax Suit in the History of the World,' and Creation of the Joint Committee on Taxation and Its Staff*, 66 TAX L. REV. 787, 857 (2013).

[13] The majority's citation to the Pearl Harbor investigation, Maj. Op. 16, is of limited value, as President Franklin Roosevelt passed away on April 12, 1945, nearly five months before Congress authorized the investigation on September 6, 1945, placing the former President beyond the reach of Congress's subpoena power. *See* Wayne Thompson, "The Pearl Harbor Committee, 1945–46" *in* Congress Investigates at 670.

4.

In the modern era, Congress has investigated allegations of illegal conduct by Presidents Richard Nixon, Ronald Reagan, and Bill Clinton. The majority cites these as examples of presidents being "the subject of Congress's legislative investigations." Maj. Op. 16–18. Contrary to the majority's characterization, these investigations reinforce that Congress may launch legislative investigations into administration generally, including the President's involvement in discretionary decisionmaking and purported scandals, but when wrongdoing by the President is targeted or uncovered the House transfers allegations of such conduct to an impeachment inquiry.

For example, the congressional inquiry into the break-in at the Democratic National Committee's headquarters in the Watergate Hotel began with the creation of a Senate Select Committee to investigate the incident and determine whether new legislation on electoral safeguards might be needed. *See* S. Res. 60, 93d Cong. § 1(a) (1973). The inquiry centered on whether any actions—"illegal, improper, or unethical"—took place, but the inquiry did not target any specific persons. *Id*. President Nixon initially rebuffed the Select Committee's informal requests for information. *See* Letter from President Richard M. Nixon to Sen. Sam J. Ervin Jr., Chairman, Sen. Select Comm. on Presidential Campaign Activities (July 6, 1973). The Committee, acting pursuant to its legislative power, later issued two subpoenas to the President. Those subpoenas were eventually quashed by this court. *See Senate Select*, 498 F.2d at 733.[14]

---

[14] When the Supreme Court upheld the grand jury request for President Nixon's tapes, it specifically confined its decision to the context of criminal investigations and noted it was not concerned

While litigation was pending, the House Judiciary Committee determined that the evidence gathered through both the Senate and special counsel investigations had shifted the focus so heavily toward allegations of wrongdoing by President Nixon that a formal impeachment investigation was necessary to proceed any further:

> We have reached the point when it is important that the House explicitly confirm our responsibility under the Constitution.
>
> We are asking the House of Representatives, by this resolution, to authorize and direct the Committee on the Judiciary to investigate the conduct of the President of the United States, to determine whether or not evidence exists that the President is responsible for any acts that in the contemplation of the Constitution are grounds for impeachment . . . .
>
> [W]e are asking the House to give the Judiciary Committee the power of subpoena in its investigations. Such a resolution has always been passed by the House. . . . It is a necessary step if we are to meet our obligations.

3 Deschler Ch. 14, § 6.2. Only after the House passed a resolution explicitly invoking its authority under the impeachment power did the Judiciary Committee subpoena the President. *See* H.R. Res. 803, 93d Cong. (1974); H.R. Rep. No. 93-1305, at 6 (1974).

The House Judiciary Committee took responsibility for commencing an impeachment investigation and thereafter

---

with how these issues might be resolved in the context of "congressional demands for information." *United States v. Nixon*, 418 U.S. 683, 712 n.19 (1974).

accorded robust procedural protections to ensure that documents obtained in the course of that process remained confidential. H.R. Rep. No. 93-1305, at 8–9. The Committee also determined that the President must comply only with subpoenas issued "relative to the impeachment inquiry." 3 Deschler Ch. 14, § 6.12. Notably, one of the grounds in the resulting articles of impeachment was President Nixon's failure to comply with subpoenas, but only those issued after formal authorization of the impeachment investigation. *Id.* § 15.13. The majority neglects this institutional history and focuses only on the Select Committee's unsuccessful attempt to subpoena the President for legislative purposes. Maj. Op. 17–18. In the 1970s, as in the 1790s, the House recognized the importance of invoking the impeachment power when an investigation shifts from a legislative inquiry to an investigation of the illegal action of an impeachable official.

Regarding the Iran-Contra Affair in 1987, the majority asserts that the House committee established to inquire into illegal arms sales to Iran to finance Nicaraguan rebels sought to "investigate . . . the role of the President" in those events. *Id.* at 16. This misrepresents the broad scope of the investigation, which inquired into whether and how the National Security Council staff and other agency officials were involved. The House resolution forming the Select Committee to Investigate Covert Arms Transactions with Iran refers to the President only in relation to assessing the need for legislation regarding "authorization and supervision or lack thereof of the matters in this section by the President and other White House personnel." H.R. Res. 12, 100th Cong. § 1(e) (1987). The corresponding Senate resolution does not mention the President at all. *See* S. Res. 23, 100th Cong. (1987). Reflecting the general focus on the process of national security decisionmaking, the joint report issued by the House and Senate select committees sought to "explain what happened in the Iran-Contra Affair" rather than target the actions of any individual official. H.R. Rep. No. 100-

433, at xv–xvi (1987). The Committees obtained over one million pages of documents, in part through subpoenas, but only accessed the President's personal papers through his voluntary cooperation.

Similarly, the majority mischaracterizes the lessons of Congress's investigation of the Whitewater Development Corporation and the eventual impeachment trial of President Clinton. Congressional involvement began several years after a United States Attorney forwarded a criminal investigation of the failure of Madison Guaranty Savings and Loan Association to the Department of Justice and, ultimately, an independent counsel. From 1994 to 1998, various House and Senate committees gathered facts on Madison Guaranty's failure and whether agencies and administration officials cooperated with the independent counsel. *See* S. Res. 120, 104th Cong. (1995)*.* The committees investigated with a wide lens, but stopped well short of targeting offenses by particular officers. *See, e.g.*, S. Rep. No. 104-191, at 1–3 (1995). Then-Governor Clinton's involvement in Whitewater was parsed in relation to public ethics, good governance, and the regulation of financial institutions. *See The Failure of Madison Guaranty Savings and Loan Association and Related Matters: Hearing Before the H. Comm. on Banking and Fin. Servs.*, 104th Cong. 1–5 (1995) (opening statement of Rep. James A. Leach, Chairman) (purpose of Whitewater hearings was to "shed light on the character of modern political leadership rather than simply spotlight flaws in a particular leader; . . . [and] to draw lessons for oversight of our banking laws rather than simply critique what went wrong with one institution"). While the President received subpoenas from the independent counsel, other federal investigators, and a federal grand jury, the majority points to no examples of either house of Congress issuing a subpoena to the President prior to impeachment.

Once President Clinton's alleged misconduct became the target, the House, citing much of the history discussed above, formally invoked the impeachment power. *See* H.R. Rep. No. 105-795, at 24 (1998) ("Because impeachment is delegated solely to the House of Representatives by the Constitution, the full House of Representatives should be involved in critical decision making regarding various stages of impeachment."). The House proceeded to a full floor vote to authorize an impeachment inquiry. *See* H.R. Res. 581, 105th Cong. (1998) (authorizing the Judiciary Committee to subpoena persons and things).

The House also declined to issue a censure resolution because it would circumvent the Impeachment and Bill of Attainder Clauses. *See* H.R. Rep. No. 105-830, at 137 (1998) ("[F]or the President or any other civil officer, censure as a shaming punishment by the legislature is precluded by the Constitution, since the impeachment provisions permit Congress only to remove an officer . . . and disqualify him from office. Not only would [censure] undermine the separation of powers by punishing the President . . . in a manner other than expressly provided for in the Constitution, but it would violate the Constitution's prohibition on Bills of Attainder.").

\*\*\*

The text, structure, and original meaning of the Constitution are best understood to provide for impeachment as the exclusive mechanism for Congress to investigate the illegal conduct of the President and other impeachable officials. The majority presents no evidence from the Constitution, our cases, or the consistent interpretation of the political branches to refute these conclusions. From the Founding to the present, interactions between the political branches demonstrate a consistent practice that confirms the original meaning regarding the separation of the legislative and judicial powers of the House. The Constitution and our history

reinforce several principles. First, the House cannot investigate the illegal conduct of an impeachable officer pursuant to the legislative power. Second, the investigation of the illegal conduct of an impeachable officer can be pursued only under the impeachment power, which transforms the House from a legislative body into the grand inquest of the nation and affords procedural and constitutional protections to the accused. Third, the House may not circumvent the weighty accountability of the impeachment process simply by proceeding through a legislative investigation.

## III.

With these constitutional and historical principles as guideposts, I reach the question at hand: whether the Committee's subpoena is a valid exercise of the legislative power. I examine the subpoena and conclude that it seeks to investigate illegal conduct of the President by reconstructing past actions in connection with alleged violations of ethics laws and the Emoluments Clauses. Such an inquiry exceeds Congress's legislative power. The remedial legislative purposes offered by the Committee might authorize any number of other investigations, but cannot authorize this subpoena, which seeks to determine whether the President violated the law. Moreover, this subpoena represents an unprecedented assertion of legislative power and is readily distinguished from our previous cases. Neither the Constitution, nor longstanding interpretation by all three branches, supports the majority's conclusion, which upholds— for the first time—a targeted investigation of the President's alleged unlawful conduct under the legislative power.

## A.

As the above history makes clear, the House's legislative and judicial powers are wholly distinct and the House cannot target conduct that could constitute a high crime or

misdemeanor through the legislative power. Discerning the line between the legislative and impeachment powers does not require a search for the Committee's motives because the Committee has emphasized repeatedly and candidly its interest in investigating allegations of illegal conduct by the President. In general, courts properly refrain from questioning legislative motive when assessing the legitimacy of congressional investigations, *accord* Maj. Op. 22, but this does not excuse us from the judicial duty to assure Congress is acting "in pursuance of its constitutional power." *Barenblatt v. United States*, 360 U.S. 109, 132 (1959); *see also Eastland*, 421 U.S. at 508–09 (upholding subpoenas "about a subject on which legislation may be had"); *Watkins*, 354 U.S. at 200 ("[M]otives alone would not vitiate an investigation . . . if that assembly's legislative purpose is being served."). An inquiry into motive involves looking behind the stated reasons for a Committee's actions. In the Committee's investigation, however, the "suspicions of criminality" are quite clearly articulated in the subpoena, the Cummings Memorandum, and other documents: the Committee seeks evidence of alleged unlawful actions by the President. *See Shelton*, 404 F.2d at 1297 (noting that sources for determining "[t]he object of the particular inquiry" include "the resolution of the Congress authorizing the inquiry," "the opening statement of the Chairman," and "statements of the members of the committee" (citing *Watkins*, 354 U.S. at 209)); *see also Barenblatt*, 360 U.S. at 117 ("[T]he nature of the proceedings themselves, might sometimes make the topic (under inquiry) clear." (quoting *Watkins*, 354 U.S. at 209)).

First, and most overtly, the subpoena seeks to uncover "whether the President may have engaged in illegal conduct before and during his tenure in office." Cummings Memorandum at 4. This inquiry relates in part to unofficial wrongdoing—i.e., events that occurred before President Trump's tenure in office—but also to actions during his tenure

in office. The investigation specifically targets the President. It is not about administration of the laws generally or the President's incidental involvement in or knowledge of any alleged unlawful activity within the executive branch. Instead the topics of investigation exclusively focus on the President's possible engagement in "illegal conduct."

Second, the subpoena seeks to help the Committee understand "whether [the President] has undisclosed conflicts of interest that may impair his ability to make impartial policy decisions." *Id.*; *see also* Appellee Br. 32 ("These documents may illuminate whether and to what extent [President] Trump misrepresented his liabilities on federal disclosure forms and has undisclosed conflicts of interest."). Again, this inquiry seeks to uncover alleged wrongdoing—undisclosed conflicts of interest may violate the statutory reporting requirements applicable to the President. *See* Appellee Br. 33 ("[E]xposing conflicts of interest is one of the core objectives of the Ethics in Government Act." (quoting *Trump v. Comm. on Oversight & Reform*, 380 F. Supp. 3d 76, 95 (D.D.C. 2019))).

Third, the subpoena seeks to investigate "whether [the President] is complying with the Emoluments Clauses of the Constitution." Cummings Memorandum at 4; *see also* Appellee Br. 34–35 (discussing "[t]he Oversight Committee's related investigations into [President] Trump's potential violations of the Emoluments Clauses"). On the Committee's own terms, it is investigating whether the President is in violation of the constitutional bar on public officials "accept[ing] . . . any present, Emolument, Office, or Title." U.S. CONST. art. I, § 9, cl. 8 (Foreign Emoluments Clause); *see also* U.S. CONST. art. II, § 1, cl. 7 (Domestic Emoluments Clause). Quite simply the Committee seeks information about whether the President is violating the Constitution.

Fourth, the Committee seeks to inquire about "whether [the President] has accurately reported his finances to the

Office of Government Ethics and other federal entities." Cummings Memorandum at 4; *see also* Appellee Br. 31 ("[The Committee's] investigations include . . . whether [President] Trump . . . submitted inaccurate financial disclosure forms to the Ethics Office."). Again, the Committee seeks to uncover whether the President has violated the law in his official capacity—namely, the Ethics in Government Act of 1978, 5 U.S.C. app. 4 § 101 *et seq.*, which imposes financial disclosure requirements on the President. The Committee's jurisdiction includes the authority to conduct oversight of the Office of Government Ethics and how it implements various ethics requirements for federal officials. *See* Letter from Appellee Regarding Oral Argument Matter at 3–4 (July 16, 2019) (asserting that the Oversight Committee has jurisdiction over the Ethics in Government Act under House Rule X, cl. 1(n)(1)). Yet this particular inquiry is not about the administration of the Office of Government Ethics or of the laws it administers, but rather about reconstructing suspected violations of ethics laws by the Chief Executive. The Committee seeks information about past transactions related to the President's financial reporting—which, if found inaccurate or incomplete, may carry civil and criminal penalties. *See* 5 U.S.C. app. 4 § 104(a).

The four inquiries stated in the Cummings Memorandum are more than political flourish—they unambiguously set out the nature of this investigation. These inquiries are repeated throughout statements and letters of the Chairman on behalf of the Committee. *See, e.g.*, Letter from Rep. Elijah E. Cummings, Chairman, H. Comm. on Oversight and Reform, to Pat Cipollone, Counsel to the President (Jan. 8, 2019) (request for "documents related to President Trump's reporting of debts and payments to his personal attorney, Michael Cohen"); Letter from Rep. Elijah E. Cummings, Chairman, H. Comm. on Oversight and Reform, to Emory A. Rounds III, Director of Office of Gov't Ethics (Jan. 22, 2019) (request for "documents relating to President Donald Trump's reporting of debts and

payments to his personal attorney, Michael Cohen, to silence women alleging extramarital affairs"); Letter from Rep. Elijah E. Cummings, Chairman, H. Comm. on Oversight and Reform, to Pat Cipollone, Counsel to the President (Feb. 15, 2019) (demanding answers to "significant questions about why some of the President's closest advisors made [] false claims [about alleged payments] and the extent to which they too were acting at the direction of, or in coordination with, the President"); Letter from Rep. Elijah E. Cummings, Chairman, H. Comm. on Oversight and Reform, to Victor Wahba, Chairman and Chief Executive Officer, Mazars USA, LLP (Mar. 20, 2019) (request for documents citing accusation by Cohen that "President Trump changed the estimated value of his assets and liabilities on financial statements . . . including inflating or deflating the value of assets depending on the purpose for which he intended to use the statements"). The Cummings Memorandum also relies on the February 27, 2019, hearing testimony of Michael Cohen, Cummings Memorandum at 1–2, during which the Chairman and Oversight Committee members repeatedly invoked allegations of criminality by the President. *See* Appellant Br. 7–8 (collecting statements from Cohen hearing). In this subpoena, the Committee has made clear that it seeks to investigate illegal conduct of the President. Indeed, the majority acknowledges that the Committee has an "interest in determining whether and how illegal conduct has occurred." Maj. Op. 30.

The subpoena itself focuses on information that closely tracks the Committee's stated object of investigating illegal conduct. It seeks, "with respect to Donald J. Trump" and his organizations, "[a]ll memoranda, notes, and communications" and "[a]ll underlying, supporting, or source documents and records" relating to multiple categories of financial statements going back to 2011, as well as "all engagement agreements or contracts" "without regard to time." In addition, the subpoena specifically demands "all communications" between President

Trump and his accountants and "all communications related to" any "potential concerns" that President Trump's records "were incomplete, inaccurate, or otherwise unsatisfactory."

The subpoena thus seeks to recreate, in exhaustive detail, the exact processes, discussions, and agreements that went into preparing the President's financial records over a multi-year period in order to determine whether there is anything misleading or problematic in those records. Such requests are akin to a criminal grand jury subpoena, designed to "inquire into all information that might possibly bear on [the] investigation until it has identified an offense or has satisfied itself that none has occurred." *United States v. R. Enters., Inc.*, 498 U.S. 292, 297 (1991). By contrast, "legislative judgments normally depend more on the predicted consequences of proposed legislative actions . . . than on precise reconstruction of past events." *Senate Select*, 498 F.2d at 732.

Moreover, the Committee's litigating position in this case continues to emphasize the importance of the four inquiries, each of which target the President's alleged wrongdoing and potential violations of statutes and the Constitution: "The Oversight Committee is investigating whether [President] Trump inaccurately represented liabilities on his statutorily mandated financial disclosures, impermissibly benefited from a lease with a government agency, and violated the Constitution." Appellee Br. 44; *see also id.* at 8–17, 21, 22–23, 31–35, 42, 44–45. Thus, we need not peer behind the curtain to find the Committee's suspicions of wrongdoing—the Committee has explicitly and consistently avowed the purpose of investigating alleged illegal activities of the President.

The Committee also offers a legislative purpose. The Cummings Memorandum concludes with the statement that "[t]he Committee's interest in these matters informs [the Committee's] review of multiple laws and legislative proposals under [its] jurisdiction." Cummings Memorandum at 4; *see*

*also* Letter from Rep. Elijah E. Cummings, Chairman, H. Comm. on Oversight and Reform, to Pat Cipollone, Counsel to the President (Feb. 15, 2019) ("Congress has investigated how existing laws are being implemented and whether changes to the laws are necessary."). Thus, even though the legislative purpose appears in a single sentence, the Committee states a double purpose—to investigate "criminal conduct by [President] Trump" and also to pursue remedial legislation relating to government ethics. Appellee Br. 44.

Given the broad power to investigate in aid of legislation, remedial legislative purposes will often be sufficient to uphold an investigation and accompanying subpoena. *See Quinn*, 349 U.S. at 160–61 (investigative power co-extensive with legislative power). The majority finds the Committee's assertion of a legislative purpose sufficient because "[s]uch an 'express avowal of the [Committee's] object' offers strong evidence of the Committee's legislative purpose." Maj. Op. 26 (quoting *McGrain*, 273 U.S. at 178). "The Committee's interest in alleged misconduct, therefore, is in direct furtherance of its legislative purpose." *Id.* at 31. In other words, the majority acknowledges that the Committee seeks to investigate illegal conduct of the President, but then states it is "even more important" that the Committee is seeking to "review multiple laws and legislative proposals under [its] jurisdiction." *Id.* at 26 (quoting Cummings Memorandum at 4). Because the Constitution provides only one way for Congress to investigate illegal conduct by the President, the mere statement of a legislative purpose is not "more important" when a committee also plainly states its intent to investigate such conduct. The legislative power cannot support this subpoena.

The majority ignores the essential constitutional distinction between the different investigative powers of Congress and turns longstanding practice on its head by concluding dismissively that "we can easily reject the

suggestion that this rationale [of investigating whether the 'President may have engaged in illegal conduct'] spoils the Committee's otherwise valid legislative inquiry." *Id.* at 29. The valid legislative inquiry is not entirely spoiled—the Committee's inquiry into legislative proposals may continue in any number of legitimate directions. Yet the Committee's specific investigation targeting the President, if it is to continue, may be pursued only through impeachment. Since the Republic's beginning, the President, Congress, and the courts have recognized that when Congress seeks to investigate individual suspicions of criminality against the President (or other impeachable officials), it cannot rely on its legislative powers. The legislative power being more general and expansive, it cannot trump, so to speak, the more specific impeachment power, which is necessary for an investigation of the illegal conduct of the President.

## B.

This is the first time a court has recognized that a congressional investigation pertains to "whether and how illegal conduct has occurred," Maj. Op. 30, but then upholds that investigation under the legislative power. The majority attempts to rely on our precedents to justify this subpoena by focusing on whether it is an impermissible exercise of "law enforcement" power. *Id.* at 21–22 (responding to appellants). The majority relies on cases that deal with private citizens and problems of administration—but a subpoena against the President that investigates allegations of illegal conduct cannot be shoehorned into this framework. A review of the cases demonstrates the novelty of the majority's holding.

The majority maintains that "an interest in past illegality can be wholly consistent with an intent to enact remedial legislation." *Id.* at 29. To the extent the precedents support this general principle, however, it has been applied only in the context of *private individuals*. It is well established that

45

Congress cannot exercise the executive or judicial powers, which are vested in the other departments of the government. "[T]he power to investigate must not be confused with any of the powers of law enforcement; those powers are assigned under our Constitution to the Executive and the Judiciary." *Quinn*, 349 U.S. at 161. The Court made this general observation with respect to private individuals, not impeachable public officials. As far as private individuals are concerned, Congress emphatically has no law enforcement powers—no power to indict, to try, or to convict—and cannot enact a bill of attainder that would single out a person for punishment through legislation. U.S. CONST. art. I, § 9, cl. 3; art. I, § 10, cl. 1; *see also Brown*, 381 U.S. at 445–46 ("[T]he Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons. . . . By banning bills of attainder, the Framers of the Constitution sought to guard against such dangers by limiting legislatures to the task of rule-making.").

The cases cited by the majority demonstrate that during an investigation of private activity, the *incidental* revelation of criminal activity is tolerated when Congress has a legitimate legislative purpose,[15] precisely because Congress cannot take

---

[15] Even when a valid legislative purpose exists, the Court has been vigilant in guarding the constitutional rights of private citizens. *See Watkins*, 354 U.S. at 198–99 (courts cannot "abdicate the responsibility placed by the Constitution upon the judiciary to insure that the Congress does not unjustifiably encroach upon an individual's right to privacy nor abridge his liberty of speech, press, religion or assembly"); *Quinn*, 349 U.S. at 161; *United States v. Rumely*, 345 U.S. 41, 44 (1953) ("[W]e would have to be that 'blind' Court . . . not to know that there is wide concern, both in and out of Congress, over some aspects of the exercise of the congressional

any action against a private person for lawbreaking. In *Hutcheson v. United States*, the Supreme Court permitted a Senate committee to investigate the unlawful activity of a union president despite the fact that, if any wrongdoing was uncovered, the evidence might have "warranted a separate *state* prosecution." 369 U.S. 599, 617 (1962) (emphasis added). The union president was, of course, not amenable to prosecution by Congress. Similarly, in *Sinclair v. United States*, the Court allowed a committee to question an oil executive, including on matters pertaining to pending criminal proceedings involving that executive. 279 U.S. 263, 290–91, 294–95 (1929). The proceedings determining the oil executive's liability or innocence, however, were being conducted by an entirely separate branch: the Article III judiciary.

The Court has upheld some congressional investigations that incidentally uncover unlawful action by private citizens in part because private individuals cannot be punished by Congress, but may be prosecuted by the executive branch and then face trial before an independent judiciary. *Cf. Kilbourn*, 103 U.S. at 182 (the Constitution requires that prosecutions of private individuals proceed by "a trial in which the rights of the party shall be decided by a tribunal appointed by law, which tribunal is to be governed by rules of law previously established"). The majority does not explain why precedents about union presidents and oil executives would apply to the President when the Constitution provides a wholly separate mechanism for Congress to impeach, to try, and, if convicted, to remove the President from office.

Importantly, the majority does not cite a single case in which the Court has upheld a congressional committee's investigation into the past illegality of an impeachable official

power of investigation." (quoting *Bailey v. Drexel Furniture Co.*, 259 U.S. 20, 37 (1922))).

for a legislative purpose. In sharp contrast to private individuals, Congress possesses not only legislative but also judicial powers over officials amenable to impeachment. This is a notable and important exception to the separation of powers—vesting non-legislative powers in the House and Senate for the limited purpose of checking the actions of certain high officials. When a legislative investigation turns toward the wrongdoing of the President or any impeachable official, it has never been treated as merely incidental to a legislative purpose. Such investigations require the House to exercise the solemn powers of the "NATIONAL INQUEST," The Federalist No. 65, at 338, with all of the procedural protections and accountability that accompany the decision to target a high official.

Indeed, in the one case dealing with a subpoena to the President for legislative purposes, our court did not ask whether the Senate Select Committee had a valid legislative purpose in investigating the events surrounding the Watergate break-in. *See Senate Select*, 498 F.2d at 732 ("[T]he need for the tapes premised solely on [Congress's] asserted power to investigate and inform cannot justify enforcement of the [Select] Committee's subpoena."). We concluded instead that a legislative purpose could not justify demanding the President's materials "in the peculiar circumstances of this case, including the subsequent and on-going investigation of the House Judiciary Committee." *Id*. at 733. As our court explained:

> [T]he House Committee on the Judiciary has begun an inquiry into presidential impeachment . . . .
>
> The sufficiency of the [Select] Committee's showing of need has come to depend, therefore, entirely on whether the subpoenaed materials are critical to the

> performance of its legislative functions. There is a clear difference between Congress's legislative tasks and the responsibility of a grand jury, or any institution engaged in like functions. While fact-finding by a legislative committee is undeniably a part of its task, legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability, than on precise reconstruction of past events.

*Id.* at 732. Thus, we carefully distinguished legislative tasks from grand jury or similar functions. When the House had already authorized and was pursuing impeachment proceedings, we found that the Senate Select Committee's legislative need was "too attenuated and too tangential to its functions to permit a judicial judgment that the President is required to comply with the Committee's subpoena." *Id*. at 733.

Similarly here, the questions of illegal conduct and interest in reconstructing specific financial transactions of the President are "too attenuated and too tangential" to the Oversight Committee's legislative purposes. *Id.* The parallels between our case and *Senate Select* continue to unfold, as some type of "impeachment inquiry" against the President has been invoked in the House. *See, e.g.*, Letter from Rep. Adam B. Schiff, Chairman, H. Perm. Select Comm. on Intelligence et al., to Rudolph Giuliani (Sept. 30, 2019) (transmitting subpoena for the President's papers "[p]ursuant to the House of Representatives' impeachment inquiry").

Other cases involving congressional investigations of public officials confirm the distinction between impeachment and legislative purposes and demonstrate the caution with which the Court has ensured Congress is not pursuing

impeachable offenses in a legislative inquiry. For example, in *McGrain*, the Supreme Court upheld an investigation of the Department of Justice only after determining that there was no targeted inquiry into unlawful action or allegations of impeachable offenses. The Senate resolution sought information about "the administration of the Department of Justice—whether its functions were being properly discharged or were being neglected or misdirected, and particularly whether the Attorney General and his assistants were performing or neglecting their duties." *McGrain*, 273 U.S. at 177. While the resolution mentioned Attorney General Daugherty, the Court emphasized that the Senate was not "attempting or intending to try the Attorney General at its bar or before its committee for any crime or wrongdoing." *Id.* at 179–80. It was essential to the Court's decision that the investigation did not target the unlawful behavior of the Attorney General. *See id*. at 178–80.

The majority draws a different "lesson" from *McGrain*: "that an investigation may properly focus on one individual if that individual's conduct offers a valid point of departure for remedial legislation." Maj. Op. 31. The majority places emphasis on the Court's statement, "[n]or do we think it a valid objection to the investigation that it might possibly disclose crime or wrongdoing on [the Attorney General's] part." *McGrain*, 273 U.S. at 179–80. Yet the Court also stressed that Congress was not targeting the unlawful behavior of an impeachable official and that "[i]t is not as if an inadmissible or unlawful object were affirmatively and definitely avowed." *Id*. at 180. In *McGrain,* the Court determined that the inquiry at issue was a legislative one, and specifically did not target "crime or wrongdoing."[16] *Id.* Thus, the majority cannot rely on

---

[16] The Supreme Court in *McGrain* did not question the legal principle articulated by the district court that to investigate the illegal conduct

*McGrain* for its novel holding that Congress can investigate illegal conduct of an impeachable official pursuant to the legislative power.

Similarly, in *Kilbourn*, the Court invalidated a subpoena against the Secretary of the Navy because it lacked a legitimate legislative purpose, while noting that "the whole aspect of the case would have been changed" if the investigation related to impeachment. 103 U.S. at 193. No purpose of impeachment could be found, however, from the preamble characterizing the Secretary of the Navy's conduct as "improvident." *Id.* The Court concluded that "the absence of any words implying suspicion of criminality repel the idea of such [impeachment] purpose, for the secretary could only be impeached for 'high crimes and misdemeanors.'" *Id.* In *McGrain* and *Kilbourn*, the Court allows Congress some leeway in its legislative investigations so long as it is not seeking to use the legislative power to circumvent the impeachment process.

By contrast, the gravamen of the Oversight Committee's investigation in this case is the President's wrongdoing. The Committee has "affirmatively and definitely avowed," *McGrain*, 273 U.S. at 180, its suspicions of criminality against the President. As we recognized in *Senate Select*, such inquiries are outside the legislative power in part because they pertain to subjects proper to an impeachment proceeding in the House, which like a grand jury must assess whether "certain named

---

of the Attorney General would be an exercise of the judicial power. *But see* Maj. Op. 48 (contending the Supreme Court rejected the district court's reasoning in *McGrain*). Instead, the Supreme Court simply disagreed with the district court's characterization of the proceedings, which were not about the wrongdoing of the Attorney General but the administration of the Department of Justice as a whole. "[W]hen the proceedings are rightly interpreted, [ ] the object of the investigation . . . was to obtain information for legislative purposes." *McGrain*, 273 U.S. at 177.

individuals did or did not commit specific crimes." 498 F.2d at 732. The majority's conclusion is inconsistent with our precedents, which confirm that investigations of the illegal conduct of an impeachable official cannot be pursued through the legislative power.

***

This subpoena goes beyond the legislative power precisely because it seeks to reconstruct whether the President broke the law. The Constitution creates a wholly separate impeachment power for such inquiries. The majority implicitly collapses these distinct powers when it concludes that the Committee's "interest in determining whether and how illegal conduct has occurred . . . is in direct furtherance of its legislative purpose." Maj. Op. 31. Yet the legislative and impeachment powers are not interchangeable. Congress, the President, and the courts have consistently maintained a careful line between these distinct powers. Thus, I would find that this subpoena exceeds the legislative power of Congress because it seeks to uncover wrongdoing by the President.

IV.

By collapsing the distinction between Congress's legislative and impeachment powers, the majority's decision has serious consequences for the separation of powers. The decision today expands the legislative power beyond constitutional boundaries, calling into question our precedents for reviewing the scope of congressional investigations; interpreting the legislative power of Congress to subsume the impeachment power; and permitting serious encroachments on the executive branch. For the majority, the fact that Congress seeks the President's papers is just a "twist" on the history of congressional investigations. Maj. Op. 65. In our government of three separate and co-equal departments, the targeting of the

President in a congressional subpoena seeking evidence of illegal conduct is no mere "twist," but the whole plot.

## A.

At bottom, the majority and I disagree about the meaning of the legislative power and whether Congress can use this power to conduct investigations of illegal conduct by the President. Yet the framework employed by the majority both decides too little and too much. To begin with, even though the majority determines that the House has the power to issue this subpoena, our precedents require making a separate inquiry regarding the scope of the Committee's delegated authority.[17] The majority begins by recognizing as much: "it matters not whether the Constitution would give Congress authority to issue a subpoena if Congress has given the issuing committee no such authority." Maj. Op. 18. The majority, however, collapses this two-part inquiry by concluding that "[b]ecause Congress already possesses—in fact, has previously exercised, *see supra* at 16–17—the authority to subpoena Presidents and their information, nothing in the House Rules could in any way 'alter the balance between' the two political branches of government." *Id.* at 59–60 (quoting *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991)). The only evidence presented to support the conclusion that Congress possesses this authority is a citation to the majority's analysis—which, as discussed above, fails to provide a single historical example of a

---

[17] Because I conclude that Congress lacks the authority to issue this subpoena pursuant to the legislative power, it follows that the House could not delegate such authority to the Oversight Committee. *See, e.g.*, *Rumely*, 345 U.S. at 42–43 (in assessing validity of congressional investigation, court must determine "whether Congress had the power to confer upon the committee the authority which it claimed"); *Kilbourn*, 103 U.S. at 196 (committee has "no lawful authority" to investigate if authorizing resolution is "in excess of the power conferred on [the House] by the Constitution").

successful subpoena to investigate a president for legislative purposes. Instead, the majority stitches together a few examples of subpoenas that issued to other officials, investigations of agency administration, presidents voluntarily sharing information with Congress, and one case from our court invalidating the only similar subpoena, which was issued to President Nixon during the Watergate investigations. *Id.* at 16–17; *see also Senate Select*, 498 F.2d at 733. On this flimsy foundation, the majority concludes that it cannot scrutinize the House Rules "absent a substantial constitutional question pertaining to the *House*'s legislative power." Maj. Op. 63.

This conclusion is unsupported by the Supreme Court's decisions in this area, which have required courts not only to consider the scope of legislative power possessed by the House or Senate as a whole, but to inquire specifically whether that power has been delegated to a particular Committee. *See United States v. Rumely*, 345 U.S. 41, 42–43 (1953) ("This issue—whether the committee was authorized to exact the information which the witness withheld—must first be settled before we may consider whether Congress had the power to confer upon the committee the authority which it claimed."); *Watkins*, 354 U.S. at 201 ("An essential premise . . . is that the House or Senate shall have instructed the committee members on what they are to do with the power delegated to them."). This delegation of authority has separate importance because, as the Court has admonished, Congress should not separate power from responsibility. *Watkins*, 354 U.S. at 215.

The scope of delegation particularly matters when Congress seeks to investigate a co-equal branch of government. Requiring a clear statement creates an important form of accountability by giving notice to the executive branch. Accordingly, "[w]henever constitutional limits upon the investigative power of Congress have to be drawn by this Court, it ought only to be done after Congress has demonstrated

its full awareness of what is at stake by unequivocally authorizing an inquiry of dubious limits." *Rumely*, 345 U.S. at 46. We have applied this rule with special force in oversight investigations: "[T]he courts have adopted the policy of construing such resolutions of authority narrowly, in order to obviate the necessity of passing on serious constitutional questions." *Tobin v. United States*, 306 F.2d 270, 274–75 (D.C. Cir. 1962).

Moreover, "[o]ut of respect for the separation of powers and the unique constitutional position of the President," the Court requires "an express statement by Congress" before subjecting the President to legislative restrictions and oversight. *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992); *see also Armstrong*, 924 F.2d at 289. These longstanding interpretive principles recognize that congressional encroachments upon the President raise serious constitutional questions, and courts should not reach out to decide such questions unless Congress squarely raises the issue.[18] One might say Congress does not hide presidents in

---

[18] The ordinary analysis of congressional authorization is somewhat complicated in this case because, after oral argument, the House enacted a resolution ratifying "all current and future investigations, as well as all subpoenas previously issued or to be issued . . . to [*inter alia*] the President in his personal or official capacity." H.R. Res. 507, 116th Cong. (July 24, 2019). The majority, however, does not rely on this Resolution to provide a clear statement, but merely to "confirm" the plain meaning of the House Rules, because all the parties agree that the Resolution does not expand the Committee's jurisdiction. Importantly, the majority properly expresses skepticism and leaves open the question of whether such a resolution can indeed provide a post hoc expansion of a committee's subpoena authority. Maj. Op. 63–64. I similarly decline to speculate about the validity of a resolution that reaches both forwards and backwards in time to authorize investigations of the President. *See Dombrowski v.*

mouseholes. *Cf. Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

Thus, even on the majority's assertion that the House possesses the legislative power to issue this subpoena, the Committee might not. The House Rules may upset the balance of power by failing to provide notice to the President.[19] While courts should properly refrain from micromanaging the House Rules, our precedents require reviewing whether Congress has taken responsibility for pushing up against constitutional limitations. *See Watkins*, 354 U.S. at 205–06. In the novel circumstances of this case, the majority has eviscerated this longstanding principle and essentially collapsed the broader question of constitutional power and the question of a committee's delegated authority.

---

*Burbank*, 358 F.2d 821, 825 (D.C. Cir. 1966) ("Whether this apparently approving action by the full Subcommittee would serve as a *nunc pro tunc* ratification and consequent validation of the subpoena for all purposes, we need not decide."), *rev'd in part on other grounds sub nom. Dombrowski v. Eastland*, 387 U.S. 82 (1967).

[19] Even without applying the clear statement rule, the majority's "natural reading" of the House Rules to include this subpoena is hardly natural, given that for over 200 years the House has declined to investigate the wrongdoing of the President without clearly designating a special committee or resolution for that purpose. That historical backdrop casts significant doubt on the majority's interpretation that a rule making no reference to the President should be read to encompass the President. *See Tobin*, 306 F.2d at 275 ("[I]f Congress had intended the Judiciary Committee to conduct such a novel investigation it would have spelled out this intention in words more explicit than the general terms found in the authorizing resolutions under consideration."); *Barenblatt*, 360 U.S. at 117–18 (noting that a vague House rule may acquire content through its "long history" and the "course of congressional actions").

Another difficulty with the majority's approach is that it focuses on the legislative power in isolation, and therefore proceeds to determine the contours of what legislation could be had in an area rife with constitutional concerns. *See, e.g.*, Letter From Laurence H. Silberman, Acting Att'y Gen., to Rep. Howard W. Cannon, Chairman, H. Comm. on Rules and Administration 4–5 (Sept. 20, 1974) (construing conflicts of interest legislation governing the "executive branch" to apply to the President raises "serious questions of constitutionality" as such legislation could "disable him from performing some of the functions required by the Constitution or [] establish a qualification for his serving as President (to wit, elimination of financial conflicts) beyond those contained in the Constitution"). Responding in part to arguments from the appellants, the majority marches through a very detailed and, in my view, unnecessary analysis of what specific forms of legislation might be possible in this area. Maj. Op. 36–45.

The majority concludes that amendments to "the Ethics in Government Act . . . to require Presidents and presidential candidates to file reports more frequently, to include information covering a longer period of time, or to provide new kinds of information such as past financial dealings with foreign businesses or current liabilities of closely held companies" would pass constitutional muster. *Id.* at 38–39. The majority also affirms that some category of theoretical laws requiring presidents to disclose evidence of potential conflicts of interest and other financial matters constitute a "less burdensome species of laws" than similarly hypothetical laws requiring presidents to divest assets or recuse from conflicted matters. *Id.* at 38. Based on this analysis of the relative constitutionality of as-yet-unenacted laws, the majority informs us that we can comfortably conclude such financial disclosure laws of the future would not "prevent[] the [President] from accomplishing [his] constitutionally assigned functions." *Id.* at 39–40 (alterations in original) (quoting *Nixon*

*v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977)). More troubling still, the majority declares that a statute "facilitating the disclosure of" any payment of "foreign emoluments" to the President would "surely . . . lie[] within constitutional limits," *id.* at 40, notwithstanding the fact that the scope of the Foreign Emoluments Clause is an unresolved question that is currently pending before this court. *See Blumenthal v. Trump*, No. 19-5237, *filed* Sept. 4. 2019 (D.C. Cir.). The majority passes on the constitutionality of a range of different legislative possibilities without a single enacted statute before us.

In the absence of any statute that has run the Article I, section 7, gauntlet, such determinations are advisory at best. The Article III judicial power extends to deciding cases, not applying "statutory litmus test[s]," Maj. Op. 37. From the Founding Era to the present, our courts have refrained from opining on the constitutionality of legal issues outside of a live case or controversy. *See Chamber of Commerce v. EPA*, 642 F.3d 192, 208 (D.C. Cir. 2011) ("To seek judicial review of . . . a contemplated-but-not-yet-enacted [statute] is to ask the court for an advisory opinion in connection with an event that may never come to pass."); Letter from Chief Justice John Jay and the Associate Justices of the Supreme Court to President George Washington (Aug. 8, 1793) (declining the President's request to issue an advisory opinion). I would avoid passing on such questions and simply recognize that an investigation into the illegal conduct of the President is outside the legislative power altogether because it belongs to the House's power of impeachment for high crimes and misdemeanors.

## B.

By allowing the Oversight Committee to use the legislative power to circumvent the impeachment power, the majority substantially disrupts the careful balance between Congress and the other departments. The text and structure of the Constitution, along with unbroken historical practice, make

plain the importance of maintaining a line between these distinct investigative powers—one ancillary to the legislative power, and the other an exercise of the House's judicial power of impeachment. The concerns underlying the distinction are fundamental and no mere anachronism.

To begin with, permitting this subpoena allows Congress to use its substantial legislative power to gather information that may be used for impeachment without the protections inherent in an impeachment investigation or proceeding. Impeachable officials are protected from ill-considered exercises of this power through careful constitutional design. The Constitution divides the impeachment and removal powers between the House and Senate, U.S. CONST. art. I, § 2, cl. 5; art. I, § 3, cl. 6; limits the scope of impeachable offenses, U.S. CONST. art. II, § 4; and provides for limited punishments upon conviction by the Senate, U.S. CONST. art. I, § 3, cl. 7. Senate trials of impeachment are an exercise of judicial power and have always been understood to include constitutional and common law protections similar to what might be available in the judicial context. *Marshall*, 243 U.S. at 546–48; *Kilbourn*, 103 U.S. at 191; Jefferson's Manual §§ 592, 619 ("The trial . . . differs not in essentials from criminal prosecutions before inferior courts."); 3 Hinds § 2486 ("[S]uch rules must be observed as are essential to justice." (quoting Op. Att'y Gen. of May 9, 1796)); 2 Story § 796 ("[T]he same rules of evidence, the same legal notions of crimes and punishments prevail.").

Allowing the use of legislative power to reach illegal conduct undermines the protections afforded to officials being investigated for impeachable offenses. These protections are essential given the obvious harms to the reputation and honor of officials targeted through the very public process of impeachment. *See* The Federalist No. 65, at 338 ("The delicacy and magnitude of a trust which so deeply concerns the political

reputation and existence of every man engaged in the administration of public affairs, speak for themselves.").

Moreover, expanding the legislative power to include investigations of illegal conduct eviscerates Congress's accountability for impeachment. Such accountability is an essential protection for the People, who elect the President as well as Members of Congress, and thus have an undeniable stake in any congressional targeting of the Chief Executive and his chosen officers. The majority allows Congress to evade public accountability by permitting investigations of the President for illegal conduct outside the "grave and weighty" impeachment process. *See* Maj. Op. 47. With impeachment, the Constitution unites power with responsibility. Impeachment and removal are Congress's "sword of Damocles," but the House and Senate must pay a political price for using these powers. William H. Rehnquist, Grand Inquests 270 (1992); *see also* Gerhardt, The Federal Impeachment Process 57 ("[T]he framers deliberately made the impeachment process cumbersome in order to make impeachment difficult to achieve."); O'Sullivan, *Impeachment and the Independent Counsel Statute*, 86 GEO. L.J. at 2229–30 ("The Framers intentionally designed the impeachment device to make its successful invocation difficult in order to ensure that civil officers would not be unduly dependent upon the legislative branch.").

The House and Senate have consistently maintained the importance of this responsibility and explicitly invoked the impeachment power when pursuing official wrongdoing. *See, e.g.*, 3 Hinds § 2400 (opening Johnson impeachment inquiry); H.R. Res. 803, 93d Cong. (opening Nixon impeachment inquiry); H.R. Res. 581, 105th Cong. (opening Clinton impeachment inquiry). Presidents since George Washington have declined demands to produce documents for legislative purposes, while acknowledging that the same request pursuant

to the impeachment power might be treated differently. *See supra* Part II; *see also Position of the Executive Department Regarding Investigative Reports*, 40 Op. Att'y Gen. 45, 51 (1941) (Attorney General Robert Jackson declining to provide information to Congress about pending FBI investigations, but noting that "pertinent information would be supplied in impeachment proceedings").[20]

Overlooking the special procedures and accountability attendant to an impeachment proceeding, the district court conflated the legislative and judicial powers of the House. With no support in the text, structure, or history of the Constitution, the district court cited the impeachment power to bootstrap a more expansive legislative power to investigate individual wrongdoing: "It is simply not fathomable that a Constitution that grants Congress the power to remove a President for reasons including criminal behavior would deny Congress the power to investigate him for unlawful conduct—past or present—even without formally opening an impeachment inquiry." *Trump*, 380 F. Supp. 3d at 95.

The district court suggests that the greater power of impeachment and removal must include the lesser legislative power to investigate illegal actions by the President. Yet the Constitution is not designed this way. The greater power does not include the lesser in a Constitution that explicitly vests Congress with limited and enumerated legislative powers and

---

[20] As the Committee has not relied on the impeachment power for this subpoena, I do not consider whether or how this court would assess such a demand for documents under the impeachment power. I simply note that Congress, the Executive, and the courts have maintained that requests under the legislative and impeachment powers may be treated differently. *See, e.g.*, *Kilbourn*, 103 U.S. at 193 (were the investigation related to impeachment, "the whole aspect of the case would have been changed").

then provides for a wholly separate impeachment power with different objects, processes, and limits. It is not only fathomable, but essential, that the impeachment and legislative powers remain distinct. The power of impeachment does not somehow expand the power to investigate for legislative purposes.

The majority similarly recognizes no separation between the House's judicial and legislative powers. But once the boundary between the legislative and judicial powers is breached, it is hard to discern any limit to the reach of the legislative power of investigation. Perhaps the functionalist approach to reading the Constitution has obscured the essential core of the constitutional powers vested in each of the three branches. The legislative power focuses on prospective, general rules for governing society. One thing it has never been is the power to reconstruct and punish individual actions, whether of private individuals or public officials. Private and public individuals are protected by the Bill of Attainder Clauses, U.S. CONST. art. I, § 9, cl. 3; art. I, § 10, cl. 1, and Congress may pursue the high crimes and misdemeanors of impeachable officials exclusively through the impeachment power, U.S. CONST. art. I, § 2, cl. 5; art. I, § 3, cl. 6.

Thus, it should be startling when the majority asserts it is a "quintessentially legislative judgment that some concerns about potential misconduct are better addressed through . . . legislation than impeachment." Maj. Op. 49. The majority argues in effect that Congress must be able to choose to target the wrongdoing of the President through its legislative powers, instead of impeachment. If this does not quite sanction a bill of attainder, it comes awfully close. The majority's assertions that Congress can simply choose between legislation and impeachment when the President's wrongdoing is at issue are unsupported by any constitutional provision and provide no rebuttal to the remarkably consistent historical understanding,

which demonstrates that both the executive branch and Congress, despite their conflicting interests, have steadfastly maintained the necessity of pursuing wrongdoing of public officials through impeachment.

The majority attempts to bolster its argument by referencing a functional separation of powers and citing to interpretations of Madison's statement in Federalist 47 that the separation of powers "do[es] not mean that these departments ought to have no *partial agency* in, or no *control* over, the acts of each other." *Id.* at 43 (citing *Clinton v. Jones*, 520 U.S. 681, 702–03 (1997), and *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. at 442–43). Yet Madison's words are being taken out of context. In Federalist 47, Madison makes this statement when interpreting Montesquieu's theory of separation of powers. *See* The Federalist No. 47, at 251 (James Madison). Madison's primary point is that "[n]o political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty," than the maxim that "the legislative, executive, and judiciary departments, ought to be separate and distinct." *Id.* at 249. The general rule of the Constitution is separation of powers—but the Constitution includes certain specific exceptions to the general rule, such as requiring the advice and consent of the Senate in the appointment of executive officers, or placing the judicial power of impeachment in the House and Senate. These exceptions reinforce the system of checks and balances and "provide some practical security for each, against the invasion of the others." The Federalist No. 48, at 256–58 (James Madison). Madison explains at length the deliberate structure of the Constitution, which permits overlap or sharing of powers for limited purposes without collapsing any one branch into dependence on another.

The exceptions to the separation of powers, however, have never been mistaken as a rule of flexible blending of powers

for the sake of convenience or expediency. To the contrary, the Court has read the exceptions narrowly and interpreted them to reinforce the constitutional limits that separate the three powers of the federal government. *See Myers*, 272 U.S. at 116 ("[T]he reasonable construction of the Constitution must be that the branches should be kept separate in all cases in which they were not expressly blended, and the Constitution should be expounded to blend them no more than it affirmatively requires."). The majority alleges that this dissent "would reorder the very structure of the Constitution," Maj. Op. 49, but provides no analysis of the Constitution to support its assertion. Similarly, the majority offers no evidence from the original meaning, historical practice, or our judicial precedents for its contrived claim that Congress can simply choose to use either the legislative or impeachment powers when investigating the President for violations of the law.

Instead, the majority chooses to march out a parade of horribles about what might happen if Congress were unable to investigate illegal conduct under its legislative power. *Id.* at 46–47, 48–49. Contrary to the majority's ahistorical alarm, maintaining the separation of the legislative and impeachment powers will in no way prevent the House from continuing to pursue remedial legislation. I do not question the longstanding recognition that Congress possesses the ability to investigate as necessary and proper to effectuate the legislative power. Such investigations can provide important and salutary oversight of administration of the laws and study the basis for new legislation. Yet targeting officials for impeachable offenses must proceed, and always has proceeded, through the impeachment power.

Thus, there is no "Hobson's Choice" here between impeachment or nothing, *id.* at 49, because whether the House moves forward with impeachment or not, Congress retains all of the legislative powers it has under the Constitution to

introduce and enact legislation. The fact that Congress cannot reconstruct "whether and how" the President violated the law as part of the legislative power does not "strip[] Congress of its power to legislate." *Id.* Indeed, frustration with lack of access to documents might prompt Congress to attempt legislation that requires such disclosure in the future, and similar legislation has already been proposed. *See, e.g.*, H.R. 1, 116th Cong., §§ 8012, 8013 (2019) (increasing stringency of presidential corporate financial disclosure requirements). To treat an inquisitorial power as essential to legislation is to misunderstand the legislative power in the context of our constitutional system of separated powers. The Committee cannot use a legislative purpose to circumvent the House's power to serve as the grand inquest of the nation when investigating the illegal conduct of the President.

## C.

Allowing the legislative power to reach investigation of impeachable offenses provides Congress with a new bludgeon against the Executive, making it all too easy for Congress to encroach on the executive branch by targeting the President and his subordinates through legislative inquiries. *See Nixon v. Fitzgerald*, 457 U.S. 731, 743 (1982) (a "special solicitude [is] due to claims alleging a threatened breach of essential Presidential prerogatives under the separation of powers"). The majority incorrectly asserts "no party argues that compliance with the subpoena would impair the President's execution of the Article II power." Maj. Op. 46; *see also id*. at 64–65. To the contrary, both the Trump plaintiffs and the Department of Justice argue that this subpoena may "distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." Appellants Reply Br. 3 (quoting *Fitzgerald*, 457 U.S. at 753); *see also* DOJ Br. 6 ("[C]ongressional committees may issue successive subpoenas in waves, making far-reaching

demands that harry the President and distract his attention." (citing *Rumely*, 345 U.S. at 46)). The majority repeatedly states that the precedents allow Congress to choose between the legislative and impeachment powers, but only where "no intrusion on the President's execution of his official duties is alleged." Maj. Op. 46; *see also id*. at 45. Yet contrary to the majority's assertions, both the Department of Justice and the President have alleged that the subpoena encroaches on the executive power, which substantially undermines the majority's premise.

By allowing any claim of a remedial legislative purpose to justify an investigation into the "illegal conduct" of the President, the majority effectively expands the already expansive legislative power. *Cf. Brewster v. United States*, 255 F.2d 899, 901 (D.C. Cir. 1958) (rejecting an interpretation that "for all practical purposes, would give the Committee on Government Operations jurisdiction to investigate virtually every activity engaged in by every person in the land"). Pursuant to its legislative powers, Congress already has substantial leeway to investigate how executive officers are administering their duties. Yet allowing Congress to use the legislative power to investigate individual officials for unlawful conduct takes "oversight" to a whole new level. The Constitution provides in effect that Congress cannot reach such allegations by "side-blows," Cong. Globe, 29th Cong., 1st Sess. 641 (1846) (statement of Rep. Adams), but must instead proceed through impeachment. *Cf. Morrison v. Olson*, 487 U.S. 654, 713 (1988) (Scalia, J., dissenting) ("How much easier it is for Congress, instead of accepting the political damage attendant to the commencement of impeachment proceedings against the President on trivial grounds . . . simply to trigger a debilitating criminal investigation of the Chief Executive.").

Unhindered by the constitutional mechanisms of accountability, Congress can expand its incursions against the

Executive. As Madison cautioned, Congress's "constitutional powers being at once more extensive, and less susceptible of precise limits, it can, with the greater facility, mask under complicated and indirect measures, the encroachments which it makes on the co-ordinate departments." The Federalist No. 48, at 257; *see also Zivotofsky*, 135 S. Ct. at 2096 ("It was an improper act for Congress to 'aggrandize its power at the expense of another branch.'" (quoting *Freytag v. Comm'r*, 501 U.S. 868, 878 (1991))).

The majority takes a narrow view of potential harms to the executive branch—suggesting that such harms result largely from the inconvenience of the President having to produce documents or make copies himself. Maj. Op. 34–35, 65. Yet using the legislative power to target and uncover illegal conduct by executive officials provides Congress with an additional form of control over executive officials who otherwise must be within the direction and control of the President. *See* U.S. CONST. art. II, § 1, cls. 1, 8; art. II, § 3; *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 493 (2010) (invalidating restrictions on the removal power that would "impair[]" the President's "ability to execute the laws [] by holding his subordinates accountable for their conduct"); *Myers*, 272 U.S. at 163–64 ("[A]rticle 2 grants to the President the executive power of the government, i. e., the general administrative control of those executing the laws."). The President cannot "take Care that the Laws be faithfully executed," U.S. CONST. art. II, § 3, if his subordinates are exposed to inquisitorial jeopardy through the ordinary legislative power.

Under the majority's decision, Congress may choose to launch investigations of illegal conduct under the legislative power—a choice that under the current rules may be implemented by a single committee chairman without the accountability and deliberation that precede impeachment. And

while this case deals only with a single subpoena, the recognition of a wholly unprecedented power to investigate shifts the balance between the branches and may unleash additional subpoenas against the President or his subordinates, which "may, like a flicking left jab, confound the Executive Branch in dealing with Congress." *In re Sealed Case*, 838 F.2d 476, 508 (D.C. Cir. 1988) (Silberman, J.), *rev'd sub nom. Morrison v. Olson*, 487 U.S. 654 (1988).

While congressional oversight investigations may probe a wide range of matters and often are no picnic for executive officials, such investigations may proceed ancillary to the legislative power. Allegations and reconstructions of illegal conduct, however, are an entirely different matter. If a congressional committee can invoke a legislative purpose to subpoena information targeting unlawful actions by the President, imagine the peril for other officers who lack the ability to fend off such requests and cannot depend on the visibility and public mandate that follow the President. *Cf. Morrison*, 487 U.S. at 713 (Scalia, J., dissenting) ("[A]s for the President's high-level assistants, who typically have no political base of support, it is [] utterly unrealistic to think that they will not be intimidated by this prospect [of an independent counsel], and that their advice to him and their advocacy of his interests before a hostile Congress will not be affected . . . . It deeply wounds the President, by substantially reducing the President's ability to protect himself and his staff."). The prospect of a Congress that can use the legislative power, rather than impeachment, to reach illegal conduct of executive officers could very well "weaken the Presidency by reducing the zeal of his staff." *Id*.

\*\*\*

Allowing Congress to investigate impeachable officials for suspicions of criminality pursuant to the legislative power has serious consequences for the separation of powers because

it allows Congress to escape the responsibility and accountability inherent in impeachment proceedings. Congressional aggrandizement in this case comes at the expense of the Executive, which no longer can rely on procedural protections when Congress, or a single committee chairman, determines to investigate unlawful activity of the President. The House's overreaching also comes at the expense of the People, who established a Constitution with specific processes for electing both Members of Congress and the President and which provides only one way for Congress to punish and remove the President.

## V.

The familiar tale recounted by the majority describes a general arc of expanding legislative powers and the accompanying recognition of Congress's power to investigate ancillary to those powers. Yet the more specific story here pertains to the fundamental separation between the legislative and judicial powers of Congress. When the House chooses to investigate the President for alleged violations of the laws and the Constitution, it must proceed through impeachment, an exceptional and solemn exercise of judicial power established as a separate check on public officials. This constitutional principle was articulated by George Washington in 1796 and by the House in 1998: "The Constitution contains a single procedure for Congress to address the fitness for office of the President of the United States—impeachment by the House, and subsequent trial by the Senate." H.R. Rep. No. 105-830, at 137 (report of the House Judiciary Committee recommending articles of impeachment).

The Constitution and our historical practice draw a consistent line between the legislative and judicial powers of Congress. The majority crosses this boundary for the first time by upholding this subpoena investigating the illegal conduct of the President under the legislative power. I respectfully dissent.